CALIFORNIA STATE DEPARTMENT OF INSURANCE
LEGAL DIVISION
Enforcement Bureau – San Francisco
CINDY A. OSSIAS, Bar No. 111021
Senior Staff Counsel
45 Fremont Street, 21st Floor
San Francisco, CA 94105
Telephone: (415) 538-4124
Facsimile: (415) 904-5490

Attorneys for the Insurance Commissioner

# BEFORE THE INSURANCE COMMISSIONER
## OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the<br>Certificates of Authority of<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, and<br><br>THE PAUL REVERE LIFE INSURANCE COMPANY,<br><br>Respondents. | ACCUSATION<br><br>(Cal. Ins. Code, §§ 700, 704)<br><br>File No. DISP05045984<br><br>File No. DISP05045985<br><br>File No. DISP05045986 |

WHEREAS, the Insurance Commissioner of the State of California (hereafter, "the Commissioner") has reason to believe that the above Respondents have engaged in or are engaging in this State in the practices set forth below, each falling within Sections 700 and 704 of the California Insurance Code;

WHEREAS, the Insurance Commissioner has reason to believe that a proceeding with respect to the alleged acts of Respondents would be in the public interest;

NOW, THEREFORE, and pursuant to the provisions of Sections 700 and 704 of the California Insurance Code, it is alleged as follows:

-1-

EXHIBIT "B"

I.

## JURISDICTION AND BACKGROUND

Respondents UNUM LIFE INSURANCE COMPANY OF AMERICA ("Unum"), PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY ("Provident"), and PAUL REVERE LIFE INSURANCE COMPANY ("Paul Revere") (all three collectively, "Respondents"), are, and at all relevant times have been, holders of Certificates of Authority issued by the Commissioner and are authorized to transact insurance business in California.

Unum is a Maine corporation licensed in the State of California to transact disability insurance, which includes disability income insurance as defined in Section 10147(a) of the California Insurance Code.

Provident is a Tennessee corporation licensed in the State of California to transact disability insurance, which includes disability income insurance as defined in Section 10147(a) of the California Insurance Code.

Paul Revere is a Massachusetts corporation licensed in the State of California to transact disability insurance, which includes disability income insurance as defined in Section 10147(a) of the California Insurance Code.

In the 1980s, Provident and its competitors were enjoying a growth-oriented market environment, earning high interest rates on their surpluses. They became highly competitive with each other by liberalizing policy provisions and underwriting. The primary product offered in the marketplace during that period was a disability income policy with quite liberal terms. Specifically, the policies sold could not be canceled, their premiums could not be raised, and their coverage applied to disability from performing the individual insured's *own occupation* for life or some shorter period, at the insured's option, in the event of total disability (with alternative coverages available for partial disability).

According to the law in California, "total disability" is defined as a disability that renders one unable to perform with reasonable continuity the substantial and material acts necessary to pursue his or her usual occupation in the usual or customary way or to engage with reasonable

continuity in another    station in which he or she could reasonably be expected to perform satisfactorily in light of his or her age, education, training, experience, station in life, physical and mental capacity. *Moore v. American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 632; *Hangarter v. Provident Life & Accident Ins. Co.*, (2004) 373 F.3d 998, 1006. As the industry evolved in the 1980s and 1990s, the first part of the above-definition was applied as the total disability definition under an 'own occupation' (hereafter, "own-occ") policy and both parts together were applied under a general or "any occupation" ("any-occ") policy.

The target market for the own-occ policies was the upper income professional – 35% of the sales were made to physicians – thus the benefits offered were high.

In the early 1990s, interest rates fell and claims started coming in on those liberal policies. In 1993, Provident hired banking and investment executives to run the company, and retained consultants to evaluate the disability income side of its business in an effort to rectify the increasingly unprofitable situation.

Out of the consultants' reports came recommendations for "reengineering" the entire disability income book of business on the claims end. Among the recommendations were both revisions of policy provisions and "claims initiatives" that would lead to a fundamental change in corporate culture, with an emphasis on "claims management" instead of "claims payment."

Regarding changes in policy language or its interpretation, for example, the consultants noted, "When combined with minimal defenses and exclusions, changing societal norms and inadequate pricing, overly generous terms resulted in the diminished profitability of Provident's IDI [individual disability income] book of business." Among other things, the consultants recommended that Provident:

• discontinue provisions offering guaranteed life-long renewal benefits, limiting guaranteed renewal or premium benefits to age 65;

• institute a mandatory rehabilitation clause in all general (i.e., any-occ as opposed to own-occ) IDI products;

-3-

• where the po____ ___tes that a rehabilitation program paid for by Provident "may be designed to help you return to work," the word "work" should not be construed mean 'any work' but should be tied to the 'own-occ' coverages in the policy (i.e., it should be construed very narrowly, to mean the insured's own occupation only), thus rendering a decision to deny payment for the rehab program reasonable.

Regarding mental and nervous condition claims, the consultants recommended, among other things, that Provident

• continue to vigorously change "corporate culture," i.e., "[m]ake the adjuster – not the attending physician – the expert on the claimant's condition, the proper treatment and how those aspects of a claim are connected to the insurance policy at issue. Build upon these changes to use the 'subjective' nature of mental and nervous claims to the Company's advantage . . ."

• have insureds under 'own-occ' policies sign side agreements that would "effectively convert the voluntary provisions [of the policy] to a mandatory provision;

• utilize in-house lawyers to protect claims-handling functions from disclosure in the event of a denial;

• earmark high value claims for reevaluation.

Internally, a task force was established to, among other things, "initiate active measures to get new and existing policies covered by ERISA" (Employee Retirement Income Security Act of 1974, 29 U.S.C. §1134) where, it was noted, "state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of benefit in question, and claims administrators may receive a deferential standard of review. . . ." – where, in short, the "economic impact on Provident . . . could be significant." One of the measures planned and implemented was the inclusion of "endorsement" language in the payroll deduction agreements used at the point of policy sale. Payment of premium by payroll deduction or salary allotment is not enough in itself to subject a policy to ERISA jurisdiction; the policy must be employer-endorsed or -sponsored.

Provident beg      implement most of the recommended changes immediately thereafter, and by 1997 had completed a comprehensive corporate restructuring designed to sharpen the corporation's strategic focus on disability income insurance.

In 1997, Provident acquired Paul Revere and revised Paul Revere's claims handling procedures to comport with its own.

In 1999, Provident merged with Unum, formed a new holding company under the name, UNUMPROVIDENT CORPORATION ("UnumProvident"), and revised Unum's claims handling procedures to comport with its own. Unum is the largest subsidiary of UnumProvident. The approximate size of UnumProvident's "capital & surplus" is $4.6 billion as of this writing.

## II.

## INVESTIGATION

In January 2003, the Insurance Commissioner of the State of California, having had cause to believe that Unum, Provident and Paul Revere had been engaged and still were engaging in this State in practices in violation of Section 704 (among others) of the California Insurance Code, ordered that an investigation be conducted into the business practices of these insurers.

The investigation included (1) an examination of Respondents' claims settlement practices; (2) an examination of Respondents' rating and underwriting practices; (3) a survey of consumer complaints received by the California Department of Insurance (CDI) in the most recent years prior to the start of the investigation; (4) independently conducted interviews of percipient witnesses and experts by CDI investigative staff and legal counsel; (5) a review of facts and, where available, published or unpublished appellate decisions in cases tried before and decided by civil juries; and (6) a review of evidence admitted in those civil trials. Among the civil cases considered were *Hangarter v. The Paul Revere Life Ins. Co.*, (2004) 373 F.3d 998, 1006; *Chapman v. UNUMProvident Corp.*, CV012323 (Marin County Super.Ct., verdict Jan. 23, 2003); *Hale v. Provident Life & Accident Ins. Co.*, A092548, A092833, Ct. of Appeal, First Dist., Div. Two, 2003 Cal. App. Unpub. LEXIS 2859; *Patrick v. UNUM Life Ins. Co. of*

1  Alameda, Superior C____ _unty of San Mateo (Tried to the Court    Statement of Decision filed

2  June 22, 1995, and Corrected Judgment on Statement of Decision filed August 10, 1995) and

3  *Ganzich v. UnumProvident Corp.*, USDC Case No. EDCV 02-00360-VAP (SGLx).

4       The Department initially had conducted a routine on-site examination of the companies at

5  their collective claims administration office in Glendale, California.  This examination included

6  closed claims for the period February 1, 2001 through January 31, 2002, under policies of group

7  and individual life insurance, group life and special risk accident death & dismemberment

8  insurance, long term care insurance, and group and individual disability income insurance (GDI

9  and IDI).

10       When the Commissioner ordered that an investigation be conducted, a targeted review of

11  open and closed IDI and GDI claim files was added to the on-site examination of the companies,

12  with a window period of January 1, 2000 through June 30, 2003.  Files then were added relating

13  to Independent Medical Examination (IME) and vocational rehabilitation assessments.

14       Additionally, the examination included a review of (1) the guidelines, procedures,

15  training plans and forms adopted by the companies for use in California, including any

16  documentation maintained by the companies in support of positions or interpretations of the

17  California Unfair Practices Act (the "Act") (Cal. Ins. Code, §790 et seq.) and the Fair Claims

18  Settlement Practices Regulations (the "Regulations") (10 Cal. Code Reg., §2695.1 et seq.), and

19  (2) the application of those guidelines, procedures, forms and interpretations, by means of an

20  examination of claims files and related records.

21       Incorporated by reference in its entirety herein is the *Public Report of the Market

22  Conduct Examination of the Claims Practices of the Unum Life Insurance Company of America,

23  Provident Life and Accident Insurance Company, and The Paul Revere Life Insurance Company

24  as of June 30, 2003.*

25       In the initial review, the examiners cited 151 violations of the Act and the Regulations in

26  the non-GDI and non-IDI files.  In the total number of IDI and GDI claim files reviewed in both

27  exams, the examiners cited 150 violations of the Act and/or Regulations.

28

Violations of ... ere of Section 790.03.b (1), 2 and 5, of the Act and of the
Regulations, the following:

- §§2695.3 (a) and (b)(2 ;
- §§2695.4(a) and (e);
- §§2695.5(b), (e)(1) and (e)(3);
- §2695.6(a);
- §§2695.7(b)(1) and (3), (d), (f) and (g); and
- §2695.11(b).

Concurrently with the targeted Field Claims examination, CDI staff counsel conducted an off-site examination of 68 of Respondents' litigated disability income claim files, finding potential violations of Insurance Code section 790.03(h)(3), (6) and (7), in many of the files.

The Claims Services Bureau (CSB) of the Department of Insurance reviewed 454 Requests for Assistance ("complaints") submitted to the Department concerning claims disputes with Unum, of which 421 concerned disability income benefits. Of these, 254 complaints alleged improper denial or termination of benefits. The complaint files reviewed were closed by CSB between January 1, 2000, and December 31, 2002.

CSB reviewed 47 complaints against Paul Revere, of which 38 concerned disability income benefits. Of these, 31 complaints – 17 insured under individual policies and 14 under group – alleged improper denial or termination of benefits. The complaint files reviewed were closed by CSB between January 1, 2000, and December 31, 2002.

CSB reviewed 113 complaints against Provident, of which 63 concerned disability income benefits. Of these, 35 complaints alleged improper denial or termination of benefits. The complaint files reviewed were closed by CSB between January 1, 2000, and December 31, 2002.

//
//
//

III.

## ALLEGATIONS

It is alleged that Respondents have knowingly engaged in the following conduct in violation of Sections 790 and 704 of the California Insurance Code:

A.    "Disability" Definition and Proof Issues

•    Defining "total disability" in claims handling in a manner inconsistent with the definition of "total disability" set forth in California case law;

•    Failing to inform the IME of the legal definition of "total disability" or of the specific job duties of the claimant's occupation;

•    Pressuring attending physicians for a finding of partial disability on meritorious total disability claims.

•    Failing to train claims personnel adequately or correctly on California's legal definition of "total disability," on how properly to conduct an evaluation of a claimant's occupational duties, and on other policy provisions;

•    Defining a person's regular occupation as that which is "normally performed in the national economy" (using the Dictionary of Occupational Titles (DOT) from the U.S. Dept. of Labor or deciding for itself how the occupation is performed in the national economy) instead of as how the substantial and material duties of the job are performed for a specific employer or at a specific location (as the policy was sold), thus rendering coverage potentially illusory or, at best, treating an "own-occ" policy as if it were an "any-occ" policy;

•    Ignoring "national economy" descriptions of an occupation when it is advantageous to the company (e.g., in nursing occupations);

•    Targeting nurses' claims for termination or denial, mischaracterizing their nonsedentary jobs as sedentary, and requiring them to find work in sedentary nursing occupations (e.g., as a utilization review nurse) even during the "own occupation" period;

•    Targeting medical specialists' claims for termination or denial, then determining predominantly through a 'billing analysis' that the medical specialist could continue in his or her

occupation even if unable to perform the specialty itself ... ., surgery; deliverables; chiropractic);

- Applying an incorrect description of the claimant's occupation in determining that the claimant is not disabled from performing the occupation's substantial and material duties;

- Selectively using portions of the medical history and IME findings to the company's own advantage, at the claimant's expense;

- Using pressure tactics on the attending physician to, among other things, get the doctor to agree to an estimated return-to-work date or to state that the insured could return to work in some capacity;

- Misapplying the partial and/or residual disability provisions in the policy;

- Inappropriately using aggressive surveillance on a claimant and misusing the results;

**B.     Discretionary Authority**

- Including a clause that confers unlimited discretion on the company in interpreting policy language, requiring an "abuse of discretion" standard of review if a lawsuit ensues;

**C.     Self-Reported Conditions**

- Characterizing certain disabling conditions as "self-reported" (e.g., pain, limited range of motion, weakness), accepting only objective test results to support disability, and sometimes using the concept to invalidate objective medical evidence in the file, thus limiting payment of benefits under the "self-reported conditions" policy provision;

- Not having the IME perform objective testing that might support the symptoms, or ignoring objective test results that support disability;

- Discounting both Functional Capacity Evaluation (FCE) results and IMEs that support disability, with little or nothing in the record to support the decision;

- Discounting objective test results by stating the results cannot predict disability or by imputing the disabling condition to a "psychological component" (thus triggering the "mental or nervous condition" limitation);

//

-9-

D.    Mental and Nervous Conditions

• Utilizing a policy provision limiting the "mental and nervous conditions" benefit 24-months to unreasonably limit the time benefits are paid for physiologically-based disabilities that may or may not have a psychological component;

• Categorizing a disability as being limited by the "mental or nervous conditions" benefits 24-month limitation period when the disability is physiologically based and/or had its inception in a physical disability, and terminating benefits that were being paid for a physical disability;

• Discounting objective test results by stating the results cannot predict disability or by imputing the disabling condition to a "psychological component" (thus triggering the "mental or nervous condition" limitation);

E.    Pre-Existing Conditions

• Including language in group policies that excludes coverage for pre-existing conditions "caused by, contributed to [by], or related to the disabling condition" and for "symptoms for which diagnostic treatment was performed or symptoms for which a prudent person would have sought treatment," so that a disabling condition would not have to have been diagnosed, treated or even in existence during the policy's pre-existing condition period for it to be excluded from coverage, the policies therefore providing potentially illusory coverage;

• Misapplying the pre-existing condition clause to deny meritorious claims; e.g., characterizing obesity as the pre-existing condition for a previously unsymptomatic, undiagnosed and untreated musculoskeletal, cardiovascular, peripheral vascular, pulmonary or orthopedic disability;

F.    Offsets

• Offsetting for benefits that it is estimated the claimant might receive, instead of only for those benefits actually received by the claimant and appropriately offset under the law;

• Stating in correspondence to the claimant that the claimant must apply for Social Security Disability Income (SSDI) benefits in order to receive an unreduced benefit, when no such duty exists in the policy;

G.    Vocational Rehabilitation

•    Imposing a duty to participate in vocational rehabilitation on a claimant where such duty exists in the policy;

•    Developing a vocational rehabilitation program consisting of no more than looking for a job in a different occupation, then terminating benefits when the claimant cannot look for another job because the claimant is unable to work at all;

H.    Survivor Benefits

•    Including a more restrictive policy definition of "eligible survivor" than exists in statutory language, such that no benefits are payable if there are no surviving spouse, no surviving child under 25, and no estate is formed;

I.    Miscellaneous Claims Handling Issues

•    Targeting claims for "resolution" (i.e., for denial or termination of benefits) based on company economics instead of the claim's merits, e.g., high benefit, noncancellable long term disability income policies previously heavily marketed, which had become costly for the company through claims;

•    Failing to document claim files regarding the so-called "roundtable" sessions at which substantive claims decisions were made;

•    Placing claimants in the position of either having to sign an overly broad authorization form – thus giving up the right to privacy in financial and credit scoring records in claims in which such records may be neither necessary nor material to resolution of the claims – or having to alter the form/refuse to execute the form and risk claim denial;

•    Failing to refer the claimant to CDI in the event the claimant believes his or her claim has been denied or benefits terminated unfairly;

•    Placing the burden of investigating the claim on the claimant (e.g., imposing unreasonable documentation obligations on the claimant) and failing to fulfill its duty to adequately investigate;

•    Misrepresenting to claimants under individual or government employer-sponsored group policies that ERISA preemption applies and thereby limits a claimant's rights on appeal;

-11-

2 Offering a ... deduction/salary allotment option for ... ment for individ. insureds, then asserting that the policy is employer-sponsored or employer-endorsed, thus governed by

3 ERISA;

4 • Overruling the opinion of attending physicians after the company's in-house physician or

5 nurse has conducted only a "paper review" of the medical file;

6 • Overruling the opinion of in-house medical personnel that supported disability or the need

7 for specific objective testing;

8 • Continuing to seek additional information where claimants provided adequate proof of

9 disability;

10 • Offering adjusters "incentives" or "rewards" for closing files;

11 • Paying a claim under a reservation of rights (sometimes for many years), then terminating

12 benefits and notifying the claimant of the company's intent to recover the benefits paid, thus

13 creating undue stress on the claimant in order to compel settlement for less than the amount due

14 under the policy;

15 • Failing to disclose to the claimant additional benefits that might be available under the

16 policy, e.g., a waiver of premium, a cost of living endorsement, a seat belt benefit;

17 • Compelling a claimant to accept an unreasonably low settlement offer through the above

18 means and others, or resort to litigation;

19

20                                   IV.

21                             CONCLUSION

22 A.    California Insurance Code, section 704(a)

23        The facts alleged above show that Respondents have conducted their business

24 fraudulently, constituting grounds for the Insurance Commissioner to suspend the Certificates of

25 Authority of Respondents for a period not to exceed one year, pursuant to Section 704(a) of the

26 Insurance Code.

27 //

28

3.    California Insurance Code, section 704.5.

The facts alleged above show that Respondents have failed to carry out their contracts in good faith, constituting grounds for the Insurance Commissioner to suspend the Certificates of Authority of Respondents for a period not to exceed one year, pursuant to Section 704.5 of the Insurance Code.

C.    California Insurance Code. section 704(c)

The facts alleged above show that Respondents have habitually and as a matter of ordinary practice and custom compelled claimants under policies to either accept less than the amount due under the terms of the policies or resort to litigation against Respondents to secure the payment of the amount due, constituting grounds for the Insurance Commissioner to suspend the Certificates of Authority of Respondents for a period not to exceed one year, pursuant to Section 704(c) of the Insurance Code.

D.    California Insurance Code, section 700(c)

The facts alleged above show that Respondents have failed to comply with the requirements as to their business set forth in the California Insurance Code, constituting grounds for the Insurance Commissioner to revoke the Certificates of Authority of Respondents, pursuant to Section 700(c) of the Insurance Code.

Dated: October 1, 2005

JOHN GARAMENDI
Insurance Commissioner

By _____

CINDY A. OSSIAS
Senior Staff Counsel

-13-