BEFORE THE INSURANCE COMMISSIONER
OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the<br>Certificates of Authority of | DECISION AND ORDER OF INSURANCE<br>COMMISSIONER UPON SETTLEMENT |
| UNUM LIFE INSURANCE COMPANY<br>OF AMERICA, | File No. DISP05045984 |
| PROVIDENT LIFE AND ACCIDENT<br>INSURANCE COMPANY, and | File No. DISP05045985 |
| THE PAUL REVERE LIFE INSURANCE<br>COMPANY, | File No. DISP05045986 |
| Respondents. | |

WHEREAS, the Insurance Commissioner ordered an investigation be conducted into the business practices of Respondents, including an on-site examination of Respondents' claims, rating and underwriting practices; and

WHEREAS, Respondents acknowledge receipt of a copy of the Accusation in the above-entitled matter; and

WHEREAS, Respondents neither admit nor concede any actual or potential fault, wrongdoing or liability in connection with the allegations contained in the Accusation; and

WHEREAS, the Department of Insurance contends that the violations alleged in the Accusation, if heard and proved, would constitute grounds for the Insurance Commissioner to suspend Respondents' Certificates of Authority, impose civil penalties and issue an order prohibiting Respondents from engaging in the conduct at issue; and

WHEREAS, Respondents and the Department of Insurance have undertaken extensive discussions to resolve the issues in this proceeding, without either party admitting the other's

#331573v3

EXHIBIT "D"

contentions, through compromise settlement without litigating the issues; and

WHEREAS, Respondents and the Department of Insurance have executed the California Settlement Agreement (CSA) attached hereto and incorporated by reference herein, and

WHEREAS, the terms of the CSA and the provisions of Section 12921(b)(1) of the Insurance Code require the Insurance Commissioner to approve the settlement of this matter; and

WHEREAS, this Decision and Order constitutes the approval of the Insurance Commissioner of the settlement of this matter upon the terms and conditions set forth in the CSA;

NOW THEREFORE, the Insurance Commissioner hereby approves the CSA and finds, without Respondents having had the opportunity to defend at a hearing, that Respondents, in certain instances, either individually or collectively, during the period with respect to which they were investigated by the Department of Insurance, engaged in the following acts or practices in violation of Sections 700 and 704 of the California Insurance Code:

- Knowingly applying a definition of "disability" in claims handling in a manner inconsistent with the definition of "total disability" set forth in California case law;

- Mischaracterizing the claimant's occupation and/or its duties in determining whether the claimant is disabled from performing with reasonable continuity the substantial and material duties of his or her own occupation;

- Selectively using independent medical examinations (IMEs) to Respondents' own advantage;

- Selectively using portions of medical records and IME findings to Respondents' own advantage;

- Overruling the opinion of the attending physician after Respondents' in-house medical personnel have conducted a "paper review" of the medical file;

- Overruling the opinion of in-house medical personnel who supported a finding of disability or the need for specific objective testing;

- Failing to train claims personnel adequately or correctly on the California legal definition of "disability," on how properly to evaluate a claimant's occupational duties, and on other policy provisions relevant to conducting a fair, thorough, objective claim investigation;

- Mischaracterizing nonsedentary nursing occupations as sedentary, then requiring nurses disabled from performing nonsedentary occupations to find work in sedentary nursing occupations (e.g., as a utilization review nurse) during the "own occupation" coverage period;

- Targeting certain types of claims for "resolution" (i.e., denial or termination of benefits) in the interest of improving "net termination ratios" – that is, for reasons other than the merits of individual claims or fair, thorough, objective investigations into those claims, such claims generally arising out of high benefit, noncancellable long term disability income policies previously heavily marketed, which had become costly for the company through increasing claims;

- Determining predominantly through an analysis of billing records that medical specialists are able to perform his or her 'own occupation' even though unable to perform with reasonable continuity the substantial and material duties of the specialty itself (e.g., surgery, delivering babies, chiropractic, etc.);

- Misapplying the partial and/or residual disability provisions in the policy;

- Inappropriately using aggressive surveillance on a claimant and misusing the results;

- Characterizing certain disabling conditions as "self-reported" (e.g., pain, limited range of motion, weakness), then accepting only objective test results to support disability resulting from these conditions even though no policy provision requires objective test results;

- Failing to request that the IME perform objective testing that could support a finding of disability resulting from a "self-reported condition," or ignoring objective test results from the IME that do support a finding of disability;

- Discounting objective test results by imputing the physiologically disabling condition to a "psychological component," thus triggering the "mental or nervous condition" limitation;

- Utilizing a policy provision limiting the "mental and nervous conditions" benefit to 24 months to unreasonably limit the time in which benefits are paid for physiologically-based disabilities, disabling on their own, which may or may not be accompanied by a psychological component;

- Including language in group policies that excludes coverage for pre-existing conditions "caused by, contributed to [by], or related to the disabling condition" or for "symptoms for which diagnostic treatment was performed or symptoms for which a prudent person would have sought treatment," so that a disabling condition would not have to have been diagnosed, treated or even in existence during the policy's pre-existing condition period for it to be excluded from coverage;

- Misapplying the "pre-existing condition" clause to deny meritorious claims, e.g., characterizing obesity as the pre-existing condition for a previously asymptomatic, undiagnosed and untreated musculoskeletal, cardiovascular, peripheral vascular, pulmonary or orthopedic disability;

- Offsetting for benefits it is only estimated the claimant might receive, instead of offsetting only for those benefits actually received by the claimant and appropriately offset under the law;

- Stating in correspondence to the claimant that the claimant must apply for Social Security Disability Income (SSDI) benefits in order to receive an unreduced benefit, when the policy contained no such duty;

- Failing to document claim files adequately regarding the so-called "roundtable" sessions at which substantive claims decisions were made;

- Failing to refer the claimant to the Department of Insurance in the event the claimant believes his or her claim has been denied or benefits have been terminated unfairly;

4

- Continuing to seek additional information where claimants have provided adequate proof of disability, thus unfairly shifting the burden of investigation to the claimant;

- Communicating to claimants under individual or government employer-sponsored group policies (i.e., policies not covered by ERISA) in a manner that could mislead the claimant into believing ERISA would apply, thus limiting a claimant's rights on appeal (among other things);

- Having an insured under an individual policy agree to make premium payments by payroll deduction/salary allotment, with the policy having no other connection to the employer, then asserting that the policy is employer-sponsored or employer-endorsed, therefore governed by ERISA;

- Paying a claim under a reservation of rights for extended periods of time, then terminating benefits and notifying the claimant of the company's intent to recover the benefits paid;

- Failing to disclose to the claimant additional benefits that might be available under the policy, e.g., a waiver of premium, a cost of living endorsement, a seat belt benefit;

- Compelling a claimant to accept an unreasonably low settlement offer through the above means and others, or resort to litigation.


ORDER

The Insurance Commissioner hereby approves the CSA attached hereto and issued simultaneously herewith.

The Insurance Commissioner hereby approves the policy forms referenced in the CSA attached hereto.

Respondents are hereby ordered to fulfill each and every term and obligation set forth in the CSA, at the time and in the manner set forth therein.

Respondents are prohibited from engaging in the conduct set forth in the Findings enumerated above.

Respondents shall pay a civil penalty in the amount of $8,000,000.00.

5

Respondents shall pay the costs of the Department of Insurance in bringing the enforcement action herein, in the amount of $598,503.00.

Respondents shall pay all reasonable future costs of the Department of Insurance to ensure Respondents' compliance with the terms of the CSA. Respondents shall pay such cost within thirty (30) days of the receipt of an itemized invoice. Invoices for costs shall be issued on a quarterly basis, commencing on January 1, 2006.

Respondents shall pay that total sum of $8,598,503.00 to the Department of Insurance within thirty (30) days of Respondents' receipt of an invoice for said amount.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 3rd day of October, 2005.

/s/
JOHN GARAMENDI
Insurance Commissioner

PUBLIC REPORT OF THE MARKET CONDUCT EXAMINATION

OF THE CLAIMS PRACTICES OF THE

# UNUM LIFE INSURANCE COMPANY OF AMERICA
## NAIC # 62235 CDI # 2039-6

# PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY
## NAIC # 68195 CDI # 0950-6

# PAUL REVERE LIFE INSURANCE COMPANY (THE)
## NAIC# 67598 CDI# 1083-5

AS OF JUNE 30, 2003

## STATE OF CALIFORNIA



## DEPARTMENT OF INSURANCE

## MARKET CONDUCT DIVISION

## FIELD CLAIMS BUREAU

# TABLE OF CONTENTS

SALUTATION..................................................................................1

SCOPE OF THE EXAMINATION.............................................................2

CLAIMS SAMPLE REVIEWED AND OVERVIEW OF FINDINGS..................4

TABLE OF TOTAL CITATIONS..............................................................8

SUMMARY OF CRITICISMS, INSURER COMPLIANCE ACTIONS
AND TOTAL RECOVERIES....................................................................10

STATE OF CALIFORNIA
**DEPARTMENT OF INSURANCE**
Consumer Services and Market Conduct Branch
Field Claims Bureau, 11th Floor
South Spring Street
Los Angeles, CA 90013



September 23, 2005

The Honorable John Garamendi
Insurance Commissioner
State of California
45 Fremont Street
San Francisco, California 94105

Honorable Commissioner:

Pursuant to instructions, and under the authority granted under Part 2, Chapter 1, Article 4, Sections 730, 733, 736, and Article 6.5, Section 790.04 of the California Insurance Code; and Title 10, Chapter 5, Subchapter 7.5, Section 2695.3(a) of the California Code of Regulations, an examination was made of the claims practices and procedures in California of:

Unum Life Insurance Company of America

NAIC # 62235

Provident Life and Accident Insurance Company

NAIC # 68195

Paul Revere Life Insurance Company (The)

NAIC# 67598

Hereinafter also referred to as Unum Life, Provident Life, Paul Revere Life or collectively as the Companies.

This report is made available for public inspection and is published on the California Department of Insurance web site (www.insurance.ca.gov) pursuant to California Insurance Code section 12938.

## SCOPE OF THE EXAMINATION

This report documents the results of two separate file review processes. The initial, routine examination covered the claims handling practices of the aforementioned Companies during the period February 1, 2001 through January 31, 2003. A targeted review of Long Term Disability claim files was later added with a window period of January 1, 2000 through June 30, 2003. The combined examination was made to discover, in general, if the claims handling practices and other operating procedures of the Companies conform with the contractual obligations in the policy forms, to provisions of the California Insurance Code (CIC), the California Code of Regulations (CCR), the California Vehicle Code (CVC) and case law. This report contains only alleged violations of Section 790.03 and Title 10, California Code of Regulations, Section 2695 et al. Alleged violations of other laws are placed in a separate report which remains confidential subject to CIC Section 735.5.

To accomplish the foregoing, the examination included:

1.  A review of the guidelines, procedures, training plans and forms adopted by the Companies for use in California including any documentation maintained by the Companies in support of positions or interpretations of fair claims settlement practices.

2.  A review of the application of such guidelines, procedures, and forms, by means of an examination of claims files and related records.

3.  A review of consumer complaints received by the California Department of Insurance (CDI) in the most recent year prior to the start of the examination.

The examination was conducted in the Glendale, California office of Unum Life Insurance Company of America.

The report is written in a "report by exception" format. The report does not present a comprehensive overview of the subject insurer's practices. The report contains only a summary of pertinent information about the lines of business examined and details of the non-compliant or problematic activities or results that were discovered during the course of the examination along with the insurer's proposals for correcting the deficiencies. When a violation is discovered that results in an underpayment to the claimant, the insurer corrects the underpayment and the additional amount paid is identified as a recovery in this report. All unacceptable or non-compliant activities may not have been discovered, however, and

2

failure to identify, comment on or criticize activities does not constitute acceptance of such activities.

Any alleged violations identified in this report and any criticisms of practices have not undergone a formal administrative or judicial process.

## CLAIM SAMPLE REVIEWED AND OVERVIEW OF FINDINGS

The examiners initially reviewed files drawn from the category of Closed Claims for the period February 1, 2001 through January 31, 2002, commonly referred to as the "review period" The examiners reviewed 353 Unum Life Insurance Company of America claim files, 168 Provident Life and Accident Insurance Company claim files and 156 Paul Revere Life Insurance Company claim files. The examiners cited 243 claims handling violations of the Fair Claims Settlement Practices Regulations and/or California Insurance Code Section 790.03 within the scope of this report.    The targeted review involved claims drawn from a run of Closed Claims for the period January 1, 2000 through June 30, 2003.  In addition, the review included files relating to Independent Medical Examinations (IME's) and Rehabilitation Assessments. The examiners reviewed 156 Unum Life, 85 Provident Life and 29 Paul Revere Life Long Term Disability claim files.  As a result of the targeted review, the examiners cited 58 claims handling violations of the Fair Claims Settlement Practices Regulations and/or California Insurance Code Section 790.03 within the scope of this report.

Further details with respect to the files reviewed and alleged violations are provided in the following tables and summaries.

| Unum Life Insurance Company of America (initial review) | | | |
|---|---|---|---|
| CATEGORY | CLAIMS FOR REVIEW PERIOD | REVIEWED | CITATIONS |
| Group Long Term Disability (LTD) | 4131 | 93 | 32 |
| Individual Disability | 360 | 71 | 16 |
| Group Life | 1082 | 19 | 8 |
| Individual Life | 65 | 37 | 32 |
| Group Life AD & D | 50 | 49 | 8 |
| Special Risk AD & D | 147 | 30 | 7 |
| Long Term care | 121 | 54 | 4 |
| TOTALS | 5956 | 353 | 107 |

### Provident Life and Accident Insurance Company (initial review)

| CATEGORY | CLAIMS FOR REVIEW PERIOD | REVIEWED | CITATIONS |
|---|---|---|---|
| Group Long Term Disability (LTD) | 241 | 78 | 16 |
| Individual Disability | 1201 | 53 | 2 |
| Group Life | 721 | 83 | 50 |
| Individual Life | 64 | 37 | 23 |
| Group Life AD & D | 32 | 17 | 8 |
| **TOTALS** | 2259 | 268 | 99 |

### Paul Revere Life Insurance Company (The) (initial review)

| CATEGORY | CLAIMS FOR REVIEW PERIOD | REVIEWED | CITATIONS |
|---|---|---|---|
| Group Long Term Disability (LTD) | 239 | 49 | 14 |
| Individual Disability | 609 | 82 | 12 |
| Individual Life | 38 | 25 | 11 |
| **TOTALS** | 886 | 156 | 37 |

| Unum Life Insurance Company of America (targeted review) | | | |
|---|---|---|---|
| CATEGORY | CLAIMS FOR REVIEW PERIOD | REVIEWED | CITATIONS |
| Group Long Term Disability | 12646* | 137 | 27 |
| Individual Long Term Disability | 931* | 19 | 6 |
| TOTALS | 13577* | 156 | 33 |

| Provident Life and Accident insurance Company (targeted review) | | | |
|---|---|---|---|
| CATEGORY | CLAIMS FOR REVIEW PERIOD | REVIEWED | CITATIONS |
| Individual Long Term Disability | 2181* | 80 | 18 |
| Group Long Term Disability | 258*. | 5 | 3 |
| TOTALS | 2439* | 85 | 21 |

| Paul Revere Life Insurance Company (The) (targeted review) | | | |
|---|---|---|---|
| CATEGORY | CLAIMS FOR REVIEW PERIOD | REVIEWED | CITATIONS |
| Individual Long Term Disability | 1163* | 21 | 4 |
| Group Long Term Disability | 241* | 8 | 0 |
| TOTALS | 1404* | 29 | 4 |

* These numbers represent claim files. Some claimants had multiple individual disability claims and/or an individual and group claims. Each claimant was considered as a single claim file

irrespective of the number of claims the individual had in the file. In addition, many other claims for the review period appeared on more than one list as various areas of concern were identified and additional list of claim were requested. A list of claims that had IME's was also requested (The IME listing was not separated by Company. The IME list of claims was 93 claim files inclusive of all three Companies.)   It was also noted that some of the claims provided for review were not claims involving California insurance contracts.  These claims were eliminated from the review.

## TABLE OF TOTAL CITATIONS (initial review)

| Citation | Description | Unum Life Insurance Company of America | Provident Life and Accident Insurance Company | Paul Revere Life Insurance Company (The) |
|---|---|---|---|---|
| CCR§ 2695.11(b) | The Company failed to provide a clear explanation of the computation of benefits. | 41 | 76 | 14 |
| CCR§ 2695.7(b)(3) | The Company failed to include a statement in their claim denial that, if the claimant believes the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance. | 18 | 2 | 6 |
| CIC§ 790.03(h)(3) | The Company failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. | 12 | 4 | 1 |
| CIC§ 790.03(h)(1) | The Company misrepresented to claimants pertinent facts or insurance policy provisions relating to any coverage at issue. | 5 | 4 | 3 |
| CCR§ 2695.7(g) | The Company attempted to settle a claim by making a settlement offer that was unreasonably low. | 6 | 2 | 2 |
| CCR§ 2695.4(a) | The Company failed to disclose all benefits, coverage, time limits or other provisions of the insurance policy. | 6 | 5 | 0 |
| CIC§ 790.03(h)(5) | The Company did not attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability becomes reasonably clear. | 6 | 1 | 1 |
| CCR§ 2695.7(f) | The Company failed to provide written notice of any statute of limitation or other time period requirement not less than sixty days prior to the expiration date. | 3 | 1 | 4 |
| CCR§ 2695.4(d) | The Company improperly required a claimant to give notification of a claim or proof of claim within a specified time. | 4 | 1 | 0 |
| CCR§ 2695.5(b) | The Company failed to respond to communications within fifteen calendar days. | 2 | 1 | 1 |
| CCR§ 2695.5(e)(1) | The Company failed to acknowledge notice of claim within fifteen calendar days. | 2 | 1 | 1 |
| CCR§ 2695.7(d) | The Company persisted in seeking information not reasonably required for or material to the resolution of a claim dispute. | 1 | 0 | 1 |
| CCR§ 2695.5(e)(3) | The Company failed to begin investigation of the claim within fifteen calendar days. | 1 | 0 | 1 |
| CCR§ 2695.6(a) | The Company failed to adopt and communicate to all its claims agents written standards for the prompt investigation and processing of claims. | 0 | 1 | 0 |
| CCR§ 2695.3(b)(2) | The Company failed to record in the file the date the Company received, date the Company processed and date the Company transmitted or mailed every relevant document in the file. | 0 | 0 | 1 |
| CCR§ 2695.7(b)(1) | The Company failed to provide written basis for the denial of the claim. | 0 | 0 | 1 |
| Total Citations | | 107 | 99 | 37 |

8

| TABLE OF TOTAL CITATIONS (targeted review) | | | | | |
|---|---|---|---|---|---|
| Citation | Description | Unum Life Insurance Company of America | Provident Life and Accident Insurance Company | Paul Revere Life Insurance Company (The) |
| CIC § 790.03(h)(5) | The Company failed to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear. | 24 | 13 | 2 |
| CIC § 790.03(h)(1) | The Company misrepresented to claimants pertinent facts or insurance policy provisions relating to coverage at issue. | 6 | 3 | 1 |
| CCR § 2695.3(a) | The Company's claim file failed to contain all documents, notes and work papers which pertain to the claim. | 3 | 5 | 1 |
| Total Citations | | 33 | 21 | 4 |

9

SUMARY OF CRITICISMS, INSURER
COMPLIANCE ACTIONS AND TOTAL RECOVERIES

The following is a brief summary of the criticisms that were developed during the course of this examination related to the violations alleged in this report. This report contains six alleged violations of Section 790.03 and Title 10, California Code of Regulations, Section 395 et al. In response to each criticism, the Company is required to identify remedial or corrective action that has been or will be taken to correct the deficiency. Regardless of the remedial actions taken or proposed by the Companies, it is the Companies' obligation to ensure that compliance is achieved. The total money recovered within the scope of this report during the examination process was $51,552.96. Additional details regarding the resolution of these criticisms may be found in the settlement documents that resulted from this examination. Unless otherwise noted, all changes in procedures are being implemented by October 3, 2005. Unless otherwise noted, all policy language changes are being implemented by November 1, 2005.

## A.    SUMMARY OF FINDINGS FROM THE INITIAL REVIEW SAMPLE:

1.    **The Companies failed to provide an explanation of the computation of benefits.** In 131 instances, the Companies failed to provide each claimant with a clear explanation of the computation of benefits. On life insurance claim settlements involving payment of interest, the company did not identify the rate of interest and the period of time to which the interest had been applied. The Companies also did not identify the amount to which the interest was applied. The explanation supplied did not include an actual computation of the settlement amount.

Further, the settlements often included multiple components that were not identified, such as the base policy benefit, amount of returned premium, amount of paid up additions, amount of insurance reflected by a percentage of wage, amount of additional coverage elected by the insured, cost of living adjustments, seat belt benefits, etc. The Companies simply provided a dollar amount of settlement. The consumer could not determine if the computation was correct without this information. (As evidence of the impact of these alleged violations, four claims cited for low settlement were a result of the Companies' failure to pay for a seatbelt life benefit. Without an explanation of this component of the life settlement, beneficiaries are unable to read the policy provisions and determine if they received the proper settlement.) The Department alleges these acts are in violation of CCR §2695.11(b).

**Summary of Companies' Response:**    The Companies acknowledge that payments did not include the rate of interest in the explanation of benefits. While the Companies believe that this is not required, they have taken steps to utilize standard letters that will include the rate of interest and the component parts of the computation of benefits. The Companies are also implementing a procedure to notify life insurance beneficiaries once a claim is presented of any additional benefits that may be payable under the policy. This notice is separate from the communication made at the time that benefits are paid and contains a cover letter and copies of applicable policy specifications.

2.    **The Companies failed to include a statement in their claim denial that, if the claimant believes the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the California Department of Insurance.** In 26 instances, the Companies failed to include a statement in their denial that, if the claimant believes the claim has

been wrongfully denied or ...cted, he or she may have the matter reviewed by the California Department of Insurance. This includes initial claim denials and second denial of claims appealed under the Employee Retirement Income Security Act (ERISA) appeal. On claims where the claimant had submitted substantial new proof of claim during the appeals process, the Companies did not include the CDI language when upholding the original denial. This in effect limits the CDI language to one denial letter per claim and all subsequent denials are referred to as upholding the appeal. The Companies are also not including the CDI language on claims where the beneficiary lives out of state. Even though the life claim involves a California contract and a California resident who dies in California, the Companies maintain that the California Statutes do not apply to beneficiaries living out of state. Denial letters sent to claimants/beneficiaries living out of state did not include the CDI language. The Department alleges these acts are in violation of CCR §2695.7(b)(3).

<u>Summary of Companies' Response:</u>    The Companies acknowledge this finding and state it is their standard procedure to include such language in all claim denials in which the beneficiary is a California resident. The Companies' claim staff has been counseled to ensure future compliance.

The Companies will now include the notification in claims involving an ERISA appeal (e.g., when a claimant submits additional information for the Companies to review and the Companies uphold the initial denial), although the Companies do not believe this notification is required on the grounds that this subsequent letter is not a denial, but an informative letter advising the Companies are upholding the initial denial.

Further, the Companies will include the CDI language in denial letters to claimants who are not California residents, but who present claims under California-sitused policies or policies in which the policyholder or beneficiary is a California resident. This notice will be provided, as will other states' contact information, as may be applicable.

3.    <u>The Companies failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.</u>  In 17 instances, the Companies failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. This problem was identified primarily in the Long-Term Disability files reviewed. Once the Companies had information that indicated the claimant was no longer disabled, or determined that the information they did have was not sufficient proof of disability, the Companies stopped performing their investigation of the claim. The Companies' medical consultants often identified the need to obtain specific medical records and specific clarifications from the claimant's doctors regarding medical restrictions and limitations. Such information might have lead to a conclusion that the claimant was indeed disabled. The Companies had authorization but did not request the records and/or did not put forth the specific questions directly to the physician. Instead, the Companies would simply inform the insured that the monthly disability statement signed by the insured doctor did not supply enough clarification to continue benefits. The burden of obtaining the very detailed and specific information needed to continue benefits was placed upon the claimant. These allegations also include instances of the Companies' failure to investigate statements from attending physicians reflecting additional periods of disability. The Department alleges these acts are in violation of CIC § 790.03(h)(3).

<u>Summary of Companies' Response:</u>    The Companies have refined their guidelines regarding investigation of a claim, which now require that once a claimant has submitted a proof

of loss, the Companies will make every reasonable attempt to obtain medical information necessary in order to adjudicate the claim. The Companies will also attempt to obtain, at the Companies' expense, information that is necessary for the prompt resolution of the claim.

Under the Companies' new claims process, the Quality Compliance Consultant will be available to review files before a non-compensable claim decision is made in order to ensure that the Companies' protocols have been adhered to and that communications to claimant are appropriate.

**4.    The Companies misrepresented to claimants pertinent facts or insurance policy provisions relating to coverage at issue.**    In 12 instances, the Companies misrepresented pertinent facts or insurance policy provisions to claimants relating to coverage at issue.

The examiners noted letters and information packets sent to the insured that included statements indicating that the policy requires the claimant to apply for Social Security Disability Income benefits or the claimant "must" apply for Social Security Disability Income benefits. Although the policy provisions include an offset for Social Security benefits received, it is not stated as a policy requirement that the claimant must apply for Social Security Disability Income benefits. The correspondence misrepresents the insurance policy provisions. The Department alleges these acts are in violation of CIC §790.03(h)(1).

**Summary of Companies' Response:**    The Companies disagree that they misrepresent pertinent facts or insurance policy provisions relating to coverage. The Companies acknowledge that the policy does not include the statements that the claimant "must" or is "required" to apply for Social Security Disability Income (SSDI) Benefits, but believe that the language states an application is required to obtain an unreduced benefit. The Companies have revised their letters to the claimants by removing anything that would lead a policyholder to infer that the policy "requires" him or her to file for SSDI benefits in order to receive policy benefits. The Companies will only offset benefit payments against amounts the claimant has actually received in awards of SSDI benefits.

**5.    The Companies attempted to settle a claim by making a settlement offer that was unreasonably low.**    In 10 instances, the Companies attempted to settle a claim by making a settlement offer that was unreasonably low. These instances involved failure to identify policy provisions and provide payment reflecting the available coverage.    This included policy provisions for waiver of premium, cost of living endorsements and four claims involving seat belt benefits on loss of life claims. Also included were a miscalculation of benefits, failure to send the settlement check and failure to make additional payment per endorsement.    The Department alleges these acts are in violation of CCR §2695.7(g).

**Summary of Companies' Response:**    The Companies acknowledge the above instances of failure to pay all coverage triggered by the claim and have made any necessary supplemental payments. However, the Companies maintain these underpayments were oversights by their claims handlers and no corrective action is warranted. With respect to additional coverages (e.g., seatbelt coverages), the Companies have implemented further claims processes for California policies to enhance the communication of coverages related to life insurance and accidental death and dismemberment claims. The Companies will implement a procedure to send the claimant a cover letter explaining that additional benefits may be

available, and a copy of the policy specifications relating to the additional benefits potentially available under the policy at issue.

6.    **The Companies failed to disclose all benefits, coverages, time limit or other provisions of the insurance policy that may apply to the claim presented by the claimant.**
In 11 instances, the Companies failed to disclose all benefits, coverages, time limits or other provisions of the insurance policy that may apply to the claim presented by the claimant. These activities included charging claimants who wanted to verify coverage and applicable benefits a $25 administrative fee before providing a copy of the individual life policy and the failure to explain or document disclosure of policy provisions of the group life policies including seat belt benefits and college tuition benefits for children of the deceased who were attending college. (As mentioned earlier, the examiners identified four death claims involving car accidents in which the insured was wearing a seat belt and was entitled to an additional death benefit that was not explained or paid.) In addition, the Companies denied survivor benefits on Group Long-Term Disability claims when an estate had not yet been formed. The Companies did not inform the potential beneficiaries of the amount of benefits available should an estate be formed. The Department alleges these acts are in violation of CCR §2695.4(a).

**Summary of Companies' Response:**    Copies of individual policies are provided to insureds at policy inception, and again upon filing of a claim, at no charge. This procedure will be reiterated to staff. The Companies maintain that they are not aware of any regulation that requires them to explain coverage prior to payment of the claim. The companies indicate that while CCR §2695.4(a) states that the insurer shall disclose benefits that may apply to the claim presented, the Companies' position is that only coverage provisions that do apply to the claim are required by CCR §2695.4(a) to be disclosed and that these coverages are explained at the time of payment. However, the Companies are implementing new claims processes to enhance communication about all applicable coverages earlier in the claims process.
With respect to additional coverages (e.g., seatbelt coverages), the Companies have implemented further claims processes for California policies to enhance the communication of coverages related to life insurance and accidental death and dismemberment claims. The Companies now send the claimant a cover letter explaining that additional benefits may be available, and a copy of the policy specifications relating to the additional benefits potentially available under the policy at issue.
The Companies are enhancing their communications relating to eligible survivors and clarifying that when no eligible survivors and no estate exist, that benefits are payable once an estate is formed.

7.    **The Companies did not attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability becomes reasonably clear.**    In eight instances, the Companies did not attempt in good faith to effectuate prompt, fair, and equitable settlement of claims in which liability becomes reasonably clear. Four of the claims involve the Companies' failure to pay survivor benefits on Group Long-Term Disability claims. The Companies contend that their policy language regarding survivor benefits authorizes them to not pay survivor benefits if no one meets the definition of eligible survivor and no estate is formed. The policy language does not conform to mandatory statutory language. Additional violations included: denial of claim for a pre-existing condition when the condition was not actually diagnosed in the period of time allowed by policy conditions; identifying an underpayment and waiting an additional nine months before paying the underpaid amount; denying a claim based

or the insurer's definition . . . the claimant's occupation and not based upon the work that was actually being performed by the claimant; and, denial of accidental death benefits involving a slip and fall. The Department alleges these acts are in violation of CIC §790.03.h(5).

**Summary of Companies' Response:**    The Companies maintain that the four claims where survivor benefits were not paid were handled in accordance with policy provisions. The policy provisions define "eligible survivor" as a spouse, if living, otherwise, children under the age of 25. If there are no eligible survivors, payment will be made to the estate. The Companies maintain that in these four instances there was no eligible survivor and no estate, thus payments were made in accordance with policy provisions. The Companies are reinforcing and formalizing a procedure to inform survivors who may be known to the Companies (and who are not eligible survivors under the terms of the contract) of what is necessary in order to make benefits payable under the policy. The Companies will also eliminate the age limitations for surviving children in the definition of "eligible survivor". If there is no eligible survivor or estate and the policy is subject to California jurisdiction, survivor benefits will be escheated to the state pursuant to California law.

8.    **The Companies failed to provide written notice of any statute of limitation or other time period requirement not less than sixty days prior to the expiration date.**    In eight instances, the Companies failed to provide written notice of any statute of limitation or other time period requirement not less than sixty days prior to the expiration date. The Department alleges these acts are in violation of CCR §2695.7(f).

**Summary of Companies' Response:**    The Companies acknowledge that the statute of limitations language was inadvertently not included in denial letters in the above instances. The Companies state that this is a problem specific to one claims handling location. The location was not utilizing standard template language that does include the statute of limitations notice. The Companies have rectified this problem with the implementation of a standard letter library and a communication to the adjusters to use only those templates within the standard letter library. The statute language notice is also covered in the Companies' claims manual.

9.    **The Companies improperly required a claimant to give notification of a claim or proof of claim within a specified time.**    In five instances, the Companies sent letters to claimants requesting proof within a specified time not supported by policy provisions or statute. Specifically, the Companies sent out letters indicating the claimant has 21 days from the date of the letter to provide proof of claim or the Companies would have no alternative other than to suspend benefits or close the claim. The Department alleges these acts are in violation of CCR §2695.4(d).

**Summary of Companies' Response:**    The Companies explained that where a claimant had failed to respond to a request for proof of continuing disability within the 30 days required under the policy, they had a practice of granting claimants an additional 21 days beyond the time limit contained in the policy to comply with the request. While not agreeing that this practice was non-compliant, the Company now agrees to provide claimants with an additional 30 days (instead of 21 days) after the initial 30-day period has passed in order to reduce confusion regarding these time limitations. The Companies have conducted training to ensure that time limitations communicated to insureds are in accordance with the policy and applicable law.

10.    The Companies failed to comply with the Fair Claims Settlement Practices Regulations.    In four instances each, the Companies failed to comply with the following Fair Claims Regulations: CCR § 2695.5(b) and CCR § 2695.5(e)(1). In two instances each the Companies failed to comply with the following Fair Claims Regulations: CCR § 2695.7(j) and CCR § 2695.5(e)(3). In one instance each, the Companies failed to comply with the following Fair Claims Regulations: CCR § 2695.6(a), 2695.3(b)(2) and 2695.7(b)(1).

   Summary of Companies' Response:    The Companies acknowledge the above findings. The Companies indicate that, it is their standard procedure to comply with the Fair Claims Settlement Practices Regulations and that the above are isolated instances of non-compliance. The Companies have reinforced procedures with their claims handling staff to ensure future compliance with the Regulations.

## B.    SUMMARY OF FINDINGS FROM THE TARGET REVIEW SAMPLE:

1.    **The Companies failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.**    In 39 instances, the Companies failed to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear. The 39 alleged violations are a result of several practices that were identified as noncompliant. The Department alleges these acts are in violation of CIC §790.03(h)(5). These include the following practices:

a.    Nursing occupations

   The Companies used an artificial definition of nursing occupations (State Licensure) to reflect a sedentary guidepost for all nurses. In other words, emergency room nurses, cardiac care nurses, clinical rehabilitation nurses, and newborn/infant care nurses, despite the very physical nature of the tasks they perform, were all combined into a single occupational definition that considered nursing a sedentary desk job. Thus staff nurses in any of the specialties identified above who could perform a desk job were determined not to be disabled from their own occupation. The examiners reviewed four claims involving non-sedentary nursing occupations in the "Own Occupation" period. All four had the same sedentary guidepost applied.

   Summary of Companies' Response:    The Companies agree to evaluate nursing occupations by reviewing the actual duties performed by the claimant prior to disability, and then determine based upon those duties what nursing occupation the claimant was performing. This methodology takes into account the physical component and specialized aspects of certain nursing occupations. The Companies have conducted additional training for claims processing personnel regarding nursing occupations and the distinctions among types of nursing duties. This training occurred in August, 2003, and is now a part of the standard training modules within the organization.

b.    Medical specialties

   The Companies sold coverage for disabilities relating to medical specialties but failed to provide coverage when the claimants could no longer perform their medical specialty. The Companies accomplished this by performing a review of the claimant's medical billing records. If, for example, the billing records indicated that the majority of time spent by a surgeon was in

consultations, case prepar... or follow up check-ups rather than ... actual surgery. (the the surgeon was not considered disabled if he she could no longer perform surgery. (No matter that the consultation, review, or follow-up work would not have been generated if the surgeon was not performing the relevant surgery.) Thus, clearly non-sedentary surgeons and obstetrians who could perform a desk job were determined not to be disabled from their own occupation. The examiners reviewed two claims involving medical billing assessments.

**Summary of Companies' Response:**    The Companies use a review of medical billing records as one of many tools to ascertain the nature of a medical practice and the actual duties the claimant was engaged in prior to disability.  The Companies agree to conduct additional training for claims processing personnel regarding the relationship between a non-sedentary component of a practice or another specialty and the ability to maintain a practice consisting of solely the sedentary aspects of that practice. New guidelines will also be developed to assist in the general determination of the ability of the claimant to maintain the specific practice in question.

**c.**    Other "own occupation" coverage

The Companies denied benefits for claimants who had coverage for disabilities relating to their own occupation. Even though the files reflected the claimant could not perform their duties in the usual and customary way, the Companies determined the claimants could perform their occupations in a different setting. This included a warehouse worker who could no longer use his back, a professional whose job required travel who could no longer travel, a collection manager who could not handle the stress of collections, a software developer who could keyboard only one hour per day, etc. The Companies determined that, although these individuals might not be able to perform the tasks of their specific jobs, they could perform the tasks generally attributed to their general occupations. The guidepost utilized was "the occupation as it exists in the national economy". The use of these guideposts effectively resulted in the handling of claims under an "Own Occupation" coverage as if they were covered under "Any Occupation" coverage.  The examiners reviewed six claims that were denied using the national economy methodology.

**Summary of Companies' Response:**    The Companies' internal efforts are still underway to implement changes to its procedures for evaluation of total disability in light of the *Hangarter* decision (373 F. 3d 998 (9th Cir. 2004)).  These changes include enhancement of existing occupational evaluation by applying the "usual and customary" and "reasonable continuity" guideposts under "own occupation" after the date of the *Hangarter* decision.
    The Companies will also discontinue application of a "national economy" guidepost for Long Term Disability claim determinations under "own occupation" coverage.

d.    Internal medical opinions

The examiners identified files wherein the Companies were not following the advice of their own medical consultants. These claims involved medical consultants paid by the insurer to review the medical records in the file. In some cases the medical consultants indicated disabling conditions but the Companies denied the claims. In some cases the medical consultants indicated the need for specific objective testing to determine the claimant's restrictions and limitations but the tests were not performed prior to discontinuing benefits. Seven claims were identified where the Companies ignored the advice of their own medical consultants or physicians paid to perform Independent Medical Examinations.

Summary of Companies' Response:    The Companies have increased the documentation required in the claims processes generally, and particularly in the event of a claim denial. If the Companies' internal medical resources form an opinion based on the evidence in the record that is different from that offered by the attending physician or another independent medical review, the Companies' claim handling standards will require that the documentation cite to the clinical findings in the file upon which that opinion is based with specific and legitimate reasons to support the determination and an explanation as to why the attending physician's position is incongruous with the facts of the case.

The Companies have also developed enhanced protocols for requiring an Independent Medical Examinations in certain cases where the opinions of the equally credentialed in-house medical resource and the treating physician differ.

e.    Policy Interpretation Issues

(1)    "Self-reporting" claims

In 1995 Unum Life, incorporated language into group disability policies limiting the duration of "self-reporting" claims. The Unum Provident companies had adopted the position that only objective test results can substantiate disability as opposed to the claimant "self-reporting" disabling conditions. Claims that had multiple Independent Medical Examinations or Vocational assessments indicating claimants were disabled were denied additional benefits when the Company determined that the results of its own investigations were based on the "self-report" of the claimant and thus were not valid. We reviewed two claims where the concept of self-report was used to discount objective medical evidence in the file.

Summary of Companies' Response:    The Companies disagree that they misused the limitation for self-reported conditions contained in certain of their policy forms. In 2002, enhanced training for claims staff was created in order to reinforce appropriate review of subjective conditions and the Companies augmented the criteria to be used in evaluating subjective complaints. The Companies will eliminate the self reporting limitation from policies offered or issued after the date of resolution of this examination.

(2)    Mental Illness

The Companies misused policy language that imposes a 24-month limitation on claims involving mental illness. The 24-month limitation was applied to claims that had been paid for twenty-four months for physiological disabilities. An example is a claimant with an abnormal

17

heartbeat identified in a clin... setting who had not been treated for a mental illness for forty-four months. The Company allocated benefits to reflect a mental illness and applied the 24-month limitation. The Company did not investigate whether the mental illness was related to the physiological disease process. The examiners identified three claims that involved the meal illness limitation on claims involving physiological diseases.

<u>Summary of Companies' Response:</u>     The Companies disagree that they misse policy language relating to mental illness limitations. However, the Companies will reinforce their training for claims processing personnel relating to evaluation of claims where mental and nervous conditions are at issue, particularly where other conditions also exist. This training will reiterate the application of *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948 (9th Cir. 1993).

The Companies are increasing communication to claimants regarding applicability of mental and nervous limitations when a claim first is determined to be compensable. The Companies have agreed to amend policy language so that the limitation on a disabling mental or nervous condition does not run concurrently with the time limitation for a disabling physiological condition.

(3)     Mandatory rehabilitation

The Companies misused the mandatory rehabilitation policy provision in the case of a claim that was denied based on the claimant's refusal to participate in a rehabilitation program that did not include any physical or mental rehabilitation. The examiners identified one claim involving a denial due to the mandatory rehabilitation clause.

<u>Summary of Companies' Response:</u>     The Companies disagree that they misuse the mandatory rehabilitation provisions that are contained in certain of the Companies' policy forms. Pursuant to the policy provisions, this rehabilitation can include occupational and vocational rehabilitation.

However, the Companies now treat the rehabilitation provisions of the contracts that contain them as voluntary. Accordingly, the Companies do not deny or terminate claims for failure to participate in mandatory rehabilitation.

(4)     Pre-existing condition

The Companies misused the policy language involved the "pre-existing" clause in the case of a claimant who was overweight. The Companies determined that obesity can contribute to disorders of the "musculoskeletal, cardiovascular, peripheral vascular and pulmonary systems." The claimant, who had no previous treatment for orthopedic problems, had her claim denied based on the Companies' characterization of her weight as a pre-existing condition that had contributed to the disabling condition. The examiners identified two files involving denials based on the misuse of pre-existing conditions.

<u>Summary of Companies' Response:</u>     The Companies disagree that they misuse policy language relating to pre-existing conditions. The Companies contend that under the policy, a Pre-existing Condition exists if a claimant has received medical treatment, consultation, care or services within a specified contractual period prior to the policy effective date. The Companies based any determinations of pre-existing conditions on whether their medical

13

resources find such a condition existed, and then whether the disability caused by, contributed to, or resulting from" the pre-existing condition (this is the most common policy language).

Since 2001, the Companies' claims handling procedures require that any determination by a claims-handler that a claim is non-compensable based on a pre-existing condition must first be approved by his or her manager. Under the new claims protocols, the determinations are also approved by one of the Companies' Quality Compliance Consultants. The phrase "contributed by" will also be deleted from the policy language.

(5)    "Reservation of Rights"

The examiners reviewed three claims involving the concept of a "Reservation of Rights". In one case, the Companies misused the "Reservation of Rights" concept after coverage had been confirmed and payments made for up to six years. Upon determining that the claimant was not disabled, the Companies indicated to the claimant that the Companies have the right to request a refund of all previously paid benefits.

In three of the claim files the claimants indicated periods of hospitalization. However, the periods of hospitalization were not investigated prior to the Companies discontinuance of disability benefits.

The Department alleges these acts are in violation of CIC §790.03(h)(5).

Summary of Companies' Response:    The Companies disagree that reservation of rights is misused or that it is used in violation of CIC §790.03(h)(5). The Companies seek repayment of benefits paid under reservation of rights only in cases of fraud, misrepresentation, or where the delay in determining non-compensability is due to the claimant's lack of cooperation. The Companies' have implemented a number of initiatives to improve the handling of claims paid under a reservation of rights, including the following:

a.    Inclusion of a notice of the fact that payment is being made under reservation of rights with each payment to ensure that the claimant is aware that they are being paid under reservation of rights.

b.    The Companies have created clearer communications to claimants including an explanation of what the reservation of rights is and statements indicating that the Companies will not require repayment of payments made under reservation of rights unless claimant unreasonably fails to cooperate with appropriate information requests, (i.e., tax information, office records) commits fraud or misrepresents information.

c.    The Companies will articulate in its letters to claimants the reasons why a reservation of rights exists, and what information is missing in order to make a final determination on the claim.

d.    Claims that are on reservation of rights for longer than 90 days are reviewed by claims management in order to ensure that the reservation of rights is appropriate.

2.    **The Companies n   ipresented pertinent facts or insu  ince policy provisions relating to coverage at issue.**     In 13 instances, the Companies misrepresented pertinent facts or insurance policy provisions relating to coverage at issue.    Documents were reviewed dung the examination indicating that the Company was aware that claims believed to be covered under ERISA (Employee Retirement Income Security Act) may not be subject to "bad faith" claims in excess of the actual benefits provided in the policy.   Thus the Companies are aware that it is important to provide accurate information to claimants regarding the status of their claim as either ERISA or non-ERISA as their potential right to recovery may have been significantly different in a disputed claim.   Eight claims were identified wherein the Companies included multiple references to ERISA in denial letters of non-ERISA claims. This may lead to confusion on the part of the claimant or their representative regarding their right to recovery on a disputed claim.   Some of the denials indicated "It appears your policy coverage is governed by the Employee Retirement Income Security Act (ERISA)".   Other denials did not actually state the claim was subject to ERISA but referenced ERISA three times in the explanation of the appeal process in place at the time. These citations included both Individual and Group long term disability policies not subject to ERISA.   The Department alleges these acts are in violation of CIC §790.03(h)(1).

   <u>Summary of Companies' Response</u>:     The Companies did not misrepresent pertinent facts or insurance policy provisions relating to coverages at issue.   The Companies sent letters to claimants that referred to ERISA timelines and the potential applicability of ERISA in an attempt to communicate that the Companies apply ERISA timelines and appeal provisions to their claim handling.

   In 2003, the Companies changed the text of the letters they send to claimants.   Those letters now refer to appeal rights and timelines without reference to ERISA.

3.    **The Companies failed to properly document claim files.**    In nine instances, the Companies files failed to contain all documents, notes and work papers.   Three of the files were missing documents vital to the Companies decision to deny additional benefits on long term disability claims. The Department alleges these acts are in violation of CCR § 2695.3(a).

   <u>Summary of Companies' Response</u>:     The Companies have comprehensive guidelines relating to the documentation of claim files, and assert that these guidelines are in full compliance with applicable law and regulation, including CCR§2695.3(a).

   In 2003, the Companies enhanced the documentation of roundtable reviews to include identification of the participants and the decision reached in these meetings.  In 2004, the internal requirements were further augmented to include documentation of the rationale for the decisions reached in a roundtable setting.

   Additionally in 2003, the Companies developed and implemented enhanced documentation guidelines for calculations of offers, negotiations and outcomes for commutations and settlements.

Exhibit "B"

Independent Review Process

Independent Review (IR) is available to a California Claimant who is entitled to claim reassessment under the terms of the California Settlement Agreement to which this exhibit is attached. In the event a California Claimant is not satisfied with a decision of the Company's Claim Reassessment Unit (CRU) that upholds, in whole or in part, the original decision that either denied or closed his or her claim, the following process shall be implemented for independent review of the CRU's decision:

1.    The California Claimant has the right to request IR no later than 30 days after the date of the letter informing the California Claimant that the original decision to deny or close has been upheld in whole or in part. The date of the letter is the date on which the letter is posted in the U.S. mail or sent by other delivery service. The letter shall provide the reasons, and the factual and legal bases for each reason given, for the CRU's decision.

2.    IR shall be composed of and operate as follows:

   a.    An individual is to be selected by mutual agreement of CDI and the Company, based upon his or her general experience and reputation in California (IR Director), to perform several functions. The individuals whose names are submitted by CDI and the Company to each other for consideration to be named IR Director must disclose any financial interests or business relationships likely to affect impartiality or that might create an appearance of partiality. The Company will contract with the IR Director, who will be retained as an independent consultant of the Company to perform the duties and tasks of the IR Director as specified herein. The Company's contract with the IR Director will run for a period of 21 months from the effective date of the California Settlement Agreement, and it is the Company's intent that the IR Director will be given sole discretion with respect to the duties described. The contract will be compliant with California laws and approved as to form by the CDI.

   b.    The IR Director is to perform, among other things, the following functions as part of the IR:

      (i)    propose a list of potential Reviewers of reassessed claims for which IR is sought;
      (ii)   administer the process of developing the panel of Reviewers;
      (iii)  be compensated a reasonable amount mutually agreed upon by the IR Director, CDI and the Company and paid by the Company;
      (iv)   mutually agree with CDI and the Company on a reasonable compensation and expense reimbursement arrangement for the Reviewers in connection with their review of CRU decisions;

1

    (v.)    mutually agree with CDI and the Company on other guidelines initially and from time to time in order to facilitate claim file and decision review in an efficient and expeditious manner by the Reviewers, including the circumstances and manner in which the opinions of Reviewers are documented in the claim files; and,

    (vi)    mutually agree with CDI and the Company on rules relating to confidentiality that must be agreed to by each Reviewer concerning his or her activities as a Reviewer, including among other matters, facts relating to personal information in claim files.

c.    The IR Director is to propose a list of 25 individuals with varied backgrounds, experience and areas of relevant expertise who the IR Director believes are qualified to review a disability claim file and the decision made by the CRU and, to the knowledge of the IR Director, have no bias toward either claimants or insurers in determining disability claims.

d.    The list of names proposed by the IR Director is to be submitted to CDI and the Company for consideration, and CDI and the Company, each without any reason provided, may peremptorily strike as many as five names from the IR Director's list. Additionally, CDI and the Company each may provide reasons to the IR Director for deleting additional names from the proposed list, and if the IR Director believes, in his or her sole discretion, that the reasons given justify the deletion, the challenged individuals are to be deleted from the list of potential Reviewers. The primary focus of challenges should relate to the qualifications of the individual to review a disability claim file fairly, thoroughly and objectively.

e.    If the IR Director believes that the foregoing process, once implemented, does not result in sufficient Reviewers to perform the requested IR on a timely basis, or that the Reviewers do not represent diverse enough fields to provide the resources for a quality review, the IR Director shall propose additional names and the process outlined above will be followed again, using an appropriate number of potential Reviewers until the IR Director, after consulting with the Company and CDI, believes that the number of Reviewers is sufficient to administer the IR on a timely and effective basis.

f.    The IR Director is to assign one or more Reviewer to each claim file for which an IR has been requested on a timely basis, taking into account workloads, special qualifications of the Reviewers, and issues that might be prominent in the claim file assigned.

g.    A Reviewer is to have access to the following in performing a claim file review:

    (i)    Complete claim file;

    (ii)    Letter sent to the claimant by the CRU providing the decision, reasons, and factual and legal bases for the reasons for the CRU's decision for which IR has been requested;

2

(iii)   Access to the individual or individuals in the CRU who primarily were responsible for the review and decision of the CRU, in order to better understand any issues relating to the file or the CRU decision; and,

(iv)   Access to any other Reviewer who possesses special qualifications or experience that the assigned Reviewer believes are needed in order adequately to review the file and the CRU decision in question and whose consultation is sought by the Reviewer.

h.   The nature of the review by the Reviewer is de novo: the entire file and process undertaken during the initial claim review and subsequently during the CRU are subject to review by the Reviewer without deference to the CRU.  The Reviewer is seeking to determine, among other things, whether or not the CRU's decision results from a good faith effort to obtain the material information necessary to make an informed claim decision – an effort expended in a fair, thorough, objective investigation; and whether or not the CRU has analyzed and weighed that information in a fair, thorough and objective manner.

(i).   If the IR Director, after consultation with the Reviewer, believes that additional information would be material to resolving whether the CRU decision being reviewed meets the standards established in the California Settlement Agreement or whether the claimant is entitled to benefits not previously awarded under the policy, that information is to be obtained so long as the IR Director also reasonably determines that the cost and time involved in obtaining the additional information are not unreasonably disproportionate to the issue that the additional information is intended to address.

(j)   The goal of the IR process is to determine whether the claimant is entitled to benefits not previously awarded under the policy.

(k)   If it appears that any Reviewer has engaged in a pattern or practice that suggests he or she is not qualified for the task of an informed review of a disability claim file, or that he or she is not performing in a fair, thorough and objective manner, either the Company or CDI may present facts to the IR Director substantiating a request that the Reviewer be removed from the panel of Reviewers, and the IR Director in his or her sole discretion may determine whether or not to remove the Reviewer.

(l)   If at the conclusion of the review of a claim file by a Reviewer, any issues or concerns raised by the Reviewer about the handling of the claim or the information relied upon by the CRU are not resolved to the satisfaction of Reviewer and the CRU, the final decision of the CRU will be the final decision on the claim file; provided, however, the Reviewer may add to the claim file any information or opinion that he or she believes appropriate relating to the handling of the claim, the information relied upon or additional information ("Reviewer's Report").  If the CRU challenges the propriety of any portion of the Reviewer's Report, the IR Director shall decide in his or her sole discretion whether the

3

challenged portion of the Reviewer's Report is appropriate for inclusion in the claim file or should be deleted or modified. The claim file, including the Reviewer's Report as finally determined by the IR Director, shall be available to the claimant.

5.   This IR process for the CRUs decisions for California Claimants is entered into in good faith by the Company and CDI to provide a method of independent review that is appropriate for the circumstances.   The approach set forth in this exhibit may be reviewed by each party after the IR process has had sufficient time in which to operate for assessing its effectiveness.  If either party believes that changes should be made in order to better accomplish its purpose, the suggested changes shall be considered in good faith by the other party and, if there is mutual agreement, the changes shall be implemented.



August 16 2006

CLAIM, TEST
123 MAIN STREET
Anycity, Anystate 12345-4673

Re:    Claim No. 5400000060002

## NOTICE TO CALIFORNIA CLAIMANTS
### of
### UNUM LIFE INSURANCE COMPANY OF AMERICA
### PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY
### THE PAUL REVERE LIFE INSURANCE COMPANY

Your claim for disability insurance benefits was denied, or your disability insurance benefits were terminated, on or after January 1, 1997, by one of the above-named UnumProvident insurance companies.

The California Insurance Commissioner and UnumProvident have recently reached an agreement that provides the opportunity for your claim to be reevaluated (reassessed) under certain standards developed especially for California claims.

You may have previously received a letter from UnumProvident notifying you of your right to ask for reassessment of your claim. If you responded to that letter by asking the company to reassess your claim, there is no need for you to respond again with a new request.

If you did not receive the earlier letter or if you did not respond to the earlier letter by asking for reassessment of your claim, you may now request reassessment of your claim by doing one of the following things:

- Fill out and return the enclosed form in the envelope provided; OR

- Visit www.unumprovident.com/elect with your claim number ready (provided at the top of this page); OR

- Place a toll-free call to (877) 477-0964 and provide your name, current address and claim number. This phone number is provided for your convenience in applying for reassessment, but no other information is available currently through this special temporary line.

PO Box 9728
Portland, ME 04104-5028
Phone 1-877-477-0964

You must res.   id ,   n 60 days of the date of this .  .ic   .r your claim to be reconsidered. Yo.   equest for reassessment will be a  .nowledged by UnumProvident.

In addition to its agreement with the California Insurance Commissioner regarding California claimants, UnumProvident is reassessing claims nationwide under an agreement it reached in late 2004 with 48 other state insurance regulators and the U.S. Department of Labor. Because of the large number of claims to be reviewed, the process will take a substantial amount of time. If you elect to have your claim reassessed, you will receive another letter from UnumProvident closer to the time your claim actually will be reviewed, letting you know the approximate time period of that review. Enclosed with that letter will be a Reassessment Information Form for you to fill out and return to UnumProvident with information it needs to begin reviewing your claim.

By asking for your claim to be reassessed you agree to give up (waive) certain legal rights in the event and to the extent that benefits are paid to you. The legal rights you will be asked to give up will be described in greater detail in a form you will be asked to sign and return along with the Reassessment Information Form.

These rights are important and include the ability to pursue legal action, including the ability to obtain special or extracontractual damages, but only to the extent that such an action is based on any part of the claim denial or termination of benefits that is reversed or changed by the reassessment.

Before you decide to give up any of your rights, you may wish to consult an attorney.

If there remains a complete or partial denial of benefits after the reassessment of your claim, your right to pursue legal action for further benefits that are not related to any reversal or change of the previous decision on your claim shall not be waived.

If you have already started legal action relating to your prior claim decision, please provide a copy of this letter to your attorney as soon as possible so that he or she can advise you of your options. If, after consulting with your attorney, you decide to have your claim reassessed, you will need to take such action as is necessary to stop further legal proceedings pending the outcome of the reassessment process. Please note that filing a lawsuit concerning your claim after requesting reassessment will make your claim ineligible for reassessment.

You are encouraged to contact UnumProvident by one of the three steps provided for applying to have your claim reassessed. Please note that you must make contact within 60 days of the date of this notice to be eligible for UnumProvident to prepare your claim for review.

PO Box 9728
Portland, ME 04104-5028
Phone 1-877-477-0954

If you experience difficulty in participating in the claim reassessment process or otherwise, you may call the California Department of Insurance Consumer Hotline at (800) 927-HELP (4357).

Thank you.

UnumProvident Claim Reassessment Unit
Provident Life and Accident Insurance Company

## FAILURE TO TAKE ACTION WILL RESULT IN A LOSS OF THE OPPORTUNITY TO HAVE YOUR CLAIM REASSESSED.

UNUMPROVIDENT

# Request to Participate Form

Name:  Claim, Test

Claim Number:  5400000060002

Insuring Company: Provident Life and Accident Insurance Company

**By returning this letter, I am requesting to participate in the Claim Reassessment Process.**

Signature:_____

Last four (4) digits of Social Security: _____

Date: _____

In order to have your claim included in this reassessment, this form must be mailed to the address provided by November 30, 2005.

PO Box 9728
Portland, ME 04104-5028
Phone: 1-877-477-0964

UnumProvident        Assessment Unit
PO Box 3728
Portland, ME 04104-5028

CLAIM, TEST
123 MAIN STREET
Anycity, Anystate 12345-4673

**...surance Commissioner**

*California Department of Insurance*

FOR RELEASE:
October 3, 2005

MEDIA CONTACT:
Gary Gartner 415/ 53-2003 cell
Norman Williams 916/492-3566

## NEWS ADVISORY

# INSURANCE COMMISSIONER JOHN GARAMENDI ANNOUNCES HISTORIC FINE AND CORRECTIVE ACTIONS AGAINST WORLD'S LARGEST DISABILITY INSURANCE COMPANY OVER HANDLING OF CLAIMS; ACTIONS WILL HAVE FAR-REACHING IMPACT

*Settlement could alter the playing field and stop insurers from unfairly denying benefits to workers who become disabled*

SAN FRANCISCO – Insurance Commissioner John Garamendi will announce the largest fine in the history of the Department of Insurance Monday. The action, and the terms of the settlement, will dramatically change the way disability insurance policies are sold and the way claims are handled in California, and possibly the nation. UnumProvident, the largest disability insurer in the world has been the target of a three-year investigation by the California Department of Insurance for wrongdoing related to improper claims denials and benefit terminations of individuals with brain damage, spinal cord injuries, heart disease, AIDS and other disabilities.

**WHO:**     State Insurance Commissioner John Garamendi

Claimants who were denied benefits by UnumProvident including:

Joan Hangarter of Novato, who paid her disability premiums for nearly a decade, but when she became disabled, she and her children found themselves homeless and bankrupt, because UnumProvident stopped paying her benefits. She won a landmark $7.7 million jury verdict against Unum.

Carol Tatum of San Francisco, former Exec. Asst., SF Dept. of Public Works who acquired Lupus and became unable to work. Her attorney's argued that Unum deliberately misinterpreted her records so they could deny her claim.

**WHEN:**     Monday, October 3, 2005          2:00 pm

**WHERE:**     Philip Burton Federal Building
Front Courtyard
450 Golden Gate Avenue
San Francisco, CA

# # #

Visit the Department of Insurance Web site at www.insurance.ca.gov. Non media inquiries should be directed Consumer Hotline at 800.927.HELP. Callers from out of state, please dial 213.897.8921. Telecommunications Devices for the Deaf (TDD), please dial 800.482.4833.

*California Department of Insurance*

FOR RELEASE:
October 3, 2005 (#039)

MEDIA COTACT:
Norman Williams
916-492-3316

## NEWS RELEASE

## INSURANCE COMMISSIONER JOHN GARAMENDI ANNOUNCES MAJOR SETTLEMENT AND $8 MILLION FINE AGAINST UNUMPROVIDENT OVER INSURER'S HANDLING OF DISABILITY CLAIMS

*Landmark agreement will change the way disability policies are handled in California*

SAN FRANCISCO – Insurance Commissioner John Garamendi on Monday announced a landmark settlement with UnumProvident Corporation that will significantly improve consumer protection and profoundly impact how disability policies are handled in California - and possibly the nation.

The deal requires the nation's largest disability insurers, Unum Life, Provident Life & Accident, and Paul Revere, to pay an $8 million fine, the largest levied in the Department's history. The agreement settles a dispute over thousands of claims by California policyholders who were unfairly denied benefits. UnumProvident will change its policy language and claims handling procedures in dealing with those disputed claims, and all future claims.

Declaring that all disability insurers doing business in California will eventually be required to adhere to the standards set in the UnumProvident agreement, Commissioner Garamendi announced the settlement at the Philip Burton Federal Building in San Francisco.

"This is a new day for policyholders whose disability insurance claims have been wrongly denied by insurance companies," said the Commissioner. "I am making it clear today that policies sold in California will deliver what they promise. In this state, insurers will live up to their end of the bargain."

The case stems from an exhaustive Department investigation begun in 2003 into allegations of unfair claims settlement practices by the Tennessee-based UnumProvident. The investigation covered more than 25 business practices that violated California law, including:

- Knowingly applying the wrong definition of "total disability" in claims handling;
- Selectively and inappropriately using independent medical exams and other medical information to the company's own advantage;

(MORE)

- Mischaracterizing certain non-sedentary nursing occupations as sedentary, which required policyholders to find sedentary nursing work instead of receiving the disability benefits to which they were entitled

Last year, UnumProvident signed a settlement with 48 other states over some of the same practices, in addition to paying a fine of $15 million. Commissioner Garamendi declined to sign that agreement, working instead to seek further consumer protections consistent with California law.

The Commissioner noted that many of the provisions of this agreement will eventually apply to all other disability insurers operating in the California market. "Today's action goes beyond UnumProvident," he said. "California's disability insurers now have a new standard, one that will provide a better sense of security for policyholders, which is what disability insurance is really all about."

To ensure that all insurers are in compliance with the standards set by the agreement, Commissioner Garamendi will soon commence a data call for purposes of reviewing all outstanding policies of other carriers writing disability insurance in California.

The terms of the agreement with UnumProvident will apply to California claimants who were denied benefits between January 1, 1997 and September 30, 2005. They are eligible to have their claims reassessed, and if necessary are entitled to a review of the reassessment by an independent expert.

Important aspects of the settlement include:

- California claimants who opted in under the multistate settlement will be reassessed under California settlement standards;

- A higher standard must be met for the insurer to reject a claimant's doctor's opinion on disability, and the reasons must be documented in claim files;

- Claimants or their doctors may request an independent medical examination;

- All other claims handling changes implemented in the multistate settlement are incorporated within the California settlement.

# # #

NATIONAL EDITION

# Los Angeles Times

MONDAY, JUNE 30, 2003

Disability insurance giant UnumProvident Corp. is coming under fire in California for allegedly taking advantage of a federal law to deny benefits to its policyholders.

At issue are cases such as that of Laurie Hindiyeh, who was forced to quite her job as controller of a real estate company because of an inner-ear ailment. For two years, the long-term disability coverage she had from Unum helped to offset her lost income.

But then the checks stopped. Unum declared her fit for work, based in part on surveillance videotapes. It cut off her benefits about a year ago, she said.

Hindiyeh, 41, said the insurer's finding contradicts the opinions of four physicians she sees for bilateral Meniere's disease, a condition she believes stems from severe allergies to mold, trees, and weeds, among other things. The Fremont resident is taking regular shots for the allergies and hopes to be well enough to return to work in some capacity one day.

In the meantime she has good days when she can drive her children to school. But she said she never knows when she will be too dizzy to get out of bed or when a bout of vertigo will make even lying down feel like a "carnival ride." There are times, Hindiyeh added, when she vomits uncontrollably for hours. She takes sedatives to control such symptoms which leaves her extremely tired.

Hindiyeh said Unum's decision to terminate her benefits came as a shock. "There was not one doctor from Unum that reviewed my case that was an ear, nose and throat doctor or a specialist in Meniere's disease. Not one" she said. "I have two of the top specialists in the country on my case."

Though Hindiyeh is convinced that Unum made the wrong call, she has little recourse. Because she obtained coverage through her employer, her ability to contest Unum's decision is sharply limited by the Employee Retirement Income Security Act. The 1974 federal law, according to subsequent Supreme Court rulings, exempts employee benefits, such as disability insurance,

E. . . regulation.

As a result, Hindiyeh and thousands of similarly insured Americans are not covered by state consumer protection laws and are not entitled to take most claim disputes before a jury.

### Unum Accused of Hiding Behind Federal Shield

In fact, the insurance companies often are the only arbitrators of such disputes. Only after the insurer has denied an appeal are policyholders permitted to go to court, where they may receive a hearing before a judge.

At that point, policyholders who fall under ERISA are still not entitled to compensatory or punitive damages, even if they prove the insurer knowingly cheated them out of benefits. All they may recover is the amount of the benefits in dispute, and the burden of proof is high. For a policyholder to win, a judge must conclude not only that the insurance company made the wrong decision but that is also acted in an arbitrary and capricious way.

"As a practical matter, you have lost all of your rights, " said Ray Bourhis, a San Francisco lawyer who represents Hindlyeh. "You can't even call the California Insurance department and ask them to investigate because they have no jurisdiction. You have nothing, and, as a result, you have no leverage."

Bourhis and other insurance lawyers say they believe Unum has exploited the ERISA shield in its handling of employer-provided long-term disability coverage. Bourhis cited the insurer's own internal memos, which he obtained in previous lawsuits, describing the company's plans to use the federal rules to reduce its payouts to policyholders.

Last week, Bourhis filed a petition that demands Unum to be held in contempt. It alleges that termination of Hindiyeh's benefits violates an injunction issues last year. In it, U.S. Magistrate James Larson ruled that Unum used biased medical examiners, destroyed medical reports and withheld information about benefits from consumers, and he ordered the company to stop using such tactics to deny claims.

"We are in the process of reviewing the petition, and we do not believe we are in violation of any court order," Sabourin, the Unum spokesman, said.

### Legal Recourse

Several California insurance lawyers, whose affidavits were filed with Hindiyeh's contempt request, contend that Unum routinely

cuts benefits to ERISA-covered policyholders with heart disease, Meniere's disease, Crohn's disease, AIDS and other disabilities. The petition asks the judge to reopen all such disability claims rejected by Unum in California since the injunction was issued Nov. 12, 2002.

Meanwhile, policyholders in New York have filed a class-action suit against Unum, also alleging that the company has a pattern of improper denials in ERISA disability disputes. A federal judge recently allowed the suit to move forward against Unum's objections. Such efforts are unusual. Few lawyers accept ERISA-related disability matters because even if they win, the awards usually are so small that they do not cover the cost of preparing the case.

What's more, ERISA prevents State Insurance Commissioner John Garamendi from investigating disputes that involve claims for benefits obtained through employers, noted spokesman Norman Williams, adding that Garamendi wants the rules changed. All Californians "need to enjoy the same protections that are provided under state statutes, which go much further than ERISA," Williams said.

Before he took office, Garamendi pledged to investigate Unum's claims-handling practices in light of Larson's injunction. The order stemmed from a suit filed by Joan Hangarter, a self-employed chiropractor who purchased disability insurance on her own. Because her coverage was not obtained through an employer, Hangarter was entitled to a jury trial, in which she won a $7.67 million judgment.

If Larson grants Hindiyeh's request for a hearing on her contempt allegation against Unum, Bourhis said he is armed with evidence obtained in other suits against the company, including corporate memos that indicate Unum subsidiaries have saved money by aggressively targeting ERISA claims for years.

## ERISA Advantage

One Oct. 2, 1995 memo, written by then-UnumProvident executive Jeff McCall says: "The advantages of ERISA coverage in litigious situations are enormous. ...(There) are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of benefit in question...The economic impact on Provident from having policies covered by ERISA could be significant."

The memo cites as an example a group of 12 claims that the company settled for $7.8 million. "If these 12 cases had been covered by ERISA, our liability would have been between zero

million," the memo says.

The memo encourages employees to be "diligent and thorough" and review all claims to determine if they fall under the federal law. The memo also says that the company's goal is to pay valid claims and deny invalid claims, but it notes that "there are gray areas, and ERISA applicability may influence our course of action."

Unum's Sabourin said he could not comment on the memos.

Download PDF File and images

# San Francisco Chronicle

## State fines big insurer $8 million
## UnumProvident was accused of trying to avoid disability payouts

Victoria Colliver, Chronicle Staff Writer

Monday, October 3, 2005

The state Department of Insurance issued an $8 million fine -- biggest in the agency's history -- against the nation's largest disability insurer as part of a landmark settlement reached Sunday.

UnumProvident Corp., based in Chattanooga, Tenn., misinterpreted job classifications, improperly overruled doctors' opinions and knowingly used incorrect insurance definitions to avoid paying benefits, state regulators said.

Insurance Commissioner John Garamendi called Unum an "outlaw" company and said the insurer harmed consumers by denying claims.

"This company engaged in a strategy to increase its bottom line at the expense of its customers," he said.

Unum spokesman Jim Sabourin said late Sunday that the company agreed to the settlement in order to eliminate the concerns raised by Garamendi's office.

"We certainly don't accept all of the allegations," he said. "We believe by settling we can remove this cloud of uncertainty around our claims practices and move forward with an eye toward serving our customers in California."

The corporation, which operates Unum, Provident and Paul Revere life insurance companies, has been for many years the subject of heavy criticism and several lawsuits across the country.

Insurance commissioners from 48 states agreed to a settlement last year against Unum. It required Unum to reopen 215,000 cases and fined the company $15 million, but found no wrongdoing on the company's part.

Garamendi rejected the multi-state settlement, saying it didn't go far enough to protect California consumers because it put Unum in charge of reassessing claims without third-party review. Montana, the only other state to reject the agreement, has yet to reach a settlement.

The California agreement includes a third-party review by insurance experts, limits the discretion insurers have to interpret policy language and establishes a model policy that Unum and other disability insurers will be required to adhere to in California.

The commission's investigation covers the period from Jan. 1, 2000, through June 2003, a span that Sabourin said "does not accurately reflect our company or our claims handling processes of today."

Sabourin said Unum has a new chief executive and has initiated changes designed to improve the quality of claims decisions.

Ray Bourhis, a San Francisco attorney who has won several multimillion dollar lawsuits against Unum, commended Garamendi for refusing to sign the multi-state agreement.

Bourhis said the commission's settlement resolves his main objections with the multi-state agreement, which he called a sham. He was pleased that the California agreement includes specific findings of

"That's like asking the fox guard the henhouse, what's for dinner," he said.

Carol Tatum, former manager in San Francisco's Department of Public Works, was pleased to hear about the settlement.

Tatum, who suffered from an illness that prevented her from doing her job, filed a disability claim in November 2002 that was supported by two doctors. She said the company misinterpreted records to deny her claim.

"They attempted to prove I could work," she said. "They contacted the city of San Jose and compared my job with something that was totally different from what I did and they also denied me on that basis."

Tatum, who has since retired, settled a claim against Unum in May for an amount she declined to reveal. She said she felt traumatized by being treated like a nonentity by the company. "It furthers the debilitation and makes you feel helpless," she said.

*E-mail Victoria Colliver at [vcolliver@sfchronicle.com](mailto:vcolliver@sfchronicle.com).*

# Los Angeles Times

## State Fines Insurer, Orders Reforms in Disability Cases

By Peter G. Gosselin
Times Staff Writer

October 3, 2005

California insurance regulators today will announce that they are fining the nation's largest disability insurer $8 million, requiring the company to reopen as many as 26,000 California cases and demanding that it alter the policies it sells in the state to include greater consumer protections.

The regulators said they intend to impose similar policy changes on all firms licensed to sell disability insurance in the state. Independent legal authorities said the changes will give disability claimants new rights to win court review in disputed cases, a precedent they said could spread to other kinds of insurance, such as healthcare coverage.

The action, which will come as a settlement with Chattanooga, Tenn.-based UnumProvident Corp., could substantially alter how insurance is regulated in California — and perhaps the nation as well if other regulators follow the state's precedent.

The action will be substantially stiffer than a settlement last fall between the company and regulators in 48 other states in which officials made no formal findings of wrongdoing but only identified "areas of concerns."

By contrast, California regulators will charge UnumProvident with more than 25 violations of state law, allegations that the company will neither admit nor deny in favor of settling the case.

Among the charges: that the company knowingly applied the wrong legal definition of disability in denying claims or ruling claimants were able to go back to work, targeted high-cost claims for denials to save the firm money, misused claimants' medical records and even the opinions of in-house medical personnel to deny benefits and wrongly sought to file cases under a federal benefits law that severely limits claimants' ability to successfully sue their insurers.

Regulators said they uncovered violations of state law in nearly one-third of a random sample of about 1,000 claims handled by UnumProvident.

UnumProvident is an outlaw company. It is a company that for years has operated in an illegal fashion," said California Insurance Commissioner John Garamendi. "Our settlement is designed to make it a poster child of a legal company."

Garamendi is scheduled to announce his agency's settlement with the company at two news conferences in Los Angeles and San Francisco later today.

Reached Sunday, UnumProvident Chief Executive Thomas R. Watjen said he could not comment on California's allegations because details of the firm's settlement with the state were still being worked out. But Watjen suggested that the regulators' action is based on an outdated examination of company operations in 2000 through 2003.

The changes include Watjen's replacement of longtime UnumProvident Chief Executive J. Harold Chandler in 2003.

News of California's tough action comes two months after a Los Angeles Times story detailed extensive problems at UnumProvident and other major disability insurers. The paper traced many of the problems to a series of court decisions concerning federal benefits law, which have blocked states from providing consumer protection for a wide array of employer-provided benefits including healthcare, and have limited claimants' right to sue.

Disability insurance is designed to replace half or more of a person's wages if they are incapacitated by illness or injury. More than 50 million Americans are covered, most through their employers. UnumProvident, with half the U.S. market, covers 25 million.

Under the firm's settlement with the state, UnumProvident policyholders in California whose claims were denied or whose benefits were terminated since Jan. 1, 1997, will be able to request that the company reassess their case with an eye to starting or resuming benefit payments.

But unlike a similar reassessment process set up by the 48-state settlement last fall, those dissatisfied with the company's review of their claims can appeal to an independent reviewer to be chosen jointly by the state Insurance Department and the company.

The settlement will require UnumProvident to change the language in all new — and some existing — California policies in several ways that favor consumers. For example, it will force the company to remove limitations on benefits for "self-reported" conditions such as migraine headaches and fatigue, which are impossible to measure objectively but can severely disable people.

It also will restrict the firm's use of a 24-month limitation on benefits for "mental and nervous conditions." UnumProvident repeatedly has been accused of wrongly categorizing claimants as suffering from such conditions, rather than physical ailments, to reduce what it must pay them.

The settlement will require the company to drop its court challenge to Garamendi's order outlawing so-called "discretionary authority" in policies. Discretionary authority language effectively makes the insurer the final arbiter of most disputes involving policies, and means that claimants' suing the firm have had to prove not imply that the company's decisions were wrong, but arbitrary and capricious — a difficult standard to meet.

State Insurance Department officials said they will call a meeting of other disability insurers for early November to discuss the new requirements, and will take regulatory action against those who refuse to adopt the policy changes.

"What we're saying to any company operating in this area of insurance," Garamendi said, "is it has to stop screwing its customers."

Additionally, the planned settlement "will undoubtedly bleed over into healthcare and give claimants a better chance to make their case for coverage," said Mark D. DeBofsky, a partner with the Chicago law firm of Daley, DeBofsky and Bryant.