# Exhibit - A

PART 3 & 4

Any one-on-one (i e , directed to a particular client) service-oriented correspondence and certain routine correspondence to a client or prospect in the form of a letter or note, written or electronic (e-mail) must be submitted to SMRU at the time of mailing Such correspondence must be on approved Agent/Registered Representative stationery or approved registered DBA stationery

SMRU will review the correspondence and send the Agent a written determination (approval or comments) and maintain a copy in the Home Office correspondence file Service-related correspondence would include a "thank you" note to clients for their business, a letter confirming an appointment with an established client, or confirming that their account has been established, and sending copies of forms or statements

### 5. Procedures for Fixed Products Correspondence -- Managing Partner Post Review Program

All traditional fixed products (non-securities) correspondence, excluding LTC and Asset Preserver, intended for one client, either for prospecting or servicing must be provided to the Managing Partner on a post-use-basis

> **Note**: For more complete information on the review and approval of outgoing correspondence, please refer to the Field News on the "Updated Guidelines on the Review Programs for Service and Prospecting Materials", flowchart and grid, dated 4/10/06 on Agency Portal

### 6. Expiration Date

All approved material includes an "Expiration Date," which can be found on the approved determination sheet In addition, marketing materials will contain an expiration date, which will appear as an "Exp " before the date, will be attached to the SMRU number The SMRU information on marketing materials will look like this: "SMRU 00314654CV(Exp 03/07)"

Generally, SMRU approval of sales material will be valid for two years from the date of the original approval, unless either the content or the information becomes inaccurate (e g , a change in Company policy, amended tax laws, financial data that requires updating), or any changes or revisions are made to the approved content Note: No Agent may use material that has expired

Other considerations:

- Materials containing market-sensitive information has a shorter expiration date due to potential market volatility and interest rate fluctuations, etc
- General statistical information has a one-year expiration date unless the cited source is updated less frequently and/or more current information is readily available at the time of use
- Pre-approved brochures and other material that reference New York Life's financial information and third-party rating must be updated every April or sooner, to the extent circumstances require

The above list is not exhaustive Depending on the content of certain material, Agent's sales materials will be subject to varying expiration dates

To use any sales material after its expiration date, the Agent must resubmit it, along with its original approved document ("Bates") number and the reviewer's name, to SMRU for review and approval A resubmission form, which can be found on the Agency Portal under "Standards and Compliance," must be submitted with the expired sales material This material may not be used until approved by SMRU

### 7. "Approved As Is" Clause

All approved material has an "Approved As Is" clause. Accordingly, any change to a previously approved document will void the prior approval, thus requiring a resubmission to SMRU. This will apply to all material created and submitted by an Agent, as well as any pre-approved corporate advertisements or sales literature created by the Home Office Agency Department that has been personalized with the Agent's name and Company affiliations.

### 8. Misrepresentations and False Advertising Prohibited

No Agent is authorized or permitted to issue, circulate, or cause or permit to be issued or circulated, an estimate, illustration, circular, statement, sales presentation or comparison that is considered false or misleading. This includes information that:

- a. Misrepresents the benefits, advantages, risks, conditions, or terms of any security or insurance policy issued by the Company or other insurer or issuer;

- b. Misrepresents the dividends or share of surplus to be received on any policy being offered by the Company, or the dividends previously paid by the Company on similar policies;

- c. Misrepresents the financial condition of any insurer or issuer;

- d. Misrepresents the name, title, or true nature of any policy or class of policies;

- e. Misrepresents by means of any incomplete comparison or otherwise, the contents of any policies being offered by the Company or other insurer, either for the purpose of replacing (i.e., inducing or advising a policyowner to drop, loan against, withdraw from or otherwise reduce in value an in-force policy in order to take a new policy), or for the purpose of otherwise inducing or tending to induce any person to purchase, lapse, forfeit, exchange, convert, or surrender any policy or benefit;

- f. Omits a material fact necessary to make the statements made not misleading;

- g. Exaggerates or makes unwarranted statements about any product or service; or

- h. Makes claims that cannot be substantiated.

The laws of many jurisdictions make such acts a criminal or civil offense. The Company furnishes forms, illustrations, and proposals for the purpose of making illustrations with respect to its policies. These forms, illustrations, and proposals, authorized by the Company for this purpose, comply with the applicable laws of all jurisdictions. Agents are prohibited from using or creating their own forms, illustrations, statements, and proposals.

In addition, no Agent is authorized or permitted, directly, or indirectly to take any action with respect to policies, policy envelopes or literature of the Company that obliterates or modifies, in any way, any of the printed matter thereon.

## B. SEMINARS AND SALES TALKS

Seminars or sales talks conducted by NYLIFE or any Agent that mention or relate to securities or insurance, including long-term care, must conform to the following rules:

i   Before the beginning of the seminar or sales talk, each attendee must receive a current prospectus for each securities product to be mentioned;

ii  SMRU must approve in advance and in writing any written material to be distributed, or slides, video, displays, etc. to be used. This rule includes flyers or invitations used to advertise the seminar;

iii The address and phone numbers that appear in seminar and sales talk material for Agents must always be those of the registered branch office, either the detached location, G O if housed, or a Sales Office;

iv  Agents who are not Registered Investment Advisors may not charge seminar attendees an admission fee for reimbursement of written or other materials distributed at or in connection with a seminar; and

v   Certain states may permit Agents to provide refreshments and meals at seminars if the cost is reasonable or within the specific state's limit. See the state-by-state grid available on Agency Portal on the Seminar Resource Page for the specific amount allowed in your state. Company-provided material regarding long-term care insurance must be utilized due to the state specific requirement, including state filing. It is recommended that the Agent use Company-approved material.

Any formal seminar sales talks not previously authorized by NYLIFE for use with the public must be approved in advance and in writing by SMRU. A listing of Compliance-approved seminars is located on the Agency Portal under Sales and Marketing>Marketing Resource Center>Client Pieces and Promotional Material

## C. RESTRICTIONS ON THE USE OF MATERIALS

### 1. Materials Not for Public Use
Literature or communications of any type that include any of the following legends may not be used, or shown to customers or prospective customers, under any circumstances: "For Broker-Dealer Use Only," "Not For Use With The Public," "Internal Use Only," "RR Use Only," or a similar notation. Literature or communications that include these or similar legends may not be left in view of customers or members of the general public - for example, in a waiting room or reception area

### 2. Use of Material Printed in a Foreign Language
All written advertising, sales material, or correspondence for a specific securities product must be written in English unless a current prospectus and application for the product is available in the foreign language the Agent wishes to use and the client reads and writes that language. Any material deemed to be advertising, sales material or correspondence, regardless of the language used, is subject to the same requirements and approvals as outlined in this Handbook. In general, only generic general educational material may be translated on registered products. Please see the Agent & Registered Representative's Guide to Advertising, Sales Literature & Communications for the applicable procedures

### 3. Private Placement Offerings
No advertising, sales literature or sales correspondence are permitted for private placement securities offerings

### 4. Proprietary Information and Materials
Agents are prohibited from using or divulging for any non-company purpose proprietary or private information learned in the course of their business activities. Agents may not copy or furnish proprietary

Company materials, not created for public distribution, to any person not employed by the Company, except as may be permitted under any other agreement with the Company. This includes client information and any other Company information related to our business.

## D. BUSINESS LOCATIONS

### 1. Life Insurance Products

The Company's Home Office location must be identified in an appropriate place on all NYLIC Home Office advertising material for insurance products. For additional rules and guidance, refer to the Agent & Registered Representative's Guide to Advertising, Sales Literature & Communications. This guide can be found on the Agency Portal under Standards and Compliance.

### 2. Registered Products

The only address and telephone number that may appear in advertising material relating to a securities product is the address and phone number of a NYLIFE Securities branch office. Detached Agents should ensure their location has been registered as a branch office of NYLIFE.

Sales literature and correspondence must be printed on SMRU-approved stationery, which sets forth the addresses and phone numbers of the applicable NYLIFE registered branch and the NYLIFE GO.

Agents are permitted to use only their Field Technology e-mail address on business cards and stationery. E-mail addresses for non-Company servers (e.g., AOL) may not be used to communicate with customers or other Company personnel, and therefore may not be displayed or published on any communication. This restriction includes postings to electronic discussion groups and Usenet.

### 3. Signage

General Offices, Detached Offices and Sales Offices that are registered as an NASD Branch (i.e. have a Form BR filed) must display a sign that reflect the NYLIFE Securities name as well as the SIPC symbol. Please refer to section IV-S of this Handbook for additional information regarding the branch registration process.

The SIPC advertising By-Laws require member broker-dealers to include the official advertising statement in its advertising: "Member of the Securities Investor Protection Corporation" or "Member of SIPC." As such, most advertising and sales literature on behalf of NYLIFE will need to include this official advertising statement on brochures, printed advertisements, advertisements on radio or TV, letterhead and business cards and as part of the complete broker-dealer disclosure phrase: "Registered Representative Offering Securities through NYLIFE Securities, Member NASD/SIPC."

## E. TITLES/DESIGNATIONS

Agents may only use Company-approved titles and professional designations when dealing with the public. When representing New York Life, the term "Agent" must be used; when representing NYLIFE Securities, the term "Registered Representative" must be used. Refer to Agency Portal>Standards & Compliance>Advertising/Sales Material>SMRU Corner>Agents and Registered Representatives Guide to Advertising, Sales Material and Communications for a list of approved designations/titles (subject to limitations).

### 1. Use of an Assumed Name (DBA)

Special rules govern the use of assumed names, or "doing business as" ("DBA") designations, when corresponding with clients or prospects, or in advertising and selling products. All DBAs must be submitted to the SMRU for approval, accompanied by a completed DBA Approval Request Form that has been signed by the Agent's Managing Partner. If any outside business activity ("OBA") (i.e., insurance brokering) will be conducted through the DBA, this activity will need to be approved before SMRU can approve the DBA. In addition, if the Agent is a NYLIFE Securities Registered Representative, the DBA submission will also need to include a printout from the Agent Contracting System (ACS) indicating that this system has been updated to include the RR's OBA/DBA information. Specifically, this update will need to deem the DBA to be an other business activity for the RR and list the DBA as an employer under the RR's employment history. The RR will need to obtain this printout from his or her General Office. Once the DBA is approved by SMRU, the OBA/DBA information on ACS will be forwarded to the NASD for the purpose of updating the RR's Form U-4. TAS Agents are generally prohibited from operating under a name other than their own and/or establishing or utilizing a personal Doing Business As (" DBA") designation.

Please go Agency Portal > Standards & Compliance>Advertising/Sales Material> SMRUCorner> DBAs for the most current detailed guidelines on the establishment and use of DBAs available. All other questions about the use of DBAs should be directed to SMRU's toll-free number: 800-846-5021.

## 2. Business Cards and Stationery
All Agents who are Registered Representatives, and all Agents who are not registered and not PTAS, TAS or Senior NYLIC Agents must have Company approved stationery. Agents who are **not** Registered Representatives **and** are either a PTAS, TAS or Senior NYLIC Agent are not required to have Company stationery, provided the Agent signs a "Stationery Certification" stating that the Agent will not send outgoing written correspondence to clients, prospects or potential clients. The certification must be kept in the Agent's supervisory file in lieu of a copy of the stationery. The certification will be reviewed as part of the Supervisory Interview file review.

All Agents must have business cards that meet Company Standards.

Agents may only use Company approved titles and professional designations on letterhead and business cards when dealing with the public. When representing NYLIC, they must use "Agent." When representing NYLIFE, they must use "Registered Representative." An Agent who is also a Registered Representative may use the title "Financial Services Professional" in conjunction with the identification of NYLIFE. **Note: Agents may not use the title "Financial Services Professional" in lieu of "Agent" when representing New York Life Insurance Company.** NASD requires that business cards and stationery used in offering securities identify the broker-dealer at its official registered branch office location. NYLIFE-approved business cards and stationery meet this requirement. Only Company-approved business cards and stationery may be used in connection with securities activities. For Agents who are Registered Representatives, permissible forms of approved business cards and stationery are those produced under the current program announced by New York Life's Corporate Compliance Department. (Refer to Agency Portal>Standards & Compliance>Advertising/Sales Material>SMRU Corner> Guide to Advertising, Sales Material and Communications .PDF for samples). All stationery and business cards printed prior to the establishment of the current program are not to be used with clients and must be discarded.

Use of a P.O. Box on a business card or letterhead without also including a street address for the Agent's detached business location is prohibited.

A DBA is a business identity. As such, when submitting a DBA for approval, corresponding letterhead and

business cards must accompany the request

## F. INCOMING CORRESPONDENCE

**This section applies only to Agents who are also Registered Representatives.**

NASD Conduct Rule 3010(d) requires broker-dealers to develop appropriate procedures for the review of incoming correspondence relating to its securities business. The rule is intended, among other things, to provide for the proper identification and handling of customer complaints and to ensure that customer funds and securities are handled properly.

### 1. General Office/Sales Office and Detached Agents

Material is considered "covered correspondence" when it is written material (regardless of the method of delivery, including mail, facsimile, e-mail other than the e-mail that passes through an e-mail address monitored by the Company, courier, messenger or hand delivery by a customer) and is directed to an Agent who is also a Registered Representative of NYLIFE or an individual working for such a Registered Representative. In addition, material is considered covered correspondence when it:

    a    Relates to securities, variable insurance, annuities, mutual funds, Section 529 plans, or a customer;

    b    Contains a complaint about any product;

    c    Accompanies funds or refers to funds, regardless of product; or

    d    Represents or contains other "red flag" items identified from reviewing incoming correspondence

All incoming written materials directed to an Agent who is also a Registered Representative or an individual working for a Registered Representative will be opened, copied, logged, and reviewed accordingly to determine if it is covered correspondence. Any materials that clearly do not fit within the definition of covered correspondence (e.g., catalogs, birthday cards, or utility bills) will be distributed directly to the Agent without being copied or logged

All customer funds received will be logged and copied. The applicable GO will process funds payable to the Company or any of its subsidiaries, with a copy provided to the Agent for informational purposes. Funds related to non-proprietary fixed insurance business will be turned over to the Agent

Agents who are housed in a GO may not establish a Post Office box for the receipt of Company mail or otherwise have Company-related mail sent elsewhere to avoid the foregoing review procedure or any other purpose. Housed Agents must also provide any faxes or items hand-delivered by a client, that meet the definition of covered correspondence, to their Administrative Manager so it can be logged accordingly

### 2. Detached Office Locations

For purposes of these procedures, a detached office location is defined as any address to which mail is delivered at an address other than that of the GO or Sales Office, with an IPS Reviewer on site. In addition, any Agent who receives mail in the GO, but does not maintain leased space at a GO or Sales Office location is considered detached. The following rules relate to any location where the Agent receives correspondence including a home address, second detached location or PO Box

When received in a detached location incoming correspondence materials are considered "covered

correspondence" when they are written material (regardless of the method of delivery, including mail, facsimile, e-mail other than the e-mail that passes through an e-mail address monitored by the Company, courier, messenger or hand-delivery by a customer) and are directed to an Agent who is also a Registered Representative of NYLIFE or an individual working for such a Registered Representative In addition, incoming correspondence is considered covered correspondence when it:

    a  Relates to securities, variable insurance, annuities, mutual funds, Section 529 plans, or a customer;

    b  Contains a complaint about any product;

    c  Accompanies funds or refers to funds, regardless of product; or

    d  Represents or contains other "red flag" items identified from opening the incoming correspondence

Each Agent operating from a detached location shall maintain an incoming correspondence log for each week with regard to all covered correspondence received  Each piece of covered correspondence is to be Bates-stamped (dated and numbered) and copied, and attached to the log

Agents working from detached locations must record certain information about incoming correspondence as it is received and securities transactions effected  The three forms designed for this purpose - the Funds Received Log, the Securities Transaction Log and the Incoming Correspondence Disposition Form - are consolidated on one form, and all forms must be forwarded to the IPS Reviewer in his/her assigned GO

In the event that no covered correspondence or funds were received during a particular week, or no securities transactions were effected, the Agent shall indicate that fact on the applicable section of the Covered Correspondence Form

The IPS Reviewer at the GO shall be responsible for preliminarily reviewing the materials contained in the Covered Correspondence Files for Agents assigned to that GO who operate from detached office locations  The IPS Reviewer shall identify those materials that require further review, make copies of those materials, and forward them to the Agency Reviewer

**a. Funds Received Log**
Each Agent shall prepare a Funds Received Log when operating from a detached location  The Funds Received Log shall include entries for all funds (e g , personal checks, cashier's checks, money orders, etc ) that are received in such location, or picked up by the Agent directly, regardless of whether such funds pertain to insurance or securities products issued or offered by the Company, its affiliates, or non-affiliated companies  A photocopy of all financial instruments other than currency received must be attached to the log  In the event that no funds were received during a particular week, the Agent should enter "Nothing to Report (NTR)" on the Funds Received Log

**b. Securities Transaction Log**
The Securities Transaction Log is a written record that describes all securities transactions (purchases and sales) affected by the Agent during the preceding week, including all new business  It is required to be prepared weekly by each Agent operating from a detached location  In the event the Agent effected no securities transactions during a particular week, the Agent should enter "Nothing to Report (NTR)" on the Securities Transaction Log  For Direct Trading (DT) transactions handled through the Streetscape system, a summary listing of transactions can be produced that can be attached to the Log to account for DT

transactions. Agents can either attach the listing, or list individual trades on the log forms. When using this D1 listing the Agent must indicate on the Securities Transaction Log that a listing is attached and indicate which dates they cover. To obtain the summary through Streetscape Agents must follow the steps below: From the Trading Tab on Streetscape, The RR selects the order manager option;

1. Then click on the "Order Event History Tab ";

2. Select the trade date in the date field (a separate listing should be attached for each day in the reporting period when direct trades were entered);

3. Select branches in the first drop down menu and complete the following in the box: n23, n24, n26, n27, n60;

4. Make sure the drop down selection is ALL on the "Order Action", "Security Type", and "Event" Fields;

5. Click on the search selection on the right side of the page; and

6. Once the results populate right click the mouse and select print (make sure you select a landscape setting for printing)

Questions or requests for assistance related to the summary listing should be referred to NYLIFE at 800-884-3874

Trades completed outside of the Streetscape system, including those completed through DST Vision and by Eagle IARs through the IAG platform, must continue to be listed on the Incoming Correspondence Securities Transaction Log.

### c. Incoming Correspondence Procedures and Disposition Form

On a weekly basis, each Agent operating from a detached office location will be responsible for ensuring that the copied Covered Correspondence, a Funds Received Log, and a Securities Transaction Log for the previous week's activity are accurately completed and forwarded to the IPS Reviewer in his/her assigned GO. In the event that no covered correspondence was received during a particular week, the Agent shall note on the Incoming Correspondence Disposition Form "No Incoming Correspondence Received." A copy of each log and supporting documentation should be maintained by the Agent in their detached location.

### 3. Sanctions for Non-Compliance

Agents who are determined to have violated the above incoming correspondence review procedures shall be subject to the Company's disciplinary procedures. Any initial failure to comply will result in a warning letter requiring full and continuing compliance within 14 days. Any further failure to comply after that period may result in a $500 fine payable to the Company. A failure to pay the fine, and/or comply within 10 days of the notice of the fine will result in termination.

## G. TELEMARKETING/DO NOT CALL POLICY

The Federal Communications Commission ("FCC"); the Federal Trade Commission ("FTC"), the SEC, the NASD and many states have rules governing telephone solicitations. These rules are intended to protect customers against telephone-solicitation abuses known as "Do-Not-Call" rules, ("DNC") Agents are prohibited from using the telephone to solicit business if a consumer's residential or wireless telephone

number appears on the National DNC list, a state specific DNC list or the Company DNC list, unless otherwise noted

The Federal rules supersede all less restrictive state DNC rules. Therefore unless noted otherwise, the Federal rules apply

The rules cover all "telephone solicitations," which include telephone calls or messages to encourage the purchase of insurance and financial products and services, including appointment-setting calls and referrals. The rules apply to calls to current clients, as well as prospects

Calls made solely for the purpose of servicing or maintaining policies or accounts do not fall within the definition of telephone solicitation, and are therefore exempt. However, if an Agent initiates a solicitation during a service call, such call would be covered under these rules

## 1. State Requirements

New York Life is subject to various state DNC rules and unless noted otherwise in the following sections, the Federal rules supersede all less restrictive state DNC rules

## 2. Exemptions

There are four categories of exemptions to the National DNC list, as follows:

### a. Business - to - Business

The rules apply only to calls placed to residential and wireless telephone subscribers, not business telephone numbers. However, telephone solicitations may not be placed to businesses that are on, or ask to be placed on, the New York Life DNC list. Therefore, Agents must first verify that the business consumer is not on the New York Life DNC list prior to placing a call to that business consumer

As home-based businesses may not have business telephone numbers, the most prudent course of action for any numbers not obtained from a business directory is to assume they are not exempt

### b. Established Business Relationship

Subject to any further guidance from the FCC, calls to those with whom an Agent has an established business relationship are exempt. The "established business relationship" falls into two categories:

    i    Purchase or Transaction

An established business relationship exists for the duration of a business relationship (e.g., while a life or annuity policy is in force or a mutual fund or brokerage account is active) and for **18 months** after the policy/account is no longer in-force or active. However, telephone solicitations may not be placed to anyone on, or who asks to be placed on, the New York Life DNC list. Therefore, Agents must first verify that the consumer is not on the New York Life DNC list prior to placing the call

Several states have stricter requirements, which must be observed when placing calls to their residents. Please visit Agency Portal>Standards & Compliance > Do Not Call/E-mail> State Specific DNC Rules for a detailed listing of state rules pertaining to the Established Business Relationship exemption

    ii    Inquiry or Application

An established business relationship exists when a consumer places an inquiry with the Company and the inquiry creates the expectation that such Company will call them. Some examples of an inquiry would include oral permission, an unsigned business reply card, a policy that was not placed in force or a general

inquiry into the Company (calls from consumers asking about an Agent's office hours, directions to their office or similar questions are not considered inquiries). An existing business relationship exists for three months after such an inquiry, and a telemarketing call to that consumer during that **3 month** period would not be covered by the rules except if it is made to anyone on, or who asks to be placed on, the New York Life DNC list. For these inquires, Agents may place the call to the consumer prior to the 2nd Friday of the month following receipt of the inquiry without checking any DNC list. Agents placing calls after this time period, but before the end of the three-month period must first verify that the consumer is not on the New York Life DNC list prior to placing the call. Calls outside of the three-month period are not exempt.

iii    Several states have stricter requirements, which must be observed when placing calls to their residents. Please visit Agency Portal> Standards & Compliance > Do Not Call/E-mail> State Specific DNC Rules for a detailed listing of state rules pertaining to the Inquiry or Application exemption.

### c. Personal Relationship

Calls made to people with whom Agents have a personal relationship -- including family members, friends and acquaintances are not covered by the rules. Agents may make calls to these people unless they are on or ask to be placed on the New York Life DNC list.

In determining whether an individual is considered a friend or acquaintance, Agents should, among other things, decide whether that person would expect calls because of the relationship. Regulators would be much less likely to find that the personal relationship exists if a person complains or challenges the existence of a personal relationship. For example, a relationship with a close relative or friend with whom an Agent is in regular contact should be sufficient to qualify for the exemption. Conversely, it would be difficult to demonstrate a personal relationship with every member of an Agent's high school class. Due to the limited nature of this exemption, Agents should not be making more than a limited number of personal relationship calls each day.

Telephone solicitations may not be placed to anyone on, or who asks to be placed on, the New York Life DNC list. Therefore, Agents must first verify that the consumer is not on the New York Life DNC list prior to placing the call.

### d. Express Written Permission

Calls made pursuant to a *signed, written agreement* between an Agent and the consumer, in which the consumer agrees to be contacted by telephone and lists the number to which the call may be placed, are exempt unless and until the consumer revokes his or her consent. Agents may not call consumers to request their written permission to be called.

Agents using reply cards as a way to generate prospects will need to update the card to include the consumer's permission, their signature and telephone number (reply cards without a signature qualify for the 3 month inquiry exemption). Agents must retain copies of returned cards as evidence that they have complied with the exemption, and it is recommended that a separate file be created to retain these cards.

For this exemption, Agents may place calls to the consumer prior to the 2nd Friday of the month following receipt of the signed, written permission without checking any DNC list. Agents placing calls after this time period must first verify that the consumer is not on the New York Life DNC list prior to placing the call. Telephone solicitations may not be placed to anyone on, or who asks to be placed on, the New York Life DNC list.

### 3. How to Comply

All telephone solicitations that do not meet an exemption described above **must** go through the Company vendor Do Not Call system, Gryphon Networks. Gryphon Networks provides the automatic blocking of telephone solicitations to prospects whose names appear on the national DNC list, any state's DNC list or the New York Life DNC. Agents are prohibited from calling an individual who is blocked by the Company vendor Do Not Call system.

As noted above, telephone solicitations that meet an exemption do not need to be placed through the Company vendor Do Not Call system, but must be checked against the New York Life DNC list prior to placing the call. To check the New York Life DNC list, Agents must follow the following steps:

- enable Agency Portal username and password;
- go to Standards & Compliance > Do Not Call/E-Mail>GO Do Not Call List(Query) to view the list; and
- input the 10-digit telephone number and name to determine if the consumer is on the New York Life DNC list

A hard copy of the New York Life DNC list is available through each GO's Administrative Manager for those Agents who do not have access to the New York Life DNC list, and must be checked prior to placing a telephone solicitation call. In addition, the New York Life DNC list is available through the community PCs within the GO.

If a name or number appears on the New York Life DNC list, the individual cannot be called regardless of whether an exemption might otherwise apply.

### 4. Agent Identification

At the beginning of a call, Agents must clearly state their name, that they are calling for New York Life or NYLIFE, as applicable, a telephone number or address at which the Agent can be contacted, and the purpose of the call. Agents may not use a name other than their own name.

Several states have stricter requirements, which must be observed when placing calls to their residents. Please visit Agency Portal>Standards & Compliance > Do Not Call/E-mail> State Specific DNC Rules for a detailed listing of state rules pertaining to Agent Identification when placing telephone solicitation calls.

### 5. Immediate Disconnect

In all cases, if the consumer says that he or she is not interested in the product or service, the call must me discontinued immediately.

### 6. Caller ID

Agents must transmit Caller ID information, including the company name and a telephone number that permits a consumer to make a DNC request during normal business hours. The number may be answered by an automated system, (i.e., an answering machine), as long as it can receive a DNC request. Agents are prohibited from directly or indirectly blocking or falsifying the transmission or receipt of Caller ID information.

### 7. State Record Keeping Requirements

**Louisiana** - Agents must maintain a log in either numeric or chronological order for a period of 12 months that includes the number called, the time of the call and the date of the call. Calls placed through

the 800 numbers with our DNC vendor will be tracked automatically through the standard detailed phone bills in each General Office. Call outside of our DNC vendor must be tracked on a separate log.

**New Jersey** - Every Agent who makes a telemarketing call must maintain the following records for at least two years: (1) all phone records associated with telephone lines used for telemarketing; and (2) a log that includes the phone number, date and time of each telemarketing sales call. Calls placed through the 800 numbers with our DNC vendor will be tracked automatically through the standard detailed phone bills in each General Office. Call outside of our DNC vendor must be tracked on a separate log.

## 8. General Rules

**a. Calling Hours** - Telephone solicitations may generally be placed between 8:00 am and 9:00 pm. Calls are prohibited on federal holidays. Several states maintain stricter requirements which must be observed when placing calls to their residents. Please visit Agency Portal>Standards & Compliance > Do Not Call/E-mail> State Specific DNC Rules for a detailed listing of state rules pertaining to calling hour restrictions.

### b. Additional Requirements

Agents also must:

|      |                                                                                              |
|------|----------------------------------------------------------------------------------------------|
| i    | Not use a name other than his or her own name;                                               |
| ii   | Not make a call to a pager, cellular phone number, or any other service in which the called party is charged for the call; |
| iii  | Not use automated dialing machines and artificial or prerecorded voice messages;             |
| iv   | Not send unsolicited faxes or unsolicited e-mails, including e-mail "spams";                 |
| v    | Not send text messages to wireless devices (e.g. cell phones, pagers, etc.); and            |
| vi   | Submit all telemarketing scripts for review and approval by SMRU prior to use.               |

In addition, non-Agents, such as secretaries, sales assistants and licensed/registered service assistants, are prohibited from making telephone solicitations on an Agent's behalf. However, they may set up appointments if they follow the DNC rules described in this section.

## 9. Adding a Name to the New York Life Do Not Call List

Agents must immediately report to their Administrative Manager the name, phone number, and, when possible, the address of any consumer who does not wish to receive telephone solicitations from New York Life, its affiliates, and/or its representatives. The Administrative Manager is responsible for seeing that the consumer's information is added to the New York Life DNC list.

## 10. Training

Agents are required to complete the NYLIC University course on Do Not Call Rules and Regulations, and pass the exam at the end of the course during the contracting process. This includes all new Agents (i.e., PTAS, TAS, PP-A, TEA, 9x5, N-9, corporate and business Agents). This requirement must be done before any type of Agent's Contract is activated.

## 11. Consumer Availability of Do Not Call Policy

Federal rules and regulations require the Company to maintain a Do Not Call Policy and make it available to consumers upon request. The Do Not Call Policy, which is available on the Agency Portal at Standards & Compliance>Do Not Call/E-Mail>Do Not Call List Policies and Procedures, should be provided to consumers upon request. Agents must notify their Managing Partner whenever they provide a consumer with a copy of the Do Not Call Policy.

## 12. Penalties

Failure to comply with the DNC rules could result in fines being imposed against the Agent of up to $11,000 per federal violation and $25,000 per state violation. If an Agent fails to follow Company procedures, they will be personally responsible for any fines levied. E&O Insurance does not cover these fines. In addition, Agents could face disciplinary action by the Company up to and including termination.

## H. JUNK FAX

Based on the Junk Fax Prevention Act of 2005 and state laws, Agents are prohibited from sending unsolicited advertisements to facsimile machines. In addition, non-Agents, such as secretaries, sales assistants and licensed/registered service assistants, are also prohibited from transmitting unsolicited advertisements to fax machines, on an Agent's behalf.

## I. HANDLING CONTACTS WITH THE MEDIA

Agents may respond to general questions related to insurance. Any specific inquiry related to Company products, persons or other details should be referred to the Managing Partner who will contact the Corporate Communications Department.

## J. USE OF ELECTRONIC COMMUNICATION

All Agents may only use a Company-provided e-mail address in the course of carrying out their business functions.

In order to be in compliance with NASD regulations governing electronic communications between Agents and the public, Agents must strictly adhere to the following rules:

- Agents may not solicit or recommend the sale of securities products, including variable life and annuity products, via e-mail. Agents may communicate with their clients using Company-provided e-mail (Field Tech, Lotus Notes, etc.) regarding service items only.
- Agents are prohibited from communicating with clients using personal e-mail accounts (AOL, etc.). Note that receipt of incoming business related correspondence through these non-New York Life accounts is subject to 3010 reporting requirements. The Agent is required to immediately notify GO management of the receipt of any such correspondence. GO management will provide the Agent with direction on how to take corrective action.
- Managing Partners and Agents must follow the same rules for e-mail as for other outgoing correspondence.

### 1. Acceptable Use For All E-mails

Acceptable use guidelines that e-mail users must adhere to include:

- Keeping message sizes as small as possible. Limiting the distribution of messages that contain large attachments, graphics or animation;
- Addressing e-mail to the smallest number of recipients necessary to get the job done;
- Using e-mail in an ethical and lawful manner;
- Being accountable for the message content sent over e-mail systems;
- Using only authorized New York Life e-mail systems for any and all e-mail related to an Agent's business; and
- Using New York Life's e-mail systems for Company business only (Personal e-mail may occasionally be sent or received during business hours as long as it doesn't interfere with normal business

activities. Agents should bear in mind that these e-mail messages are also subject to Company review and production in connection with litigation or regulatory compliance. Users should have no expectation of privacy for any communication sent or received on Company e-mail systems)

## 2. Prohibited Use For All E-mails

The following are examples of activities that constitute improper usage of e-mail and are prohibited:

- Creating or exchanging:
  - o Information which is illegal, inaccurate, against Company policy or contrary to the Company's best interests;
  - o Information for personal gain (e.g., non-New York Life for-profit business affairs);
  - o Defamatory, discriminatory, abusive, sexually-oriented, harassing, obscene, threatening, or other inappropriate language or information;
  - o Chain letters;
  - o Advertisements or sales literature to clients and/or prospects; and
  - o Non-New York Life solicitations;
- Responding to or disseminating of unsolicited junk e-mail ("spam");
- Broadcasting non-business messages of a personal nature;
- Disguising one's identity in e-mail ("spoofing"); and
- Purposely wasting New York Life's computing resources or unfairly monopolizing those resources. This includes sending unnecessary mass mailings and subscribing to non-business "listservers" (discussion groups conducted through e-mail)

**Agents are prohibited from independently establishing web sites pertaining to their association with NYLIFE or New York Life, or soliciting business on the Internet.** However, Agents may establish web sites through the Company's program, currently administered by Emerald Publications. All web site content must be approved by SMRU before it is put online. Agents may refer to themselves as such on their approved web site and, if applicable, as an IAR of Eagle Strategies Corp. They may state that they offer a wide range of insurance and financial products. They may also state all the types of products they are properly licensed and registered to sell (e.g., mutual funds, variable annuities), provided they include the proper disclosures. They may not mention specific products by name (e.g., "MainStay Mutual Funds"). Agents may always refer to the New York Life web site on their business cards and/or stationery

Agents may not link their approved web site with any other sites except sites maintained by a local Chamber of Commerce or similar civic associations, industry organizations, and Company-related web sites, upon approval from SMRU

Note: Agents must follow the same sales material and advertising rules with e-mail as they do with other outgoing correspondence

## K. CAN-SPAM ACT of 2003

The Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM") Act of 2003 has important implications for Agents who communicate with clients and prospects using email

The Act is intended primarily to prevent commercial emails that are designed to mislead or deceive recipients. It also imposes certain obligations on legitimate users of commercial email, such as providing recipients with a means to "opt out" of receiving future emails. Violations of the CAN-SPAM Act can result

in both civil and criminal penalties for the Agent and the Company. Agents may also be subject to an internal disciplinary action, including a fine, suspension or termination.

## Policy Governing Outgoing Emails

Agents are required to include "opt-out" language on all outgoing email communications.

All emails must also include the physical address at which the Agent can be contacted.

If an Agent receives any "opt out" replies, he/she must ensure that the message has also been sent to email_optout@newyorklife.com. If it has not, he/she must send a copy of the request immediately to email_optout@newyorklife.com. Agency Standards will compile and post a " Do Not Email and Wireless Domain " list of all clients and prospects that have opted out of receiving email communications. The list will be updated every Friday, and will be posted to Agency Portal>Standards & Compliance>Do Not Call/E-Mail.

Agents are responsible for screening **every** outgoing commercial email against the Do Not Email and Wireless Domain Lists list prior to sending. This rule applies to emails sent by Agents themselves, as well as any emails sent on the Agent's behalf by a third party (such as an email marketing company).

In addition, Company policy prohibits the sending of commercial e-mail to wireless phones, pagers, and other devices that use an Internet domain name assigned by a wireless carrier (e.g., @sprintpcs.com). To facilitate Agent compliance with this requirement, New York Life maintains a list of wireless domains to which commercial e-mails cannot be sent. For the list of prohibited emails, please got to Agency Portal>Standards & Compliance>Do Not Call/E-Mail>"Do Not Spam" Email and Wireless Domain Lists.

## Additional Requirements under the Provisions of the CAN-SPAM Act

The following rules pertain to all commercial emails as defined by the CAN-SPAM Act:

### 1. Opt-Out Provision

According to the CAN-SPAM Act, all emails Agents send to clients and prospects must include a valid return email address or other Internet-based mechanism (such as a link to a web page) that permits a recipient to opt out of receiving further emails from that sender. The return email address or opt-out mechanism must be capable of receiving messages for at least 30 days after transmission of the original email. The temporary inability of a return address to accept emails due to a technical or capacity problem would not be a violation of the Act if the problem was not foreseeable and was corrected within a reasonable time.

If the recipient of an email opts out, the Agent as the sender and those acting on the Agent's behalf (such as a company hired to transmit email or a joint marketer) must stop sending commercial emails within 10 business days after receipt of the opt-out request. In addition, once a sender has received a notice to stop transmitting commercial emails to a specified email address, that address cannot be sold or otherwise transferred, except as necessary to comply with the Act or where the recipient has given his or her express consent.

### Email Opt Out Language Templates:

a) Opt Out Language for New York Life Agents
If you do not wish to receive email communications from New York Life, please reply to this email, using the words "Opt out" in the subject line.

Please copy email_optout@newyorklife.com
New York Life Insurance Co , 51 Madison Ave , New York, NY 10010

*Required Signature Language*
Name: **<Insert>**
Agent **(Required Field)**
New York Life Insurance Company **(Required Field)**
Address (can be detached, SO or GO): **<Insert>**
Phone (can be detached, SO or GO): **<Insert>**

**b) Opt Out Language for New York Life Agents who have an approved DBA**
If you do not wish to receive email communications from New York Life and/or **<Insert DBA Name>**,
please reply to this email, using the words "Opt out" in the subject line
Please copy email_optout@newyorklife.com
New York Life Insurance Co , 51 Madison Ave , New York, NY 10010

*Required Signature Language*
Name: **<Insert>**
Insurance Professional (or **<Insert>** approved DBA title) **(Required Field)**
DBA Name: **<Insert>**
Address (can be detached, SO or GO): **<Insert>**
Phone (can be detached, SO or GO): **<Insert>**

**c) Opt Out Language for Registered Representatives of NYLIFE and New York Life Agents**
If you do not wish to receive email communications from New York Life and/or NYLIFE Securities, please
reply to this email, using the words "Opt out" in the subject line
Please copy email_optout@newyorklife.com
New York Life Insurance Co , 51 Madison Ave , New York, NY 10010

*Required Signature Language*
Name: **<Insert>**
Financial Services Professional (Required Field)
New York Life Insurance Company Agent (Required Field)
Detached Address or SO addresses (if applicable): **<Insert>**
Registered Representative offering securities through NYLIFE Securities (member NASD/SIPC)
**(Required Field)**
GO Address: **<Insert>**
GO Main Phone: **<Insert>**

**d) Opt Out Language for Registered Representatives of NYLIFE Securities with a DBA**
If you do not wish to receive email communication from NYLIFE Securities and/or **<Insert DBA Name>**, please reply to this email, using the words "Opt out" in the subject line  Please copy
email_optout@newyorklife.com
NYLIFE Securities, 51 Madison Ave , New York, NY 10010

*Required Signature Language*
Name: **<Insert>**
Investment Professional (or **<Insert>** approved DBA title) **(Required Field)**
DBA Name: **<Insert>**

Detached Address or SO Address (if applicable): **<Insert>**
Registered Representative offering securities through NYLIFE Securities (member NASD/SIPC)
**(Required Field)**
GO Address: **<Insert>**
GO Main Phone: **<Insert>**
DBA name is not owned or operated by NYLIFE Securities or its affiliates **(Required Field)**

### e) Opt Out Language for individuals affiliated with Eagle Strategies Corp.

If you do not wish to receive email communications from Eagle Strategies Corp , please reply to this email,
using the words "Opt out" in the subject line
Please copy email_optout@newyorklife.com
Eagle Strategies Corp , 335 Madison Ave , Suite 200, New York, NY 10017

*Required Signature Language*
Name: **<Insert>**
Financial Adviser **(Required Field)**
Eagle Strategies Corp , a Registered Investment Adviser **(Required Field)**
Detached Address or SO Address(if applicable): **<Insert>**
Registered Representative offering securities through NYLIFE Securities (member NASD/SIPC)
**(Required Field)**
GO Address: **<Insert>**
GO Main Phone: **<Insert>**

### f) Opt Out Language for individuals affiliated with Eagle Strategies Corp. who also have an approved DBA

If you do not wish to receive email communications from Eagle Strategies Corp and/or **<Insert DBA
Name>**, please reply to this email, using the words "Opt out" in the subject line
Please copy email_optout@newyorklife.com
Eagle Strategies Corp , 335 Madison Ave , Suite 200, New York, NY 10017

*Required Signature Language*
Name: **<Insert>**
Financial Adviser‡ **(Required Field)**
DBA Name: **<Insert>**
Detached Address or SO Address (if applicable): **<Insert>**
Registered Representative offering securities through NYLIFE Securities (member NASD/SIPC)
**(Required Field)**
GO Address: **<Insert>**
GO Main Phone: **<Insert>**
‡Financial adviser offering investment advisory services through Eagle Strategies Corp , a Registered
Investment Adviser **(Required Field)**
DBA name is not owned or operated by Eagle Strategies Corp  or its affiliates **(Required Field)**

## 2.  Physical Address

Emails must include the Agent's valid physical postal address or a Post Office Box  The address must be a
location where a consumer can physically find the sender and/or employees of the sender  The Agent's email
communication must include all the information currently displayed on the Agent's letterhead, including
company name, Agent name and title, office address and phone number

### 3. Labeling

If an email is an advertisement or solicitation of an insurance product or service (non-registered), the message must so indicate in a clear manner. Agents may satisfy this requirement by using the words "advertisement," "offer," or "solicitation" in the body of the email. Phrases such as "This product may be a good solution for you" would also satisfy the requirement.

### 4. Harvesting

Agents are prohibited from using automated mechanisms (such as "robots" or "spiders") to obtain email addresses that appear on websites or online services.

### 5. Dictionary Attacks

Agents may not use automated means to generate possible email addresses by combining various permutations of names, letters or numbers.

### 6. False Header Information

Agents are prohibited from sending an email that contains, or is accompanied by, false or materially misleading header information. Header information must accurately identify the sender's address, the time at which the mail was sent, and the Internet location from which the message has been sent.

### 7. Deceptive Subject Lines

Agents may not send an email that contains, or is accompanied by, a deceptive subject line that would likely mislead a recipient about the content or subject matter of the message.

### 8. Originating Email Address

Emails may not include an originating email address, domain name or IP address obtained by false pretenses or representations.

### CAN-SPAM Act Supersedes State Laws

The CAN-SPAM Act creates a uniform national standard for commercial email communications. It preempts most state laws that regulate commercial email (including California's Senate Bill 186, which would have required recipients to "opt-in" to receive unsolicited email). The Act does not preempt state laws that are not specific to email, including those that relate to computer fraud and abuse, trespass, consumer protection, contracts or torts.

### Penalties for Non-Compliance

The CAN-SPAM Act will be enforced primarily by the Federal Trade Commission ("FTC"). The Federal Communications Commission ("FCC"), the Securities and Exchange Commission ("SEC"), state insurance departments and state attorneys general also have jurisdiction to enforce the Act.

Internet service providers ("ISPs") may bring civil actions against those who violate the Act. If an ISP is successful in such a suit, it may receive the greater of its actual monetary loss or statutory damages of $100 per email sent with a false or misleading header or $25 per email for any other violation, up to $1 million. The court may increase the maximum statutory damages to three times the amount otherwise available if the court finds that the defendant violated that Act knowingly or engaged in email harvesting or dictionary attacks (i.e., e-mail spamming technique in which the spammer sends out thousands or millions of e-mails with randomly generated addresses using combinations of names, letters or numbers added to known domain names in the hopes of reaching a percentage of actual e-mail addresses).

Each violation brought by a state, the SEC or FCC can result in statutory damages of $250 per email, up to $2 million. Damages can be tripled if it is demonstrated that the sender acted intentionally, harvested email addresses without the authorization of the website, or used dictionary attacks.

Criminal penalties and imprisonment may be imposed for certain violations of the Act, such as knowingly falsifying email header information, hacking a person's computer and sending "spam" from it, and establishing email accounts with false information from which multiple emails are sent. Penalties include prison terms of up to three years for most violations, as well as fines, forfeiture of any property used in the offense, and forfeiture of any profits obtained from such offense. Prison terms of five years apply to repeat offenders and those who violate the Act in the course of committing a felony.

Please contact AVP Robert Asterita, Agency Standards (914-846-3603) for questions concerning the CAN-SPAM Act.

## L. MONITORING OF ELECTRONIC COMMUNICATIONS

The Company monitors e-mail that is sent to and from Agents. Any correspondence sent from an Agent's e-mail address is presumed to be coming from the Agent. The Home Office conducts this review after the e-mail is sent or received to identify e-mail communications that contain problematic "patterns" (words of phrases). In the following circumstances, corrective or disciplinary action will be taken:

- When the content of an Agent's message is egregious or when an outbound message violates NASD and/or Company guidelines; or

- When the number of problem messages sent by an Agent is excessive, or the content of the e-mails sent is consistently offensive.

The above rules apply to Agents and their staff sending e-mails on the Agent's behalf. Each member of an Agent's staff that uses e-mail in the course of his/her duties must have a separate e-mail address. E-mail addresses may be assigned to an Agent's staff in such a way that the staff's affiliation with the Agent will be clear to the public. The e-mail for staff members must, of course, continue to flow through FT to facilitate the required Company monitoring.

E-mail that is sent outside of the Company is generally transmitted across the Internet. Since Internet e-mail cannot be assumed secured or confidential, users must consider the sensitivity of any NYL information they send via this means. If exposure of this e-mail would be a problem, a more secure method must be used. For example, statutes such as the Gramm-Leach-Bliley Act require protection of non-public information NYL holds on its customers. Consequently, NYL non-public customer information should never be sent via e-mail, particularly over the Internet, without additional safeguards.

E-mails are subject to review by individuals responsible for compliance, maintenance, and security of Company systems. They may also be subject to review by law enforcement officials and regulatory authorities. They may be copied to other Company systems and used in accordance with the operation of those systems. Messaging privacy is not guaranteed and should not be expected. All e-mails sent or received on the Company's approved e-mail domains may be provided to a regulator upon request, pursuant to applicable rules. The Company recommends that Agents limit the amount of personal e-mails that flow through Company systems and limit the transfer of e-mail between Company and personal e-mail systems.

## SECTION IV
## PROHIBITED SALES PRACTICES AND OTHER IMPORTANT RULES

### A. ANTI-MONEY LAUNDERING

Agents are subject to New York Life's corporate anti-money laundering ("AML") policy. Refer to New York Life's Anti-Money Laundering Policy Handbook, (available from Brian Toutrel, of the Corporate Compliance Department), for the corporate anti-money laundering policy and related procedures. The policy is also available on the Agency Portal, under Standards & Compliance>Policies & Procedures>Anti-Money Laundering Policy. The NYLIFE Anti-Money Laundering Procedures Guide is also available at this site.

### 1. Accepting Cash

    a    Agents and employees are prohibited from accepting U.S. or foreign currency as payment for any securities product or transaction.

    b    Agents and employees are prohibited from "converting" U.S. or foreign currency in relation to any transaction, whether or not securities. This means that all personnel are prohibited from first accepting currency from or on behalf of a customer, and then purchasing a "cash equivalent" (such as a money order, traveler's check, or cashier's check) with the funds, so that the cash equivalent can be used to fund the transaction. Similarly, Agents are prohibited from accepting cash and writing a personal check to pay for a transaction.

    c    The Company has strict rules regarding the acceptance of U.S. currency for traditional (non-securities) products. For example, currency may not be accepted for any transactions other than initial premiums. Where currency is accepted as payment for an initial premium on a traditional product, Agents and employees are required to comply with the Company's procedures for timely and accurate reporting on IRS Form 8300. For further information, please refer to "Cash Receipt and Reporting" immediately below.

### 2. Cash Receipt and Reporting

Agents who receive more than $10,000 in currency and/or cash equivalents in a single non-securities transaction (or in a series of related transactions over the course of a twelve-month period) are required to complete draft IRS Form 8300 and forward it to the Administrative Manager within 5 days. Any questions concerning whether or not a Form 8300 is required in a particular situation should be discussed with the Administrative Manager. When a transaction must be reported, the Administrative Manager will provide Agents with a copy of IRS Form 8300 and assist in completing the draft Form 8300. The Administrative Manager should verify that the form has been completed properly and promptly fax the form to the IPS Tax Unit for filing with the IRS. Forms 8300 are required to be filed with the IRS within 15 days of the receipt of currency or cash equivalents that causes the $10,000 threshold to be exceeded. Severe penalties may be imposed by the IRS for failure to file, late filing or the filing of an incomplete Form 8300.

Cash equivalents may include a cashier's check even if it is referenced to as a "treasurer's check" or "bank check."

Cash equivalents do not include checks drawn on an individual's personal account.

A cashier's check, bank draft, traveler's check, or money order with a face amount of more than $10,000 is not treated as a cash equivalent, and the Agent is not required to prepare Form 8300 based on the receipt of such instruments.

Agents are prohibited from advising customers on ways to structure transactions to avoid reporting requirements. An example of structuring would be arranging for a client to make a series of cash deposits in amounts below the reporting threshold in an effort to avoid reporting requirements. To do so is a violation of federal law and could result in fines, incarceration, and dismissal.

Agents are responsible for obtaining all required information on Form 8300 in connection with new business or for any other cash transaction. Agents should obtain and record the documentation necessary to verify the identity of the person from whom the reportable currency and/or cash equivalents are received (not necessarily the policy owner). Verification may be made by examination of a valid government issued document such as a photo ID driver's license or passport. Verification of the identity of a non-U.S. citizen can be made by examination of such person's passport. If the payer has a Social Security number, it must also be included on Form 8300.

For additional information on currency or cash equivalent receipt and reporting, see your Administrative Manager.

### 3. Customer Identification Programs

New York Life has in place a Customer Identification Program ("CIP") that sets forth procedures for opening accounts that specify the identifying information to be obtained from each customer.

- **a. Information that must be obtained:** Agents must at a minimum obtain the following information on a policy owner or account owner prior to submitting an application or new account form:
  - name
  - date of birth (for an individual)
  - address, which shall be:
    - for an individual, a residential or business street address;
    - for an individual who does not have a residential or business street address, an Army Post Office or Fleet Post Office box number, or the residential or business street address of a next of kin or another contact person; or
    - for a person other than an individual (such as a corporation, partnership, or trust), a principal place of business, local office, or other physical location; and
  - identification number, which shall be:
    - for a U.S. citizen, a Taxpayer Identification Number ("TIN")
    - for a non-U.S. citizen, one or more of the following: TIN, or a passport number and country of issuance. For citizens of Canada and Mexico, a government issued document such as a valid driver's license will be acceptable. Any other driver's licenses or national citizenship cards will not be accepted.

Note: The above requirements pertaining to non-U.S. citizens do not change existing underwriting procedures or requirements.

Agents will be provided with a simple form entitled *Identification and Verification Form (22502)* to use to collect the information required. The new form only needs to be completed once for each new business customer, or the first time a repeat buyer is looking to place additional business.

Agents must attest that the information collected is true to the best of their knowledge and that the person identified on the documentation submitted by the proposed owner appears to be the same person identified on the application

**b. Verification of identity:** The CIP requires the verification of identity of each policy owner or account owner, using the information obtained above. Company procedures for verifying customer identity require Agents to review identifying documents, which may include:

- for an individual, an unexpired U.S., Canadian or Mexican government-issued identification evidencing nationality or residence, such as a valid driver's license or passport; any other driver's licenses or national citizenship cards will not be acceptable;

- for corporations, partnerships, and trusts, documents demonstrating the existence of the entity, such as certified articles of incorporation, a government-issued business license, a partnership agreement, or a trust instrument

In addition to reviewing the above documents, Agents must record the type of document reviewed (e.g. driver's license or passport) and document (e.g. driver's license or passport) number and expiration date on the *Identification and Verification Form (22502)*. A separate form is required for each owner

The Company is responsible for providing notice ("Customer Notice") to policy owners and account owners that they are requesting information to verify their identities. For all new business, Agents must provide new clients with a copy of a notice disclosing "Important Information about Procedures for Opening a New Account". The notice will be automatically included with the Company's "Privacy Notice." Agents are required to sign and submit the *Identification and Verification Form (22502)*. In order for the new business to be processed, the completed form must be submitted, for each owner, with the application. The Company will not process an application without this form

**c. Payment from Third Party Payers:** The Company is now required to obtain information regarding initial and inforce payments received from parties other than the policyowner, insured or annuitant - payments from Third Party Payers. In addition to verifying identity to meet the Customer Information Program (CIP) requirements, the Company must collect and monitor additional information in accordance with the requirements of the Office of Foreign Assets Control (OFAC) and the Bank Secrecy Act (BSA). The required information regarding any payer other than the policy owner, insured or annuitant will be collected through either the new business application or Form 22502. Agents may be contacted for additional information regarding initial or in-force payments

## 4. Suspicious Activity

Suspicious activity is generally defined as one or more transactions conducted or attempted by, at or through a financial institution involving funds or assets for which:

The financial institution detects any known or suspected federal criminal violation involving the financial institution, or the financial institution knows, suspects or has reason to suspect, that the transactions:

- Involve funds related to illegal activity;
- Are designed to evade the regulations; or
- Have no business or apparent lawful purpose and the financial institution knows of no reasonable

explanation for the transaction after examining the available facts, including the background and possible purpose of the transactions

Suspicious activity is evidenced by "red flags," or warning signals

## 5. Discovering a "Red Flag" Indicating a Suspicious Transaction

If in the course of his business an Agent encounters any one or a combination of the red flags discussed below, the Agent should immediately bring the situation to the attention of the Managing Partner

Agents should provide the Managing Partner with all of the facts of the situation, including all related documentation The Managing Partner will then, where appropriate, contact the AML Compliance Officer The AML Compliance Officer may ask the Agent to complete a questionnaire designed to obtain additional information about the activity, the customer, and the transaction, and may also ask for copies of documentation Once the review of the situation is completed, the AML Compliance Officer will determine whether or not the suspicions activity should be reported to the authorities, and take other appropriate action Under no circumstances should an Agent disclose to the customer that they are being investigated for suspicious activity This is referred to as "tipping" and is strictly prohibited Failure to comply with this prohibition can result in fines, penalties and/or imprisonment

## 6. Anti-Money Laundering Red Flags

Agents may encounter so called red flags (or warning signals) when working with a or existing customer on a new policy or account An Agent who identifies any of the following red flags should promptly notify his or her Managing Partner

### New Business Red Flags

- A customer exhibits unusual concern about New York Life's compliance with government reporting requirements or New York Life's AML policies, particularly with respect to his or her identity, type of business and assets, or is reluctant or refuses to reveal information concerning business activities, or furnishes unusual or suspect identification or business documents

- The customer wishes to engage in transactions that lack business sense or apparent investment strategy, or are inconsistent with the customer's stated strategy

- The customer provides information identifying a source of funds, but the information turns out to be false, misleading or substantially incorrect

- Upon request, the customer refuses to identify or fails to indicate a legitimate source for his or her funds or other assets

- A customer (or person associated with the customer) has a questionable background or is the subject of news reports indicating possible criminal, civil or regulatory violations

- The customer exhibits a lack of concern regarding investment risks, transaction commissions, or other costs

- The customer appears to be acting as an Agent for an undisclosed principal, but is evasive about providing, or declines or is reluctant, without legitimate reasons, to provide information regarding that person or entity

- The customer has difficulty describing the nature of his or her business or lacks general knowledge of his or her industry.

- The customer's policy/account application contains incomplete or missing information (not including simple oversights)

- The customer is from, or has accounts in, a country identified as a non-cooperative country or territory by the Financial Action Task Force ("FATF"), as identified by the Corporate Compliance Department

- The customer is a government official of, or is affiliated with, one of the following countries: Burma (Myanmar), Cuba, Iran, Libya, North Korea, or Sudan. The list of blocked nations is updated on a regular basis by OFAC ("Office of Foreign Asset Control"). The OFAC web site is http://www.ustreas.gov/index.html

- The customer provides a suspicious Social Security Number or Taxpayer Identification Number For example – all zeros or sequential numbers like 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 or 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

**Policy Payment Red Flags**
- A check with an unusual or unofficial corporate name or logo

- A "starter check" is used to pay premiums. Any check without a pre-printed name and/or address, or without numbers usually, but not always, between 1 and 100, may be suspicious, especially for a business bank account

- Premium payments made by a third party with no apparent relationship to the policy/account/contract

- Agents should be suspicious of cash or cash equivalents and recognize the possibility of structured transactions designed to circumvent the reporting requirements. Agents should carefully review payments made with bank drafts, cashier's checks, money orders or traveler's checks

### 7. Training

All Agents are required to complete the AML CBT on NYLIC University on an annual basis. In addition, all newly hired Agents are required to complete the AML CBT. The CBT is integrated in Basic Career Course as part of the new Agent training so that it is completed within the new Agent's first three months under contract. As a result, the new Agent's annual AML training requirement is satisfied. Agents who fail to satisfy required aspects of their 2006 AML CBT course by the required date may have their insurance and securities license(s) suspended.

### B. ACCEPTING COMPENSATION

Agents are prohibited from:

1    Sharing commissions on securities transactions with any individual who is either not registered with NASD or not licensed in the state in which the transaction took place and where the customer resides;

2   Paying another Agent any portion of the commission received on a securities sale  All payments made
    for securities commission-sharing arrangements must be made through NYLIFE;

3   Rebating, directly or indirectly, to any person, entity, firm or corporation, any part of compensation
    received, or paying any finder's fee;

4   Accepting, directly or indirectly, from any person, entity, firm, or corporation other than New York
    Life, NYLIFE and their affiliates, securities-related compensation of any kind (such as a bonus,
    commission, fee, gratuity, finder's fee, referral fee, or any other non-monetary or monetary
    consideration); or

5   Accepting a gratuity or undisclosed compensation from a customer

## Sharing Commissions

### a. Sharing Commissions on Sales of Securities/Registered Products

Agents may share commissions from the sale of securities only with other Agents who are Registered
Representatives of NYLIFE and who meet all requirements for sharing (i e , they have appropriate
NASD registrations and the necessary state securities license)  Only NYLIFE may make payment of such
commissions to the respective Agents (i e , an Agent may not pay another Agent directly)  Also, they may
not share commissions with Agents of other broker-dealers with the exception of business processed
through Advanced Market Networks, or with the prior written permission of the President, CEO or
COO of NYLIFE Securities in a particular case  In addition, Agents are not permitted to receive or pay
fees for referral business, with the exception of the CPA Referral Program (for details, please see the
"Partnership for Professionals" Manual)  All commission sharing arrangements must be disclosed to
NYLIFE on the application, 1099s are not permitted

### b. Sharing Commissions on Sales of Traditional (Non-Securities) Insurance Products

Established Agents may share a portion of the commission earned on traditional (non-securities) life
insurance or fixed annuity sale with a non-New York Life Insurance Agent, but must issue IRS Tax Form
1099 as evidence of this transaction  New York Life Agents may not share commissions with former
New York Life Agents who were terminated for cause

1   The following requirements must be met before an Agent may share a commission:

a)  Written approval from the Managing Partner must be received prior to establishing an
    agreement to share the business  Approval is obtained through the completion of Form
    21763 by the writing Agent, the non-New York Life Agent and the Managing Partner
    Agents must obtain a copy of the current valid life insurance and/or annuity license of
    the party who will receive the 1099  The Managing Partner will keep a file documenting
    the approval  The file should also include a copy of the license of the Agent receiving
    the 1099;

b)  The non-New York Life Agent must have an insurance license for life and annuity in the
    proposed insured's state, and if applicable, be approved by New York Life  State
    regulations must also permit the sharing arrangements;

c)  The solicitation, completion and witnessing of the application, and the delivery of the
    policy, are all completed by the New York Life Agent

**Non-TAS Agents are permitted to share commissions with licensed non-New York Life Agents
and issue Form 1099, under the conditions set forth above, only in those jurisdictions that permit**

this practice. TAS Agents are not permitted to engage in such arrangements.

2    The following jurisdictions currently prohibit commission sharing, unless the New York Life Agent is sharing with a licensed broker. In order to be eligible for commission sharing, each party must be licensed as a broker (not as an Agent), in life and health and/or annuities, depending on the product that is being offered at the time the solicitation is made, in the following states:

Alaska
District of Columbia
Florida
New Mexico
New York
North Carolina

### c.  Sharing Compensation with Employees

Employing Agents may not directly or indirectly share with or pay to any employee transaction-related compensation.

**Should an Agent's employee violate applicable insurance or securities laws, rules, and regulations and/or Company policies, rules or procedures the Employing Agent may be subject to disciplinary action, up to and including termination of his/her Agent's Contract, as well as regulatory sanctions.**

## C. INSIDER TRADING

Federal and state securities laws make it unlawful for any person to trade or recommend trading in securities on the basis of material, non-public information (i.e., "inside information"). Agents and other persons associated with NYLIFE must preserve in confidence any inside information they may receive and must not use it in any manner that violates securities laws or creates the appearance of impropriety, including trading while in possession of such information or telling others about such information. They are required to comply with any policies and procedures that New York Life or NYLIFE may adopt to detect and prevent insider trading.

To be considered "inside information," the information must have the following characteristics:

1    Material: An investor would consider it important when making an investment decision, or it is likely to have a substantial effect on the market value of securities;

2    Non-public: Information that has not been disclosed to the general public and has not been made widely available to investors; and

3    Confidential: It was obtained from another person on a confidential basis, or where the recipient of the information knows that the other person breached a duty of confidentiality by disclosing it.

**Agents who have reason to suspect that trading on or sharing of inside information has occurred or may occur must immediately notify the Corporate Compliance Department.**

## D. PRIVATE SECURITIES TRANSACTIONS

## 1. Selling Away

A private securities transaction (sometimes referred to as "selling away") occurs when an Agent or another person associated with a broker-dealer participates in a securities transaction that is not approved for sale by his or her broker-dealer. The Company does not permit Agents to offer private securities transactions under any circumstances, even where no compensation to the Agent is involved. Agents are permitted to sell only those securities approved for sale by the Company.

The term "security" encompasses more than stocks, bonds, mutual funds, and variable insurance products. Agents are prohibited from engaging in or participating in any solicitation or sale, or in any meeting involving the solicitation or sale, of any securities product or any other money-raising venture (including the issuing of promissory notes) that has not been expressly approved, in writing, by an officer of NYLIFE. Such activities would include, but are not limited to, participation in:

    a   The offer, sale, or issuance of promissory notes;

    b   The offer or sale of short-term debt or obligation instruments, privately-issued bonds, or investment partnerships;

    c   The offer or sale of coins, antiques, or other collectibles as investments;

    d   Soliciting any person to execute contracts involving lease agreements of any kind, such as ATM leases, vending machine leases, or coin-operated telephone leases; or

    e   Viatical settlements

Product sponsors sometimes claim that anyone can sell their products, and wrongly imply that their products do not require SEC and/or state registration, or are not securities. If an Agent is approached by anyone concerning any money-raising venture, he/she should seek guidance from the Managing Partner or the Zone Agency Standards Officer. Under no circumstances should an Agent accept the statement of someone outside the Company that the offer of a particular product does not require securities registration, or is not otherwise subject to regulation, regardless of whether the person can furnish a legal opinion or other documentation in support of such statement.

### Penalties

Any Agent who participates in a private securities transaction will be subject to disciplinary action by the Company, including possible termination, and will be held personally responsible for whatever losses an investor incurs as a result of such transactions, as well as any related losses to the Company. Regulatory authorities may also subject Agents to a fine, suspension or bar from engaging in any securities activities. There may also be criminal penalties and sanctions.

## 2. Viatical Settlements

A viatical settlement (a.k.a. life settlements, advanced settlements, assignable life) involves the sale of a life insurance policy to a third party. The owner of the life insurance policy sells the policy for a reduced amount or a percentage of the contracted death benefit. The buyer typically becomes the new owner and/or beneficiary of the life insurance policy, becomes responsible for subsequent premiums, and collects the death benefit of the policy when the insured dies. The purchaser of a viatical settlement invests in the viatical settlement contract obtained by the viatical settlement provider.

**Viatical settlement investments used as device to defraud investors**

Some states have enacted laws prohibiting companies from using advertising that exaggerates the safety and profitability of viatical investments. States have also brought actions against companies involved in viatical sales. Instances of viatical settlement sales involving "wet ink" and "clean sheeting" schemes have occurred. A "wet ink" scheme involves the solicitation of healthy people to apply for insurance by viatical sellers. Once the policy is issued, it is immediately sold to investors using misleading medical information. "Clean sheeting" involves the viatical seller soliciting people who actually are terminally ill to apply for insurance, either in amounts just below the limits for a medical exam, or by using the medical records of a healthy person. "Clean sheeting" involves an attempt to defraud the insurance company, and may constitute a basis to deny an ensuing death claim.

**Prohibition of participating in viatical settlement market**

Due to the potential for abuse in the viatical settlement market, the unsettled tax and regulatory climate, and the potential securities law implications (e.g., selling away), Agents are strictly prohibited from participating in any transactions involving viatical settlements.

### 3.  Prohibition of Stranger-Owned, Investor-Owned and Charity-Owned Life Insurance

New York Life prohibits Agents from participating in any secondary market sale of a life insurance policy, which includes life settlements and the several variations of STOLI programs now in the marketplace such as investor-owned life insurance (IOLI) and charity-owned life insurance (ChOLI).

STOLI, IOLI and ChOLI are designed to ultimately result in ownership of a policy by a third-party investor who will not suffer an economic or emotional loss upon the death of the insured. These programs often involve an attempt to disguise the actual need for, or intent of, insurance purchases. By converting life insurance into an investment product STOLI, IOLI and ChOLI undermine the importance of insurable interest and potentially jeopardize the favorable tax status of the Company's products.

**Common Characteristics of Stranger-Owned Life Insurance Programs**

STOLI and ChOLI programs are designed, through a series of steps, to end up with a life insurance policy owned by or benefiting a stranger (a lender or investor). Here's how the process generally works:

- Speculators induce individuals to apply for and buy life insurance policies. The inducements - such as "free insurance," no-risk loans or cash - are akin to bribes. The speculators and the insured have an understanding, at the outset, that the speculators will purchase the policy from the insured.

- The speculators become the owners of the policy, even though they have no insurable interest in the insured.

- These schemes are targeted at the elderly, usually those with a high net worth, so that larger amounts of life insurance can be obtained.

- The policy is "free" to the individual who is insured, as the first few years of insurance premiums are financed by the speculators or a lender they provide.

- The actual transfer of the policy to the speculators takes place after the period (usually two years) in which the insurance company has the legal right to contest or deny the coverage.

- Unlike conventional life settlements, this is not a true secondary market transaction - because the primary market never existed. The person insured never wanted the policy.

New York Life Agents are prohibited from selling policies that are being purchased as part of a non-recourse financing arrangement or any other investor-owned program. A "Statement of Client Intent" must be completed and signed by the policyowner, insured and Agent for all permanent policies, including term conversions, for issue ages 65 and over and total face amounts (including any term riders) of $1 million and over. The signed form must be submitted with the Part 1. If not, the policy will not be released for delivery until the form is sent and reviewed by the underwriter. Depending on the nature of responses, the underwriter may call for additional information concerning either the financials or the trust.

### 4.  Charitable Life Sales Using Special Trust Notes and Annuities

Charitable Life Sales Using Special Trust Notes and Annuities solicitations encourage charitable giving by finding donors to be insured using life premiums paid through trust notes purchasing single premium immediate annuities. Essentially, such plans allow groups of investors to use charities or religious institutions to obtain benefits from life polices in which both the charity and the investors have an interest.

The State of New York Department of Insurance has issued an opinion that such policy purchases do not constitute a valid use of insurable interest. Accordingly, such arrangements are not acceptable under the New York Insurance Law. **Agents are prohibited from engaging in this practice. This practice will not be approved as an Outside Business Activity.**

### 5.  Cash Out Refinancing

Agents may be solicited to become involved in transactions where home mortgages are refinanced with the primary purpose of generating cash for purchasing life insurance or securities. The NASD has disciplined RRs for making unsuitable recommendations by recommending mutual funds, or variable annuities, using the proceeds of a "cash out refinancing" mortgage. The NASD has also issued an Investors Alert related to this practice.

**The Company considers "Cash Out Refinancing" inappropriate for the purchase of securities or traditional products. Agents are prohibited from making recommendations or mortgage borrowing as a means to fund life or annuity purchases.**

### 6. Private Securities Transactions In Limited Partnerships

Agents are prohibited from soliciting the purchase or sale of any limited partnership, recommended or otherwise whether in the primary or secondary trading market. The sale or transfer of a client's interest in a limited partnership, if facilitated in any way by a NYLIFE Agent, may constitute a private securities transaction, whether or not the Agent receives compensation. Customers, however, may contact NYLIFE Brokerage Services directly to execute transactions in publicly traded limited partnerships that are listed on a major exchange.

If clients wish to sell an interest in a limited partnership that was purchased through NYLIFE in past years, Agents should:

a   Suggest that the client seek to sell the partnership interest directly to another individual. However, the Agent must not get involved in the transaction in any way (e.g., by seeking or suggesting a buyer);

b   For non-proprietary limited partnerships, advise the client that the sponsor or general partner may

have information or procedures to facilitate the sale or transfer of the interest to another person. Upon request of the customer, Agents may provide the phone number of the sponsor or general partner of a particular limited partnership, but must not become involved in the transaction in any manner; or

c.   For proprietary limited partnerships, advise the client to call Jennifer Caminiti, (973) 394-4120 or Mark Newhart, (973) 394-4216, for information or procedures to transfer an interest. Agents must not become involved in the transaction in any manner.

## 7. Private Placement Variable Universal Life Insurance

Private Placement VUL is available for sale only by those Agents who have been specifically approved by NYLIFE.

A Private Placement is an offering of securities that is made without SEC registration, pursuant to an exemption under the Securities Act of 1933 ("1933 Act"). Regulation D under that Act sets forth conditions which, if satisfied, provide a "safe harbor" for satisfying the 1933 Act's exemption provisions. If these conditions are not met, the status of the entire offering will be placed in jeopardy, which may result in regulatory and civil liability for both the issuing company and the individuals who offered or sold the Private Placement. Thus, it is imperative that certain compliance procedures be strictly followed.

Upon obtaining approval from NYLIFE to offer a Private Placement Variable Universal Life Insurance Policy, the Agent will be provided procedures outlining the process that must be followed.

## 8. Group Variable Annuities

Group variable annuities, although exempt from SEC registration, are still considered securities and therefore subject to almost all of the conditions and restrictions of any other securities transaction. NYLIFE has the same supervisory obligations with respect to group variable annuity sales as it has over the sales of other securities. The offer or sale of non proprietary group variable annuities without the prior knowledge and consent of NYLIFE is considered "selling away" and is prohibited. All Agents must complete a new account form, have it signed by their Managing Partner and fax it to NYLINK @ 212-351-6101 prior to participating in Group Annuity Sales. Only approved sales materials may be utilized and Agents must ensure that the particular product is suitable for the customer.

Group variable annuities include:

a.   A group annuity that has a value that fluctuates with the value of the underlying assets; or

b.   A guaranteed investment contract ("GIC"), guaranteed separate account, or synthetic GIC that has either of the following features:

   •   A market value adjustment on early termination (for example, where the owner is at risk of receiving less than the guaranteed amount on early termination); or
   •   An interest rate that is reset more frequently than once a year

Agents are prohibited from receiving any compensation related to group variable annuities from any company other than NYLIFE, and all compensation must flow through the books and records of NYLIFE.

## 9.   Equity-Indexed Annuities

Agents are prohibited from selling any Equity-Indexed Annuities and Equity-Indexed Life Insurance.

products  Agents who sell these products will be subject to disciplinary action up to and including termination

## E. RESTRICTIONS ON THE PURCHASE AND SALE OF PUBLIC OFFERINGS OF EQUITY SECURITIES

### This section applies only to Agents who are Registered Representatives.

Neither Agents nor associated persons may purchase securities in a public offering for their own accounts or their immediate family members  For purposes of this prohibition, the term "public offering" is defined as any primary or secondary distribution of securities made pursuant to a registration statement or offering circular, including initial public offerings

Agents and associated persons must adhere to the following rules:

1  Neither they nor any immediate family members they support, either directly or indirectly, may purchase initial or secondary public offerings of securities  "Immediate family members" include parents; mother-in law or father-in-law; husband or wife; brother or sister; brother-in-law or sister-in-law; son-in-law or daughter-in-law; and children  Note: Immediate family members who are not supported by the Agent may participate in an initial or secondary offerings, provided they purchase from a broker-dealer other than NYLIFE and the Agent or Associated Person has no ability to control the allocation;

2  They may not purchase new issues of securities pursuant to a "stand-by arrangement," and

3  Investment partnerships or investment clubs in which they participate may under certain conditions be eligible to purchase new issues of equity securities  Any Agent or associated person seeking to benefit from this exception must receive prior approval from the Corporate Compliance Department

## F. SALES PRACTICES OF AGENTS

It is the duty of the Managing Partner to supervise all sales activities of the Agents in his or her respective GO  The following section describes both recommended and prohibited sales practices for Agents

### 1. Only Approved Products may be Offered

Agents are prohibited from offering or selling any securities product not expressly offered, sponsored or approved by NYLIFE

Agents are authorized to solicit the sale of only those securities products offered by NYLIFE (e g , approved mutual funds, certain Section 529 plans, variable annuities, and variable life insurance)

### 2. No Solicitation or Recommendation of General Securities Products

Agents are prohibited from soliciting or recommending the purchase or sale of stocks, bonds, options or any other general securities product  Agents are permitted to solicit purchases of approved products for sale by NYLIFE  The Agency Portal (https://www.ap.newyorklife.com/AP/1,4343,ST-633 137-1,00.html) lists products approved for sale and the current prospectus and any supplements that must be provided to a prospective purchaser  Agents should contact outside vendors directly to obtain current prospectuses for non-proprietary mutual funds

## 3. Exercising Discretionary Authority

Agents are prohibited from exercising discretionary authority, including time and price discretion, over a customer's account, policy, or other financial assets. Agents must not obtain or hold clients' signed but undated forms or applications for submission at a later date, or otherwise may they have access to client's PINs, bank accounts, etc.

## 4. Delivering a Prospectus

Before or while discussing with a prospective purchaser a variable annuity, variable insurance contract, mutual fund, or Section 529 plan, an Agent must provide the prospective purchaser with the current prospectus (or offering statement) for that product. For mutual funds purchased through the brokerage platform, National Financial Services LLC will forward a prospectus to the customer together with the confirmation of the transaction.

Agents may not mark, circle, highlight, write on, or otherwise modify any prospectus given or to be given to a customer. Such alterations could be considered undue emphasis or materially misleading. Also, Agents may provide only a current original, printed prospectus for the product being solicited, not a photocopy or a reproduction. The Corporate Compliance Department is responsible for updating the New York Life Intranet site (https://www.ap.newyorklife.com/AP/1,4343,SI-633-137-1,00.html), which lists the proprietary products that are approved for sale, and the current prospectuses and any supplements that must be provided to prospective purchasers. Agents should contact outside vendors directly to obtain current prospectuses for non-proprietary mutual funds.

A Statement of Additional Information ("SAI") may be available as a supplement to a mutual fund or a variable contract prospectus. If so, the prospectus will contain information on how a customer may obtain an SAI.

Agents must in every case explain the material terms of the prospectus. They must provide a complete description of all fees, penalties, and/or expenses associated with the transaction, describe product features, and point out relevant tax considerations (e.g., in the case of tax-qualified plans) to the customer, and refer specifically to each applicable charge or fee, including any sales or administrative charges. Use of the term "no load" to describe a product that has a "front-end" or "back-end" sales load, or a 12b-1 expense of 25 basis points or more, is strictly prohibited and violates securities laws.

An Agent must be properly licensed and registered in order to be eligible to recommend the purchase or sale of a security. Questions on licensing and registration should be directed to your Administrative Manager.

An Agent may not make statements that are inconsistent with the contents of the prospectus or SAI.

Whenever a variable contract provides for a choice of variable settlement options, Agents must deliver a current prospectus to any beneficiary receiving death proceeds.

For NYLIFE AdvisorOne accounts:

If an Agent uses advertising or marketing material in conjunction with the offer or sale of a mutual fund purchase, the advertisement or marketing material must be preceded or accompanied by the prospectus. If advertising or marketing materials are not utilized, the prospectus will be forwarded to the customer together with the confirmation of the transaction.

## 5. Delivering a Prospectus for Closed-End Unit Investment Trusts

One exception to the rule requiring prospectus delivery before or during the sales presentation is that, in certain circumstances, Agents may discuss unit investment trusts ("UITs") without first giving the prospective purchaser a current prospectus for the particular UIT. Many closed-end UIT series close out quickly, making distribution of a prospectus for the currently available series impractical. Agents engaged in sales of UITs must abide by the following rules:

    a   They must provide a current prospectus for the trust series whenever possible. The Agent should inform the client that the trust series is subject to closing out and that succeeding series are likely to be different, particularly with respect to underlying bond investments and estimated current returns.

    b   They must contact the sponsor before discussing a particular trust series with a client to determine whether that series is available and, if so, identify any material differences between the prior series and the current one. If no series is currently being offered, an application for units cannot be solicited until the next series becomes effective.

    c   They may use no written materials relating to a specific series, other than those expressly approved for use, unless those materials are preceded or accompanied by a current prospectus. It may be improper to use written sales materials if a trust series is not currently being offered. The Corporate Compliance Department will advise the registered product business area about proper compliance procedures for the use of sales materials.

    d   They may make oral statements regarding the trust or a series only if they strictly follow information contained in the written sales materials, in the current prospectus, or in the final prospectus for an earlier series. Agents must carefully point out any material differences between the series.

    e   They must inform the client that more complete information is available in the current prospectus, and that the client should read the prospectus before investing. Although a current prospectus will be delivered to the client by the sponsor with a confirmation of the order, the client has the unqualified right to review a current prospectus before applying.

## 6. Delivering a Buyer's Guide
### a. Life Insurance

All clients must receive a Buyer's Guide and all state-specific and other requirements set forth in the Buyer's Guide must be carefully followed. A Buyer's Guide (form 21621 in most states) **must** be presented to the consumer when the life insurance policy is **delivered**. The following states require the Buyer's Guide to be delivered at the time of application:

  Georgia, Massachusetts, New York*, Illinois, Nevada, Washington, Maine, New Hampshire, and Wisconsin.
    *New York also requires the distribution of an "Addendum" (Form #21942) with the Buyer's Guide.

### b. Long-Term Care Insurance

All clients must receive the Shopper's Guide to Long-Term Care Insurance or the state-specific shopper's guide. The Shopper's Guide (form G6369 in most states) must be presented to the consumer prior to the presentation of the application. The following states require delivery of the Guide at a time other than prior to presentation of the application:

    Maine - first solicitation

Massachusetts – first face-to-face contact

North Carolina – prior to sale

Wisconsin – at time contact person to solicit the sale

All clients age 65 and older must also receive a Guide to Health Insurance for People with Medicare (form G6282) The Medicare Guide must be presented to the consumer at the time of application
    Massachusetts also requires delivery of an "Addendum" (form G6282MA) with the Medicare Guide

### c. Annuities
Many states require Agents to provide a "Contract Summary" in addition to the Buyer's Guide to Fixed Deferred Annuities

## 7. Making the Sales Presentation
In making sales presentations to current or prospective customers and in closing sales, Agents must uphold the highest ethical and professional standards of New York Life and NYLIFE Full disclosure must be provided to the client regarding any traditional (non securities) insurance or registered product, including, where appropriate, the potential for consequences of market changes volatility, interest rate fluctuations, the non-guaranteed nature of dividends, and any inherent risk, fees, and surrender charges associated with the product Agents must observe these following guidelines:

### a. Balance The Presentation
1 The advantages of specific products, particularly variable contracts, mutual funds, Section 529 plans, and other securities, must not be discussed without explaining their respective risks, especially market and interest rate risks;

2 The advantages of a variable contract, mutual fund, Section 529 plan, or other securities or insurance products must not be exaggerated;

3 Claims about (i) the underlying investments of a mutual fund, UIT, or Section 529 Plan or (ii) the management ability or competence of New York Life, NYLIAC, NYLIFE, the investment advisor to a mutual fund, or the sponsor of a UIT or other products distributed by NYLIFE must not be exaggerated;

4 Disclose what must be considered when purchasing a variable annuity in a qualified plan;

5 Statements inconsistent with the terms of the prospectus and SAI are prohibited;

6 Disclosure must be provided regarding the characteristics of the investment or product, the costs associated with the purchase, as well as possible tax consequences Among the items that must be disclosed, if applicable, are:

   - Objectives of Fund / Investment;
   - All charges and expenses associated with Class A, B, and C shares;
   - 12b-1 fees;
   - Contingent deferred sales charges or front-end loads;

- Risk of loss of principal;
- Potential for fluctuations in market values;
- Breakpoints at which sales charge discounts are available;
- Letter of Intent and Rights of Accumulation provisions; and
- Surrender charges

### b. Discuss Performance Carefully

1. Agents must never guarantee a customer against loss, or in any way represent that the Company or the Agent will guarantee the customer against loss, unless the prospectus or offering materials specifies such guarantee;

2. Agents must not predict or project the investment performance of any security or separate account even in hypothetical terms; and

3. Agents must not predict, guarantee, or imply a guarantee regarding dividends or other non-guaranteed values of insurance or annuity products.

### c. Make Comparisons Carefully

1. The results or performance of any two specific securities products or investment products must not be compared. Different products often have different objectives, terms, policies, and other differences that affect their investment results making comparison inappropriate. Agents may only use Company-approved material for comparison purposes;

2. The results or performance of any mutual fund or equity must not be compared with any market index or average, except through the use of sales literature prepared by NYLIFE and approved for public use;

3. Representations or implications that the management of a separate account is under the same investment restrictions or operates under the same limitations applicable to New York Life are prohibited; and

4. Use of a policy illustration not specifically approved in advance by SMRU, or alteration of an illustration approved for use, are prohibited

## 8. Prohibited Sales Practices

1. In addition to other activities that are prohibited under the provisions of this Handbook, Agents are prohibited from engaging in the following activities: Selling mutual funds just below a "breakpoint," thereby making the shareholder ineligible for a lower sales charge;

2. Recommending as an advantage the purchase of a mutual fund shortly before a dividend is to be declared (i.e., selling dividends);

3. Recommending the short-term trading of mutual funds;

4. Recommending the sale of one mutual fund and the purchase of another mutual fund with similar or identical characteristics, objectives, etc. (i.e., mutual fund "switching") unless there is a legitimate reason to do so and there is full disclosure to the customer regarding associated charges;

5    Providing legal or tax advice  Agents should always advise customers that they may wish to contact an accountant, attorney, or tax advisor in connection with the contemplated securities, annuity, or insurance transaction;

6    Signing an application or subscription agreement obtained from a prospective purchaser by an individual not registered and/or licensed to sell the product;

7    Having customers sign required forms or applications in blank or accepting blank signed forms;

8    Recommending the sale of one class of mutual fund shares over another without first determining the anticipated holding period and assessing which share class is appropriate in light of the client's intended investment;

9    Creating and using account statements, reports and/or summaries not approved by the Company or SMRU;

10   Placing the Company under any legal obligation that is not within the authority granted by the Company in the Agent's contract, the Registered Representative Agreement, this Handbook, or otherwise in writing by a responsible Company officer;

11   Accepting risks of any kind on behalf of the Company, or making, modifying, or discharging contracts; extending the time for paying any premium; waiving forfeitures or any of the Company's rights or requirements; binding the Company by any statement, promise, or representation; agreeing with any applicant to any extra premium for extra risks; or collecting any monies other than as authorized by the Company;

12   Entering into contracts with sub-Agents for the solicitation of insurance (except that a Corporate Agent may use sub-Agents who are contracted as such by the Company under approved Corporate Sub-Agent Contracts);

13   Engaging in speculation in human life by soliciting or receiving an application, or delivering a policy, or by suggesting or assisting in any assignment or transfer of ownership of a policy, where the policy is to be used for that purpose;

14   Acting as both an Agent and the Trustee for a trust account established by a customer, or acting as an Executor of a customer's estate; or being named as beneficiary of a customer's account, or acting in any other fiduciary capacity with respect to a customer's account, either directly or indirectly, of any policy issued by the Company  An exception may be authorized in writing by the Executive Officer responsible for Agency Standards and Supervision in the case of a policy on the Agent or on a member of the Agent's family  To obtain an exception, the Agent should email a Request for Approval form, and the Managing Partner should email his/her agreement to Suzanne Carrington of Agency Standards and Supervision  Unless and until an exception is granted, no such policy or account may be placed in force or become active  In addition, no funds may be collected with respect to such an application for a new policy or account and no change may be effected for an in-force/active policy or account;

15   Charging for services that are undertaken or rendered to any applicant, policyowner, beneficiary, or assignee, such as explaining the terms of a policy, collecting policy proceeds, making or submitting proofs or settlement of any claim, or any other similar service;

16. Keeping custody of a policy, other than a policy on the Agent or a member of the Agent's family, for a period longer than is necessary for purposes of analysis, record organization and review for servicing;

17. Signing another person's name (such as an applicant, insured, policyowner, beneficiary, assignee, or investor) on any document there of relating to or required for the offer and/or sale of a securities or insurance product, with or without the permission of the client;

18. Having a customer sign any form or application in blank or accepting a signed blank form or application. A customer must sign required documents only after all relevant fields have been completed, since he or she is attesting to approval of all data contained therein;

19. Signing as a witness to any person's signature on any application or other paper relating to the Company's business (such as health certificates, amendments, questionnaires, etc.) unless that signature is written in the Agent's presence;

20. Impersonating a customer for the purpose of effecting transactions of any type by telephone, Internet, e-mail or otherwise;

21. Receiving at the Agent's address or an address under the Agent's control, any correspondence from the Company to an applicant, policyowner, insured, or beneficiary, whether or not such person consents thereto, unless authorized in writing by the Executive Officer responsible for Agency Standards and Supervision;

22. Submitting an application for insurance on another Company Agent or on a member of that Agent's immediate family, without the prior written approval of the Executive Officer responsible for Agency Standards and Supervision;

23. Advancing premiums on behalf of a policyowner other than a member of the Agent's immediate family;

24. Sharing directly or indirectly in the profit or loss in a customer's investment;

25. Signing the name of a customer on any document, even with the customer's authorization;

26. Acting as a third-party administrator of a retirement or investment plan;

27. Using the Agent's own residence, business address, GO address, or any other address they control, as a customer's address without the express written approval of the Executive Officer responsible for Agency Standards and Supervision;

28. Holding or receiving mail for customers;

29. Conducting a transaction that is not specifically authorized by the client (i.e. unauthorized trading);

30. Providing a written financial plan to a customer. This would include stringing together several modules on Agency Portal that assist in evaluating a customer's needs and making a suitability

determination  These tools may continue to be used individually, but may not be put together in such a way that they "could" be considered a comprehensive written financial plan. For example, an Agent may continue to use the Planning Station module(s) (estate, retirement, education, survivor, etc.) available on the Agency Portal to help educate the client about a particular financial topic, assist in illustrating a financial concept or justifying a product sale based on the results of the analysis  Agents should not, however, couple two or more modules to create the potential appearance of a comprehensive written financial plan for a client;

31  Purchasing or selling securities or any other property, real or personal, based on information known to NYLIFE or any of its affiliated companies or associated persons but not available to the general public  This prohibition does not apply to information distributed by NYLIFE to its Agents that is labeled "internal use only" or "broker-dealer use only;"

32  Participating in the distribution of securities that are not authorized for sale by NYLIFE;

33  Selling viatical settlements, Investor Owned Life Insurance (IOLI), Stranger Owned Life insurance (SOLI), Charity Owned Life Insurance (CHOLI), promissory notes, brokered CD's, coins, objects of art, or other collectibles;

34  Soliciting any person to execute contracts involving lease agreements of any kind, such as, ATM leases, vending machine leases, and coin-operated telephone leases;

35  Offering or selling short-term debt or obligation instruments, privately issued bonds, or investment partnerships;

36  Investing in any security or other property to personally profit from the intended purchase or sale of that security or other property by a program or mutual fund whose securities are or will be offered by NYLIFE;

37  Purchasing a security offered by NYLIFE unless it is solely on the terms described in the prospectus or offering memorandum;

38  Purchasing securities offered by NYLIFE to the unfair exclusion of the general public;

39  Dealing with any non NASD member at a different price, for different commissions or fees, and/or on different terms and conditions from those accorded to the general public and disclosed in the offering material  Securities regulations generally prohibit the sharing of commissions with persons who are not associated with a NASD member firm;

40  Recommending a customer to a firm engaged in providing investment management, brokerage, or similar services for a referral fee, unless the recommendation is allowed pursuant to a program approved by NYLIFE;

41  Brokering real estate;

42  Participating in multi-level marketing in any capacity (Agent/RR may not sell, recruit or maintain a contract with any multi-level marketing organization, e.g., Amway, NuSkin and "legal service plans");

43. Providing management consulting services (e.g., market analysis or other analysis not related to insurance or securities products);

44. Any part-time activity of a commercial nature (coaching a school soccer team is not commercial and would be allowed; acting as an employee of another business organized for profit would not be allowed);

45. Engaging in Mortgage Brokering;

46. Providing any kind of TPA services;

47. Providing Tax Preparation services or act as a CPA;

48. Providing Insurance Consulting;

49. Providing Management Consulting;

50. Raising funds for a company (public or private), church group or charitable organization by way of the sale of shares, notes, bonds or other investments;

51. Accepting any payment, gift, services, loan or other remuneration from any other NASD member, an issuer of securities, an unaffiliated service provider of NYLIFE, or a customer of NYLIFE, unless the remuneration is provided under a program approved by NYLIFE;

52. Advertising or publicizing the Company's name, logo, or its products or services by using them in any advertising or publicity medium, including newspapers, magazines, television or radio broadcasts, the Internet or other means, unless the content of such advertising or publicity has first been submitted to, approved and authorized by the Company in writing;

53. Endorse, deposit, cash or otherwise negotiate any check drawn to the Company's order, or to open any bank account in the Company's name, or to sign the Company's name in any circumstances, or to have any checks or promissory notes printed with the Company's name thereon;

54. Endorse, deposit, cash or otherwise negotiate any check drawn by the Company to the order of a payee other than the Agent or member of the Agent's family;

55. Represent the Company in any manner whatsoever before any state insurance or securities department, governmental agency, or self-regulatory organization or official thereof; such matters must be referred to the Corporate Compliance Department; and

56. Affix stamps or labels on policies, policy envelopes or literature of the Company in such a way as to obliterate or modify, in any way, any of the printed matter thereon

## 9. Handling Customer Accounts and Securities Transactions
### a. General
Agents are prohibited from:

i.   Commingling their funds with those of customers or acting in any manner that creates an appearance of impropriety;

ii    Lending money to, or borrowing from, a customer of NYLIFE or New York Life;

iii   Holding customer funds (including checks or money orders) or customer securities;

iv    Endorsing, depositing, cashing, or otherwise negotiating any check drawn to the order of the Company's order, or to open any bank account in the Company's name, or to sign the Company's name in any circumstances, or to have any checks or promissory notes embossed with the Company's name; or

v     Endorsing, depositing, cashing, or otherwise negotiating any check drawn by the Company to the order of a payee other than the Agent or member of the Agent's family

## b. Accepting Payment

In connection with payment for the purchase of an insurance or securities product, Agents must not:

i     Accept checks from a customer made payable to the Agent or the Agent's DBA, or deposit any customer funds into an account controlled by the Agent;

ii    Submit their personal check with the customer's application/subscription agreement or deposit any customer funds into an account controlled by the Agent;

iii   Alter or change a customer's check in any manner;

iv    Accept money orders from a customer for any security or securities product;

v     Accept cash from a customer for payment for any security or securities product;

vi    Accept cash for fixed life insurance and annuity new business that exceeds $5000;

vii   Accept cash from a customer, and use those funds to purchase cashier's checks, money orders, traveler's checks or similar instruments for payment of a client's purchase/premium;

viii  Extend credit to a customer, or make loans to, or accept loans or notes from, customers or creditors, or make advance payments for the purpose of purchasing a security;

ix    Accept third-party checks from sources other than financial institutions that are made payable for the benefit of a particular client – that are to be applied to that client's product or account (e.g., a check from a store made payable to the customer); and

x     Sign the Company's name or on the Company's behalf

Agents may accept a cash payment for the first premium only on traditional (non-securities) insurance product business. **Cash may never be accepted as payment for a securities product.**

## 10. Disbursement of Funds/Redemption

NYLIFE does not issue checks for redemption proceeds for NYLIAC or MainStay products that are held directly at the issuer. Those checks come from the issuer of those products (i.e., NYLIAC or MainStay) NYLIFE also does not issue checks for funds that have been redeemed from non-proprietary variable

products nor mutual funds. If a customer wishes to receive the redemption proceeds from the sale of a mutual fund or the termination of a variable product, the request should be directed to the issuer. Please note that the issuer will have policies and procedures which must be followed in order to have a check sent to the customer.

### 11. Prompt Submission of Securities Business

The rules regarding the prompt submission of securities business apply to all securities product transactions.

Agents must promptly transmit all customer orders for securities product transactions to the appropriate business area. Agents may not under any circumstances hold customer funds in their possession nor deposit them into their business or personal account. Agents should refer to the appropriate operations manuals, maintained in the GO, for detailed procedures for submitting securities transactions. In general, the procedures provide that:

a. For variable insurance contracts, Agents must transmit, **no later than the next business day from the day of receipt,** all applications, purchase payments, or requests for withdrawals, surrenders, transfers or allocation changes, exchanges or cancellations to the applicable GO (for new account applications), Service Center (for service requests), or other designated area. Agents must disclose to their customer that the date used for processing will be the date the appropriate service center receives the request. Agents may overnight such requests to the service center at the customer's or at their own expense;

b. For mutual funds, Section 529 plans, and UITs, the Agent must transmit, **no later than the next business day from the day of receipt,** any applications or payments to the appropriate department. The customer's preference as to the method of transmission of the order (e.g., by telephone or mail) must be followed. For NYLIFE brokerage accounts, if a check, application, or Investor Profile is not in good order, Brokerage Services will call the Agent for the missing information. If the Agent is able to provide the necessary information, the application will be processed. If the Agent cannot be reached, the Agent must provide the requested information by 10 am Eastern Time the next business day. **If the missing information cannot be procured by 10 am Eastern Time the next day, Brokerage Services will return the check(s) to the client by noon Eastern Time** by overnight mail with a letter of explanation.

c. Mutual fund wire-order (telephone) applications and checks must be sent via overnight mail with next-day delivery, to ensure that trades are paid for within three business days; and

d. Agents are not permitted to hold stock certificates. In the event an Agent receives a stock certificate on behalf of a client, the Agent must immediately send it to NYLIFE. If NYLSEC receives a or stock certificate that is not in good order Brokerage Services will call the Agent for the missing information. If the Agent is able to provide the necessary information, the certificate will be processed. If the Agent cannot be reached the requested information must be provided by 10 am Eastern Time the next business day. **If the missing information cannot be procured by 10 am Eastern Time the next day, Brokerage Services will return the stock certificate(s) to the client by noon Eastern Time** by overnight mail, together with a letter of explanation.

Generally, checks and applications must be obtained from the customer at the same time and promptly submitted.

### 12. Subsequent Premium Payments and Deposits