# Exhibit - A

PART 4 84

In general, Agents should advise their customers to send remittances for renewal premiums and subsequent deposits to the address printed on their premium notice, correspondence or return envelope. This will ensure timely processing at the appropriate Company lockbox bank account or Service Center, which act as the primary portals through which remittances should flow to the Company. In the event that an Agent receives a subsequent premium payment or deposit, the following rules apply:

## Check Acceptance

Only customer personal checks, or business checks (if the business is the owner of the product), drawn to the order of the appropriate Company entity may be accepted for Company business. Checks for NYLIFE Brokerage accounts should be made to its clearing broker firm, NFS. Agents may not accept the following:

- Cash;

- Money orders except as payment for renewal premiums and subsequent deposits in situations where the customer's policy is in danger of lapse or foreclosure;

- Third party checks (except checks from financial institutions that are made payable for the benefit of a particular client, where the funds are to be applied to such client's product or account); or

- Bank or cashier's checks except as payment for renewal premiums and subsequent deposits in situations where the customer's policy is in danger of lapse or foreclosure.

Note: Agents may accept cash for the first premium only on traditional (non-securities) insurance product business.

Housed Agents must provide copies of checks received from clients to the appropriate IPS personnel at the GO before forwarding the checks to the appropriate business area. Detached Agents must photocopy the check and note receipt of the check on the Funds Received Log.

When accepting cash equivalents, Agents must provide customers with the "Acknowledgement of Receipt of Customer Funds" receipt form (Form 22209), and a copy of both the cash equivalent and the receipt must be placed in the Agent's client file. Customers should be made aware of the "Important Notice" section, which is a part of the form. In addition, Agents must (1) verify the identity of the remitter (whether it is the policyowner or a third party) of individual cash equivalents in excess of $800 by reviewing the remitter's *valid* photo identification driver's license or passport, and (2) obtain a copy of the remitter's photo ID driver's license or passport and place it in the client file to comply with the IRS Form 8300 filing requirements. General Office staff will follow the same verification procedures for clients who remit payments directly to the GO.

The General Office will not accept funds other than those deemed acceptable under Company procedures. If an Agent attempts to submit funds in a manner that is prohibited, Agency Standards will be notified and appropriate disciplinary action will be considered. Agents are prohibited from seeking to circumvent the provisions of this section by accepting cash equivalents and then remitting them through any Company lock box. Any attempt by an Agent or facilitation by their office staff to engage in these practices will be treated as a violation of Company rules and will be referred to Agency Standards for appropriate action.

### a. Prompt Submission of Payments

Agents who accept customers' personal checks for subsequent premium payments or deposits must send

them to the appropriate department or Service Center no later than the next business day after the day of receipt. Agents must disclose to their customer that the date used for processing will be the date the appropriate service center receives the request rather than the date the Agent receives the request. The check may be transmitted by first-class mail; however, transmittal by overnight mail service is preferred.

Checks submitted for subsequent deposits into a NYLIFE brokerage account should have the account number indicated on the check. NYLIFE cannot accept written instructions for trades accompanying any subsequent deposit. Trades should be effected in the usual manner. (Refer to Field News 2/00.)

### b. Application of Funds

To facilitate processing of a subsequent payment of a scheduled premium, the Agent should ensure that the premium payment notice is remitted together with the check. Checks submitted for subsequent deposit into existing mutual fund accounts should be accompanied by complete investment instructions from the customer, including identification of the mutual fund, the mutual fund number, customer account number, and the amount to be allocated to each account. Agents must follow up to ensure that payments are promptly and properly applied, according to the customer's instructions.

### c. Special Procedures for Detached Agents

In addition to complying with all requirements regarding the acceptance of and prompt submission of subsequent payments as discussed above, Agents in non-branch locations must log their receipt of all checks in the Funds Received Log before forwarding the check for processing. This requirement applies regardless of the method of receipt of the check, including checks picked up by the Agent as well as those delivered by the customer, or through the mail, a courier, or other means. It also applies regardless of the product involved. Detached Agents must also record on the Securities Transaction Log all securities transactions that correspond to checks they accept from customers.

## G. EMPLOYEES OF AGENTS

### 1. Service Activities of Agent Employees

The "Employing Agent" is a person with an Agent's Contract with New York Life. The Employing Agent is responsible for the activities of his/her employees. In this capacity, the Employing Agent must monitor each employee's activities to ensure compliance with applicable Company rules, policies and procedures, as well as applicable regulations.

The Employing Agent is also responsible for ensuring that his/her employees do not engage in activities that are prohibited by Company rules and/or insurance or securities laws, rules or regulations, including those of NASD. The following rules apply to employees of Agents who are not participating in the Licensed or Registered Service Assistant Programs and who are assisting Agents with the sale or servicing of Company business. Please consult the Managing Partner for information regarding the Licensed or Registered Service Assistant Programs.

### 2. Authorized Activities

Unlicensed/unregistered employees of an Agent/Registered Representative **may:**

- Complete routine information on product applications, before the applications are completed by the Employing Agent and signed by the insured, and using information obtained by the Employing Agent. Unlicensed/unregistered employees may not fill in the responses to questions related to

product or face amount, or involving any questions to which "Yes/No" responses are required. They may not (and Agents may not) insert dates of signatures on applications or other forms;

- Provide administrative/clerical assistance (such as filing or retrieval of documents and taking dictation) to the Employing Agent at client meetings otherwise;

- Perform administrative/clerical duties using information obtained and developed by the Employing Agent (such as inputting data to produce illustrations, client-related presentations, Ibbotson asset allocations and financial plans) as long as the output is also reviewed by the Employing Agent prior to being presented to the client;

- Perform or assist with routine service for clients (not involving witnessing documents). The unlicensed assistant may for example:

    ➢ Process death claims;

    ➢ Orally provide specific information to clients related to policy and product values and premiums due, using Company-provided information. An unlicensed employee may not interpret or explain product information to the client, and may not make statements regarding the effect(s) a proposed transaction may have on a policy or product;

    ➢ Use the Employing Agent's letterhead and sign his/her own (employee) name, followed by the notation "on behalf of Agent X," on service-related documents sent to clients as directed by the Employing Agent ;

    ➢ Send Agent-dictated correspondence to clients, indicating that the correspondence was dictated by the Employing Agent and sent in the Employing Agent's name; and

    ➢ Provide Company-approved, non-product specific concept papers and general Company information to existing and potential clients

### 3. Prohibited Activities

Unlicensed/unregistered employees of an Agent/registered representative **may not**:

- Engage in any act of solicitation, including but not limited to, discussing, advising or recommending types or amounts of coverage; discussing illustrations for proposed coverage or discussing future values; and discussing or recommending the exercise of possible optional benefits on existing policies;

- Collect initial premiums or funds intended for initial investments, or issue or sign premium receipts for renewal premiums or additional investments,

- Hold product-related discussions with clients (other than discussions related to specific service requests);

- Provide advice related to securities, insurance, estate planning or financial planning;

- Complete any question on the application requiring a response from the proposed insured, including any questions requiring a "Yes/No" response or any insurability information (such as medical history);

- Sign the Employing Agent's name to any form that requires the Employing Agent to witness the form, including but not limited to Investor Profiles, delivery receipts, subsequent premium receipts, and applications;

- Witness any form that an Agent is required to witness (see above);

- Deliver policies and/or obtain delivery receipts;

- Engage in any acts prohibited of Agents by Company rules and/or the Agent/Registered Representative's Handbook; and

- Use any printed materials not provided by or previously approved by the Company

## H. ACCESSING CUSTOMER ACCOUNTS

Agents are prohibited from accessing any customer's account via any Company Internet web site developed for customer use, for any purpose, including viewing the account activities, or for the purpose of entering purchases or sales of securities or insurance products, redemptions, loans, money transfers, or any other transaction in the customer's account, even where the customer has authorized such access by the Agent on behalf of the customer and/or where the customer has provided the Agent with their account PIN Agents may view customer account activity via Field Technology

## I. DIRECT TRADING OF MUTUAL FUNDS

### 1. Qualification
NYLIFE Agents who meet the following criteria will be eligible to participate in the program:

- Series 6 or 7 licensed;

- Managing Partner Approval; and

- Compliance Profile Rating of 1 or 2

NYLIFE reserves the right to terminate an Agent's Direct Trading privileges at any time

Agents who have been approved for the Direct Trading Program may, at the request of the customer, transact mutual fund orders through a NYLIFE brokerage account In addition, Series 7 Agents approved for Direct Trading may, at the request of a customer, submit unsolicited equity orders on their client's behalf through a NYLIFE brokerage account Agents who have been approved for the Direct Trading Program and have DST Vision transaction entitlements may, with the consent of the customer, transact MainStay exchanges and redemptions through the Vision website Agents who are not approved for these programs may not request the processing of any transaction on behalf of a customer (e g , a transfer of variable product investment divisions by telephone)

Registered Representatives who meet the eligibility requirements and would like to be admitted to the Direct Trading program should ask their Managing Partner to send notice of approval to Direct Trading@newyorklife com The Managing Partner will be contacted regarding the Registered

Representative's approval for the program

## 2. Guidelines
The following guidelines apply to all trades entered by Agents:

### a. Timely Order Entry
Equity Trades -- All equity trades must be entered immediately upon receipt from the client. If an Agent is unable to enter an order immediately upon receipt from the client, the Agent must request that the client submit the order directly to NYLIFE via phone or Internet

Mutual Fund Trades – Orders received from clients *during market hours* (generally, 9:30 am to 4 pm Eastern time) must be entered immediately upon receipt. It is important to realize that some mutual funds are priced intra-day rather than at the market close. If an Agent is unable to enter an order immediately upon receipt from the client, the Agent must request that the client submit the order directly to NYLIFE via phone or Internet. Trade correction costs necessitated by delays in submitting an order will be assessed to the Agent's ledger

Orders received from clients *after the market close* must be entered prior to the market open on the following trading day. This will ensure that clients receive the next available share price. Agents are *required* to record the Time of Order Acceptance on Streetscape. This must reflect the time the order was received from the client

### b. Detached Agents
All trades entered by detached Agents must be entered on the Securities Transactions Log

### c. Delegation of Order Entry
Agents may not delegate or assign order entry to anyone other than an approved member of New York Life's Service Assistant Program who maintains appropriate and current NASD Registrations. In order to place mutual fund orders, Registered Service Assistants must have a Series 6 designation. To place equity orders, Service Assistants must have a Series 7. Service Assistants must apply to NYLIFE for separate automated system user IDs and passwords, and must always enter trades under their own personal entitlements. Trades entered by Registered Service Assistants must be recorded as such on each Trade Ticket

### d. Accepting Orders
Agents may not accept orders from anyone other than the owner of the account or an individual with Power of Attorney as listed on the account registration

### e. Order Review
NYLIFE reserves the right to review all orders submitted, and to accept or reject any order. Agents are responsible for verifying the status of each order they enter on behalf of a client. NYLIFE is not responsible for trade corrections or "as-of" trades necessitated by an Agent's failure to confirm order status

### f. Errors and Omissions Coverage
Any trade correction costs incurred due to an error by an Agent will be debited to the Agent's ledger. All Agents must have New York Life Errors and Omissions coverage equivalent to $1 million per occurrence/$3 million aggregate prior to placing any trades

### 3. Prohibitions

Recommending or soliciting general securities transactions is strictly prohibited. Discretionary trading, which occurs when an Agent exercises his/her own judgment with regard to the security to be purchased or sold, or the price or time of order entry, is strictly prohibited. Agents who engage in such activities are subject to disciplinary action, up to and including termination.

### 4. File Maintenance

Agents who elect to participate in the Direct Trading Program must maintain a Direct Trading Order Ticket File that will be subject to review during their annual interview/inspection. The file should be kept in chronological order and the tickets must display the time the order was accepted from the customer and the time of entry into the automated system. Order tickets for trades entered via the Agent web site will consist of a screen print of the order confirmation page.

## J. MARKET EXPANSION PROGRAM

Market Expansion is a program which creates an avenue for Agents to expand their markets by establishing professional relationships with members ("sub-Agents") of select professions. The Market Expansion Program is a way for select professionals to refer their clients to a career New York Life Agent and receive a share of the commissions. The selected professions are as follows:

- CPA/Accountants;
- Attorneys;
- Bankers;
- Real Estate Principals; and
- Property and Casualty Principals

Any Agent who is interested in establishing a market expansion relationship with a person in one of these occupations should discuss the matter with the Managing Partner of their GO. Procedures related to the program are maintained through the Partnership for Professionals Manual.

## K. RULES FOR SELLING NON-PROPRIETARY VARIABLE LIFE AND ANNUITY CONTRACTS

### 1. Rules

Agents must follow the following rules when selling non-proprietary variable life and annuity contracts. In addition, the proper Non-Proprietary Variable Products Investor Profile (IS22) must be used when selling these contracts.

- NYLIFE Securities/NYLINK Insurance Agency must have an in force selling agreement with the outside company; and

- The Agent must only accept compensation from NYLIFE for the sale.

### 2. Guidelines

The main outlet through which Agents may solicit purchases of these non-proprietary life products is through BISYS Insurance Services. Agents are prohibited from processing business directly with the outside carrier. The sale of a non-proprietary variable product that is not coordinated through BISYS may be considered selling away by NASD and the Company. Non-proprietary variable annuity sales are processed

internally through NYLIFE Securities

### 3. Circumstances Where Non-Proprietary Sales Are Allowed

The following are circumstances in which an Agent may sell non proprietary variable products issued by outside carriers:

#### a.    Substandard Offer/Decline

If an underwriter has rated a NYLIAC application either a Class 5 or greater, including Risks Not Acceptable ("RNA"), or the case is issued with a flat extra annual premium greater than $7.50 per thousand, a non-proprietary variable life product may be offered through BISYS. This option does not include declines for suitability, since the same suitability parameters are applied to sales of both proprietary and non proprietary products.

#### b.    Large Case Diversification

New York Life Insurance and Annuity Corporation offers the financial strength and product features to meet most customer needs. However, under certain circumstances, a client who is purchasing a substantial amount of insurance or a large annuity may reasonably want to diversify the risk spread among multiple carriers. The requirements for large case diversification are as follows:

  i)    For variable life insurance, there must be:

  - $3 million or greater face amount where $1 million, or 1/3 of the face amount, whichever is greater, of the risk is allocated to New York Life/NYLIAC; or

  - A total premium of $90,000 where $30,000 or 1/3 of the premium, whichever is greater, is allocated to New York Life/NYLIAC

  ii)    For variable annuities, there must be:

  - A total premium of at least $500,000 where NYLIAC receives $250,000 or one-third, whichever is greater; or

  - NYLIAC may consider prior investments by the same client in active fixed and variable accounts as part of the $500,000 premium

#### c.    Product Not Offered

This option is available in situations where New York Life does not offer the particular. **This does not include situations where a non-proprietary product offers riders that are not available on a New York Life product.** To submit a case under this option, Registered Representatives must submit a detailed explanation on the case approval form under the category listed as "Other."

### 4. Enhanced Access

The Company permits Agents who meet certain thresholds of proprietary production to have enhanced access to non-proprietary variable products. The current production rules are as follows:

#### Tier I: Enhanced access to both non-proprietary variable life and variable annuity

  - To qualify, Agents must have at least $200,000 in FYC in proprietary life and annuity products in the prior Council year (including all FYC on proprietary traditional fixed, variable and term products)

**Tier II VL: Enhanced access to non-proprietary variable life products only**

- Qualify with Chairman's Council and $100,000 of FYC in all proprietary life products (includes proprietary FYC on traditional, fixed, variable and term products); **OR**

- $100,000 of FYC in proprietary variable life products in the prior Council year

**Tier II VA: Enhanced access to non-proprietary variable annuity.**

- Qualify with $100,000 of FYC in proprietary variable annuity products

## 5. Initiating a Non-Proprietary Variable Product Case

Agents considering writing a Non-Proprietary Variable Life or Annuity product must first receive approval from NYLIFE Securities prior to client solicitation and NYLIFE Securities must have an existing selling agreement with the insurance carrier for that particular business line and specific product. Agents must also be properly appointed for variable business with the respective insurance carrier. For details on the registered representative appointment process, please contact the NYLIFE Transition Department at (888) 884-3874 or by email at variable_appointments@newyorklife.com

## 6. Unapproved Non-Proprietary Variable Product Sales/Selling Away

Submitting new accounts directly to, or effecting transactions directly with, the outside carrier, or selling variable products that are not approved for sale by NYLIFE may be considered selling away. Engaging in this activity exposes the Company and the Agent to regulatory and financial risk and may constitute a violation of NASD Rule 3040 and other rules. Such sales may result in fines or the forfeiture of commissions and in disciplinary action by regulatory authorities and the Company, up to and including termination.

## 7. Suitability

A Non-Proprietary Variable Products Investor Profile must be provided to NYLIFE when an Agent submits a non-proprietary variable product application, in order to satisfy the SmartMatch suitability review requirements. The Investor Profile is also necessary to process the Agent's compensation. Non-proprietary variable product business is subject to the same suitability standards as proprietary variable products.

## L. RULES FOR SELLING NON-PROPRIETARY MUTUAL FUNDS

## 1. Rules

Agents must follow the following rules when selling non-proprietary mutual funds:

- NYLIFE must have an in-force selling agreement with the outside company;

- The Agent may accept compensation only from NYLIFE for the sale; and

- All other sales practice rules, including those set forth in this Handbook, fully apply

## 2. Approved Non-Proprietary Mutual Fund Families - Direct

In addition to selling non-proprietary mutual funds through NYLIFE's AdviserOne brokerage account, Agents are permitted to make purchases directly with select non-proprietary fund families on the approved list (or "Short List"). Fund families on the Long List are not approved for new sales; however, Agents are permitted to receive trails and new commissions on additional client deposits. Additionally, if Agents are

authorized to add new employees to a retirement plan that is held with a mutual fund on the Long List. The Short and Long Lists can be obtained on Agency Portal>Products and Services> NYLIFE Securities> Non-Proprietary Mutual Fund Listings

### 3. Unapproved Non-Proprietary Mutual Fund Sales/Selling Away

Submitting new accounts directly to the fund family or selling mutual funds that are not approved for sale by NYLIFE may be considered selling away and may violate NASD rules. Applications or orders may not be submitted directly to the mutual fund family even if on the Short List. Submitting orders directly exposes the Company and the Agent to regulatory and financial risk and may constitute a violation of NASD Rule 3040 and other rules. Such sales could result in fines or the forfeiture of commissions and may result in disciplinary action by regulatory authorities and the Company, up to and including termination.

### 4. Suitability

Agents must submit an Investor Profile to NYLIFE when submitting new business to the fund family. The Investor Profile is used to satisfy the SmartMatch suitability review requirements and is necessary to process the Agent's compensation. Non-proprietary mutual fund business is subject to the same suitability standards as proprietary mutual funds

## M. PERSONAL BROKERAGE ACCOUNTS

When an Agent or an associated person of NYLIFE opens or maintains a securities, investment or trading account at another broker-dealer ("Outside Broker-Dealer") on his or her own behalf, he or she is required to notify the Outside Broker-Dealer that he or she is an Agent or associated person of NYLIFE. Members of the Agent's immediate family must also disclose to the Outside Broker-Dealer that they are related to an associated person of NYLIFE when opening securities accounts. Agents, members of their immediate family (generally, spouse and minor children) and associated persons must also give NYLIFE prior written notice of their intent to open an account at an Outside Broker-Dealer, or immediate written notice upon disclosure of an account's existence, including the name and address of the Outside Broker-Dealer, the title of the account, and account number(s). Agents and associated persons must complete the "407 Letter" form, available from the Forms Library under "Service Forms," and submit it to their Managing Partner for approval. A copy of this form will be kept in the Agent's Supervisory file

Agents may purchase or sell securities for their own personal accounts only if the following conditions are met:

1.   the transaction is to be effected in an account at NYLIFE or Outside Broker-Dealer; AND

2.   the Agent has provided written notification to NYLIFE about his/her intention to open the account at the Outside Broker-Dealer, and has advised the Outside Broker-Dealer about his/her association with NYLIFE

The above requirements apply to any accounts over which an Agent or associated person exercises control

### Private Placements

No Agent may purchase an interest in private placement securities as a personal investment without the prior approval of the Corporate Compliance Department. An Agent wishing to purchase an interest in a private placement must first submit a written request for approval to Jeffrey Gambuzza of the Corporate Compliance Department. The Agent should also provide Corporate Compliance with copies of fully completed (but not yet submitted to the issuer of the private placement) application documents, and any

documents establishing that the Agent is an accredited investor. Agents may also, at the discretion of the Corporate Compliance Department, be required to submit other relevant documentation for review. Any Agent who fails to provide the required notice and/or obtain the requisite approval may be deemed to have engaged in a private securities transaction and be subject to disciplinary action by both NYLIFE and the regulatory authorities.

Agents are prohibited from recommending private placements that are not offered by NYLIFE to their customers. See Sub-Section D of this Section for details.

The above section on Private Placements applies to any accounts over which an Agent or associated person exercises control.

### Investments Where Prior Approval is Not Required

Prior notification and approval does not apply to the purchase or sale of mutual funds, Section 529 Plans, Unit Investment Trusts ("UITs"), or variable contracts.

## N. ACCEPTING OR GIVING GIFTS

### 1. Accepting Gifts

Agents may not accept compensation or items of material value relating to the sale of securities from any organization or individual other than NYLIFE, without prior approval of NYLIFE.

Items of material value include the following:

1    Gifts or payments of any kind based on the sale of securities; and

2    Payment or reimbursement of travel expenses, including overnight lodging, in excess of $100 per Agent per year.

In receiving gifts, Agents must observe the following:

1    The value of gifts from any product offeror (e.g., MainStay, NYLIAC) may not exceed $100 per Agent per year;

2    They can never accept securities as compensation or gift from an offeror;

3    The receipt of a "gift" may not be conditioned on the achievement of sales target involving securities;

4    No single Agent may receive at the GO level prizes or awards which in total exceed $500 annually; and

5    Contests involving registered products are generally prohibited.

Agents may not provide gifts to existing or prospective customers or clients other than items expressly approved for such purpose by NYLIFE. Questions should be directed to the Managing Partner.

### 2. Giving Gifts

Some jurisdictions allow Agents to make available to the public small advertising gifts and trinkets (so-called "logo items") so long as receipt of those items is not conditioned on any requirement that the costumer purchase or renew insurance, listen to a solicitation or fill out an insurance application. These jurisdictions limit the value of advertising gifts and trinkets that may be given to prospects and clients. The dollar amount typically ranges from $2 to $50. Agents may not provide gifts to prospects or clients other than items expressly approved for such purposes by New York Life.

New York Life requires Agents to comply with the following specific state limits on gifts (for any state not mentioned below, with the exception of California, the limit on the value of gifts is $5):

- **In jurisdictions with a gift limit under $5,** Currently, Nevada ($2) and Utah ($3) maintain gift limits of under $5

- **In jurisdictions with gift limits of $5 and over,** Currently, Alabama ($15), Arizona ($10), District of Columbia ($10), Florida ($25), Idaho ($50), Kentucky ($25), Maine ($20), Maryland ($10), Michigan ($5), Oklahoma ($25), Oregon ($10), South Carolina ($5 but $10 for refreshments served at a sales presentation), South Dakota ($25), Virginia ($5), Washington ($25) and West Virginia ($25) maintain gift limits of $5 and over

- **In jurisdictions that do not specify a gift limit,** Agents are permitted to give token or advertising gifts valued at $5 or less as such gifts do not constitute an "inducement" to purchase insurance under state rules. However, there may be a business risk associated with providing gifts of any value. Agents should consult with SMRU to determine whether advertising gifts and trinkets can be distributed in these jurisdictions

- **In California,** Agents are permitted to give gifts valued at $50 or less

Agents are required to obtain the prior approval of SMRU before distributing advertising gifts or trinkets to prospects and clients. Agents are also required to obtain the prior approval of SMRU for any advertising, seminar invitation, or correspondence to clients or prospects referring to gifts (including light meals, refreshments, etc. at seminars)

Most states may permit Agents to provide reasonable meals at seminars, subject to the requirements below. "Reasonable" is considered up to $25 per person, although there are several states that have limits under $25 (Refer to Field News dated 10/4/04). This is exclusive of room and audio-visual equipment rental and any service costs. Agents holding seminars in any state allowing "reasonable meals" may generally use words such as "dinner," "lunch," or "breakfast" in advertising and promoting their seminars if the description correctly characterizes the nature of the meal. If it doesn't, terms such as "light meal" or "refreshments" may be more appropriate

**Note:** Georgia, Massachusetts, and Wyoming **do not** allow Agents to serve anything of value at seminars

**Requirements to Provide Meals:**
Each state that permits meals to be provided at seminars requires that:

(1) The meal is provided to all who attend the seminar
(2) The meal is not contingent upon the purchase of, renewal of, or application for insurance
(3) Seminar invitees are not limited to an Agent's current and/or past clients

Texas and Wisconsin also require Agents to disclose that the purpose of the seminar is to solicit insurance.

Failure to comply with state law and Company policy could result in regulatory penalties, as well as disciplinary action up to and including termination.

### 3. Gifts of Cash and Cash Equivalents Prohibited

Gifts in the form of cash, checks, or cash equivalents (e.g. savings bonds, gift certificates, gift cards, or discount coupons) are not allowed, regardless of value.

### 4. Policy Regarding Gifts to IPS Employees

Agents may not give personal gifts to IPS employees. If Agents wish to make a small contribution to a group office gift for purposes of recognizing the IPS staff as a whole, the contribution must be given to the Managing Partner who will present a single group award to the Administrative Manager on behalf of the staff. The Administrative Manager must report this award on the office gift log as a group recognition award from the Agents.

### 5. Gifts to and Entertaining of Public Officials

Laws regarding gifts and the entertainment of federal, state, or local public officials are complex and vary widely from state to state and locality to locality. Therefore, Agents are prohibited from giving gifts or entertaining a public official without prior Company approval. To request approval, contact John O'Brien of the Corporate Office of Business Conduct at (212) 576-6556. Agents must provide the specific names and titles of the officials and complete details of the proposed entertainment and anticipated gift expenses. For example, if an Agent wishes to take a New York City official to dinner, the Agent must receive pre-clearance of the meal.

The various gift and entertainment laws generally prohibit or significantly restrict an Agent from giving things of value to public officials or employees. Items of value may include entertainment (tickets to sporting events, greens fees, etc.), travel, lodging, transportation, meals, and similar items.

Public officials include federal, state, or local government officials; any person who is compensated in any way through appropriated funds of either state or local government; or any person who is an officer or employee of a corporation of which a state or local government is at least a partial owner, or which was created by ordinance or statute. Outside consultants or independent contractors of a governmental entity are not included.

### 6. Gift Log

Agents must advise their Managing Partner of all gifts, prizes and awards they receive, except those with a value of $25 or less. These items will be reflected in the GO Contest/Gift Log Book. Documentation must be maintained in the GO to support each entry to the gift log.

### 7. Violations

Violations of state law and Company policy could result in civil and/or criminal penalties, as well as disciplinary action up to and including termination.

## O. NASD CONTINUING EDUCATION REQUIREMENTS

**This section applies only to Agents who are Registered Representatives.**

In an effort to maintain a high level of professionalism within the securities industry, and to foster greater consumer confidence, the securities industry has adopted a Continuing Education Program (the "Program"). The Program has been accepted by the Securities and Exchange Commission and adopted by the various self-regulatory organizations ("SROs"), including NASD.

## Elements of the Program
The Program consists of a Regulatory Element and a Firm Element.

## 1. Regulatory Element
The Regulatory Element applies to all registered persons (i e., Registered Representatives and registered principals) as of the second anniversary of their initial registration with NASD and every three years thereafter.

A registered individual has 120 calendar days from the date of his/her second anniversary to complete the Regulatory Element portion of the Program.

### a. Curriculum
The Regulatory Element is a computer-based NASD training session.

### b. Failure to Complete the Regulatory Element
Failure to complete the Regulatory Element within the prescribed 120 calendar days will result in the registered person's registration to be deemed inactive by NASD until such time as the Regulatory Element is met. During an inactive period, a registered person is suspended by NYLIFE and prohibited from engaging in securities activities. In addition, compensation on all securities business submitted prior to the inactive status, and payable during the inactive status period, will be forfeited. An Agent whose registration is deemed inactive must complete the Regulatory Element within 30 days from the date of suspension. Failure to meet the requirements within 30 days of the suspension will result in the termination of the Agent's contract and NYLIFE registration upon 30 days' notice. If the requirement is met within the 30-day period, the suspension will be lifted. Senior NYLIC Agents with 20 or more years of Agent service and retired NYLIC Agents (1SN or 2SN contracts) may seek approval to maintain their Agent's Contract only, provided they agree in writing not to become registered with another broker-dealer (since their NYLIFE registration will be terminated). Failure to complete the Regulatory Element may also result in disciplinary action by NASD or other regulatory body, including but not limited to the imposition of a fine, censure, or other action as deemed appropriate, including license revocation.

A limited exception to this rule will be made for Agents on bona fide medical leave and/or disability. The maximum suspension period for these individuals will be two years from the date the registration becomes inactive, after which time only their registration with NYLIFE and NASD will be terminated. A registration that is inactive for a period of two years will be administratively terminated by NASD, and the Registered Representative or registered principal may only reactivate it by reapplying for registration and meeting all qualification requirements (including re-taking any necessary examinations).

Registered Representatives or Registered Principals who are suspended may not solicit, offer, offer to sell, discuss, or correspond to or with any public customer with regard to securities, including variable insurance products, or supervise any securities business, nor may they receive any compensation related to securities activities.

## 2. Firm Element

Agents will also be subject to the Firm Element of the NASD Continuing Education Program. The Firm Element of the Program, which is administered by NYLIFE, is designed to educate and train Agents about securities products offered through NYLIFE, as well as sales practice and ethical issues related to such securities products.

### a. Curriculum and Delivery

This Firm Element portion of the Program is applicable to all selling Agents who are Registered Representatives, their immediate supervisors, and anyone else designated by NYLIFE as a "covered person." No exemptions are allowed. Agents must sign in when attending the Firm Element training. Agents will be required to participate in the Firm Element on an annual basis in the form prescribed by NYLIFE. Registered Representatives who are hired or become registered after October 1 of the calendar year in which they are hired will not be responsible for Firm Element training in that calendar year.

The Firm Element training requirement is satisfied by means of a group training session, a computer based training (CBT) exercise, and any other training as required by the Company. Any questions regarding the requirements of Firm Element Training should be directed to the Managing Partner.

### b. Failure to Complete the Firm Element

Failure to complete the Firm Element within a calendar year will result in suspension from all securities activities. Agents under suspension may not solicit purchases of securities or receive compensation related to securities activities until they are advised that the suspension has been formally lifted. Agents who are suspended will have 30 calendar days from their suspension date to complete the prior year's Firm Element Training. Failure to do so will result in the termination of their NYLIFE registration and Agent's contract upon 30 days' notice. If the requirement is met within the 30-day period, the suspension will be lifted. Senior NYLIC Agents with 20 or more years of Agent service and retired NYLIC Agents (ISN or 2SN contracts) may seek approval to maintain their Agent's Contract only, provided that they agree in writing not to become registered with another broker-dealer (since their NYLIFE registration will be terminated). Failure to complete the Firm Element may also result in disciplinary action by NASD or other regulatory body, including but not limited to, the imposition of a fine, censure, or other action as deemed appropriate, including license revocation.

An exception to this rule may be made for Agents on bona fide medical leave and/or disability. The maximum suspension period for these individuals will be two years from the date on which their registration becomes inactive, after which time only their registration with NYLIFE and NASD will be terminated. NASD will administratively terminate a registration that is inactive for a period of two years, and the Agent may only reactivate his/her registration by reapplying for registration and meeting all qualification requirements (including re-taking any necessary examinations).

An Agent on medical leave or disability who returns to service within two years of the suspension will be required to complete the prior year's Firm Element session within 30 calendar days of his or her return. Once complete, the suspension will be lifted. The registered person would also have to complete the current year's Firm Element requirements.

Agents who are suspended may not solicit, offer, offer to sell, discuss, or correspond with any public customer with regard to securities, including variable insurance products, or supervise any securities business.

## P. HANDLING CONTACTS BY REGULATORY AGENCIES

From time to time, the SEC, NASD, state insurance or securities departments or other regulatory body may initiate an inquiry, examination, or investigation of a sales location or Agent by means of an on site audit or by an oral or written communication. The reasons for an inquiry may range from a routine review of office records and Agents' sales practices to investigating an Agent's suspected misconduct. Such visits may be either scheduled or unscheduled. If the visit is scheduled ahead of time, the regulator may provide a list of records in advance of the examination date, indicating the records that the regulator expects to be ready for examination upon his or her arrival. If an Agent receives advance notice of a visit, the Agent must notify their Managing Partner (who will then notify the Zone Agency Standards Officer, Agency Standards and the Corporate Compliance Department) immediately. The Corporate Compliance Department is knowledgeable about the various requirements, policies and procedures that apply to New York Life and NYLIFE and is prepared to respond to regulatory inquiries. **Agents must not attempt to handle regulatory inquiries on their own.**

A description of the records that the Company is required to make available to securities regulators at local offices can be found in Section V of the Handbook.

Even if the inquiry appears to relate solely to activities that pre-date the Agent's association with the Company, the Agent must still immediately inform his or her Managing Partner (who will then notify the Zone Agency Standards Officer, Agency Standards and the Corporate Compliance Department). In addition, the Agent should provide a copy of his or her response to the Managing Partner, who in turn shall provide a copy to the Corporate Compliance Department.

If a request for records or information is provided by the regulator at any time prior to the examination, the Agent must begin assembling the required records as soon as possible. A copy of the request must also be forwarded immediately to their Managing Partner, who will in turn send copies to the Zone Agency Standards Officer, Agency Standards and the Corporate Compliance Department.

Upon the examiner's arrival at an office for the purpose of an inspection, Agency Field Office Management or Agents must follow these procedures:

1   Request that the regulatory examiners produce their credentials. Federal or law enforcement officials will generally have identification cards with their names and photographs. NASD and state examiners' identification may be merely a business card. If the regulator does not produce such credentials, report the situation by telephone to the Zone Agency Standards Officer to determine if (and under what conditions) the interview/inspection should proceed. If the Zone Agency Standards Officer is not available, report the situation to one of the following:

   - Senior Partner(s), Partner;
   - Agency Standards Consultant;
   - GO Administrative Manager;
   - Zone Agency Standards Officer;
   - Home Office Agency Standards – Bill Morrison at (914) 846-3605; or
   - Corporate Compliance Department – John Vaccaro at (212) 576-7444

2   If the credentials of the regulator appear satisfactory, Agents should next ascertain the purpose of the visit. For instance, the Agent should ask if the visit is a routine review, or if they are looking at a specific individual or product. Ask what information they require, and when, and what resources they need. If possible, the examiner should be provided with an empty conference room or other suitable

location. If the examiner asks for access to the Agent's computer or any computer-based records (such as the Agency Portal or the Books and Records website), please contact the Zone Agency Standards Officer and the Corporate Compliance Department immediately to determine whether alternate arrangements may be made.

3. After ascertaining the purpose of the visit, the Agent must immediately call their Managing Partner for guidance on how to proceed. The Managing Partner will notify the Zone Agency Standards Officer and the Home Office Agency Standards and Corporate Compliance Departments. In the event the Agent cannot reach the Managing Partner, the Agent should call one of the following individuals.

- Senior Partner(s), Partner;
- Agency Standards Consultant;
- GO Administrative Manager;
- Zone Agency Standards Officer;
- Home Office Agency Standards – Bill Morrison at (914)-846-3605; or
- Corporate Compliance Department – John Vaccaro at (212)-576-7441

4. The Administrative Manager or GO staff will assist and support the Managing Partner and Agents with production of the requested records. Agents should make certain to keep a copy or a list of everything provided to the examiner, and to keep their supervisors apprised of the progress of the inspection.

In the event an Agent receives a subpoena involving New York Life or NYLIFE, the Agent must immediately advise their Managing Partner, who will refer the matter to the Office of General Counsel ("OGC.") **Agents must not respond to subpoenas without consulting with the Managing Partner and OGC.** OGC must be consulted prior to any response. This applies to subpoenas that relate to Company business whether served upon an employee, a Registered Representative, an Agent, or a corporate entity. This includes subpoenas relating to securities, insurance policies, policy owners or beneficiaries, Agents, employees, New York Life property, Company procedures, or other matters.

No Agent is authorized or permitted, directly or indirectly, to represent the Company in any manner whatsoever before any state insurance or securities department, governmental agency, or self-regulatory organization or official thereof; such matters must be referred to the Managing Partner, who will then notify the Corporate Compliance Department.

Any questions an Agent may have regarding specific rules/regulations of the SEC, NASD, state securities or insurance departments, etc. should be directed to the Managing Partner, the Zone or the Corporate Compliance Department of New York Life/NYLIFE.

## Q. LOBBYING, GIFT & ENTERTAINMENT RULES

New York Life Agents' activities on behalf of the Company may not involve traditional lobbying activity. In some jurisdictions, as noted below, an Agent's sales activity may be considered lobbying and may require an Agent to register as a lobbyist.

If, on behalf of New York Life, an Agent is or anticipates communicating with any federal, state or local official in attempt to influence: (i) the approval or disapproval of legislation; or (ii) the approval or

disapproval of a formal agency rule, regulation, rate-making proceeding or policy, the Agent may need to register as a lobbyist by following the procedure outlined below

An Agent may also need to register as a lobbyist if, on behalf of New York Life, the Agent is or anticipates communicating with any public official in an attempt to influence certain official actions, including the approval of a financial or contractual arrangement (for example, the sale of an annuity to teachers in a school district as part of a 403(b) plan) by a governmental agency in the following jurisdictions:

i)     Any city or county agency in:
       Minnesota (any city or county)
       Los Angeles City, California
       Dade County, Florida
       Chicago, Illinois
       Cook County, Illinois
       New York City, New York

or ii)  Any state agency in:

| Connecticut | Maryland |
|---|---|
| Delaware | Michigan |
| Florida | Mississippi |
| Georgia | Missouri |
| Illinois | Ohio |
| Oklahoma | Texas |
| Kentucky | |

or iii)  Any federal agency, where the individual Agent is communicating with is a "Schedule C" political appointee (e.g., federal governmental agency head) or higher level political appointee

Additionally, the federal government, all states and many localities have restrictions on gifts and entertainment that can be accepted by public officials. In some states, entertaining a public official may be considered illegal. Local officials are frequently unaware of these restrictions.

Bill Morrison in Agency Standards (914) 846-3605 should be contacted before an Agent engages in any of the above-described activities involving public officials. Agency Standards, along with the assistance of the Office of the General Counsel and the Office of Governmental Affairs, will help Agents to determine if registration as a lobbyist is required or whether the proposed gift or entertainment is permissible and/or requires reporting.

## R. REPORTING ILLEGAL ACTIVITIES

Agents must report to their Managing Partner, Zone Agency Standards Officer or Zone Senior Vice President any known or suspected activity, by Agents and employees, which violates Company rules, procedures, or any applicable laws or regulations. If the matter is not adequately addressed, an Agent may also contact the Corporate Ombudsperson (Patricia Folan 1-800-NYL-0909) or the Corporate Audit Department (Mark Arning 212-576-6034)

All Agents' reported allegations will be investigated, and no reprisals against a reporting Agent will be tolerated by the Company

Activities that should be reported include, but are not limited to:

- Witnessing an application an Agent did not complete or witnessing a signature when the Agent did not see the person sign the form;
- Sharing commissions on a case with an Agent who had no part in a sale to facilitate another Agent's validation of a contract, receipt of benefits, or qualification for Council membership;
- Paying a portion of a premium for a client, or advancing premiums to the Company on a client's behalf, or refunding a portion of a premium paid by a client to the client;
- Paying a portion of an Agent's commission to a non-New York Life person or to a Company employee, except through the 1099 program;
- Taking action to destroy, alter or otherwise affect the accuracy of Company or client records;
- Suspecting Agent, employees, or existing or potential customers of activity that violates the Company's anti-money laundering rules or procedures, or activity that is a "red flag" of money laundering. Agents may also contact the AML Compliance Officer (Brian Loutrel 212-576-7384 or Patricia Jenkins 212-576-6591 ) Agents also must not advise an Agent, employee or customer that they are the subject of an investigation for money laundering; or
- Concerns regarding accounting, internal accounting controls or auditing matters at New York Life or its Subsidiaries ("Accounting Concerns") Agents are required to immediately report situations that appear to be unlawful or unethical to their supervisor If an Agent is not comfortable raising an Accounting Concern with an immediate supervisor, they should contact other internal staff, including the Corporate Ombudsperson, the Chief Compliance Officer and the General Auditor Where these avenues of communication have been exhausted, Accounting Concerns may be submitted on a confidential and/or anonymous basis to the Audit Committee through the Office of the Secretary via telephone, facsimile or regular mail Confidentiality will be maintained

The Office of the Secretary may be contacted as follows:

Telephone number: (212) 576-4489
Anonymous Hotline number: 1-800-695-4469
Facsimile number: (212) 576-8600
Regular mail:
Office of the Secretary
Suite 1309
51 Madison Avenue
New York, NY 10010

## S.  NASD BRANCH OFFICE and SPECIAL STATE BRANCH OFFICE REGISTRATION REQUIREMENTS

### 1.  NASD Branch Definition and Form BR

The NASD definition of branch office includes generally "any location where one or more associated persons of a member regularly conduct the business of effecting any transactions in, or inducing or attempting to induce the purchase or sale of, any security, or that is held out as such " In order to register a branch office NYLIFE Securities (NYLSEC) must submit a Form BR for the particular location The Form BR, requires NYLSEC to set forth various items of information including details on outside business activities (OBAs), DBAs, and websites The Contracting Licensing and Registration Unit of IPS is responsible for submitting all required Form BRs to NASD, including new locations, amendments and terminations of branch locations As part of a Form BR filing a "Person in Charge" must be identified

Registered Representatives who are identified as a "Person in Charge" must physically be located in the office. The "Person in Charge" is responsible for greeting a regulator who may come to conduct a review of the location, and should be familiar with how to handle regulatory visits as outlined in Section IV-P " Handling Contacts by Regulatory Agencies" and "Books and Records", Section V of this Handbook

NYLSEC is required to process all Form BRs on a timely basis (within 30 days of opening or closing the branch office or of amending any item on the Form BR). Accordingly, it is critical that all registered representatives keep their Form BR current. Registered Representatives should submit all Form BR related information as they would for reporting any Form U4 changes. This would include the initial registration of a branch, amendment to a location (including change of address, DBA, OBA, website, telephone number, registered representatives affiliated with the location, etc.) and closing of the location. Failure by a registered representative to promptly report any opening, closing or amendment to a detached location may result in disciplinary action

All registered representatives that have a detached location must display a NYLIFE Securities/SIPC sign that is immediately visible to a consumer upon entrance into the office. In addition, as part of the Annual Supervisory Interview and Inspection, registered representatives at detached locations will be provided a copy of their particular Form BR for their location. The registered representative must review the form and certify that the information on Form BR remains accurate in all respects. Registered Representatives will be required to furnish the interviewer with any needed changes

### 2. State Requirements
Most states have adopted the NASD definition of "branch office." However, the states listed below have slightly different definitions, and/or have specific principal requirements

The following are specific rules for those states with branch office registration or principal requirement distinct from NASD requirements:

Agents must advise their Managing Partner if they are conducting business from a location with specific state requirements to ensure that they all such requirements are met. For purposes of determining whether any location meets the state thresholds for branch office registration, all registered service assistants should be considered

- NEW HAMPSHIRE
  Any location that houses one or more Agents must be supervised by a manager who is located in New Hampshire **and** is a qualified principal

- NEW MEXICO
  Any location that houses two or more Agents must have an onsite principal (i.e. one of these Agents must become a designated principal)
  Note: Registered locations are required to maintain a copy of the Field Supervision Manual on site

- RHODE ISLAND
  Any location that houses three or more Agents must be registered with the State

## T. COMPANY AND REGULATORY PENALTIES FOR RULE VIOLATIONS

The Company must take appropriate disciplinary action against Agents who violate firm rules or industry rules or regulations. Regulatory authorities may also impose sanctions against the Company, its Agents

and/or associated persons for violations of the securities and insurance laws or NASD Rules  These sanctions may take the form of a censure, fine, re-qualification by examination, restitution, suspension, and/or permanent bar from the securities industry  The Company must take appropriate disciplinary action against Agents for violations of securities and insurance laws and regulations and related rules of the Company  Penalties are imposed based on the circumstances of each case and may include a fine, warning, reprimand, suspension, and/or termination

**SECTION V**
**BOOKS AND RECORDS**

# A. RECORDS REQUIRED TO BE MADE AVAILABLE AT THE LOCAL OFFICE

The SEC's Books and Records rules require that each local office make available the following upon a securities regulator's request. For additional information regarding these records and how to request certain records, please refer to the Field News announcement dated April 28, 2003. This announcement can be found in the Books and Records section of Standards and Compliance on Agency Portal.

- Purchase and Sales Blotters;
- Order Tickets;
- Associated Person Employment and Location Records, including NASD Form U4 and Registered Representative Agreement;
- Customer Account Records;
- Customer Complaint Records;
- Compensation Records;
- Advertising and Sales Literature;
- Contact Person Records;
- Responsible Principal Records;
- Communications, including Incoming Correspondence/Funds Received and Securities Transaction Logs, Outgoing Correspondence, and all sales material whether or not approved;
- Electronic (Email) Communications; and
- Documents to Provide to New Account Customers, including either a copy of an executed or blank copy of the account application, investor profile and other agreements

# B. AGENT FILE MAINTENANCE AND RECORD RETENTION REQUIREMENTS

The following requirements apply to both paper and imaged client files, administrative files, and Eagle Strategies files. Note: Only Company-approved Image Systems may be used to record and maintain required records.

## 1. General

Agent files must be organized in the following manner:

a. FILES RELATED TO AGENT'S SALES OF LIFE INSURANCE, ANNUITY OR INVESTMENT RELATED PRODUCTS TO CUSTOMERS
- Life Insurance and Investment Related Client Files*
- Eagle Strategies**

New York Life will periodically review Agents' files related to any approved business dealings with customers of New York Life or its subsidiaries.

*Note: In this category, Agents must include any files that involve New York Life or non-New York Life insurance or investment products, including long-term care. This would include New York Life and non proprietary products, sold to New York Life customers, and non-New York Life products sold to non-New York Life customers.

**Note: The Company will periodically review the Agent's files related to any approved business dealing with customers of New York Life or its subsidiaries

Client File Indexing Standards – Specific client materials must be segregated according to the groups detailed below. All materials may be kept in a single file as long as the materials are clearly segregated within the file. (This file segregation is important to ensure that individual Agents can readily produce only specific materials requested by regulators.)

| Type of Sale | Examples |
|---|---|
| • New York Life products, including approved NYLIFE non-proprietary products and sponsored marketing agreements, sold to New York Life customers. | • Sale of a Putnam mutual fund to a New York Life customer |
| • Non-New York Life products sold to existing New York Life customers | • Sale of non-proprietary fixed annuity to a New York Life policyowner |
| • Non-New York Life products sold to non-New York Life customers | • Sale of non-proprietary traditional life product to a non-New York Life customer |

a.   FILES RELATED TO AGENT'S APPROVED OUTSIDE BUSINESS ACTIVITIES

- In order to properly supervise Outside Business Activities, files related to an Agent's approved Outside Business Activities must be kept separate from the client files described above, with the exception of brokering traditional life and annuities, which must be kept in client files. This includes approved group, property and casualty business, and other similar activities. Agents must keep copies of the Outside Business Activity approvals.

New York Life will periodically review an Agent's client files related to any business dealings with customers of New York Life or its subsidiaries and reserves the right to periodically review an Agent's Outside Business Activity files.

## 2. Client Files

Copies of the following documents must at a minimum be retained for the current year plus the previous five years. Agents must maintain all of these records if he or she is the original Agent of record on any policy/account. Agents must also maintain a client file for every person with whom they have written contact and, at a minimum, keep copies of any correspondence with that person in the client file.

- Fact finding materials including Company-approved forms, yellow pads, notes, etc.;
- All Policy Illustrations that are used with the customer, even if they concern a product that was not purchased. In-force illustrations to the insured must also be retained. In-force illustrations for non-registered insurance products can be maintained on FTCS as PDF files. Illustrations for registered insurance must be maintained in the client files;
- Disclosure Forms "Important Notice: Replacement of Insurance or Annuities" (Form 22190) and other state-specific disclosure forms when a replacement is admitted on the application;

- Part 1 of policy application and all account applications. In addition, Investor Profiles for securities products;
- Policy delivery receipts;
- Copies of receipts provided to customers for all cash and checks accepted. California Agents must maintain these records as part of a client's file for 5 years after expiration or cancellation of a policy; and
- Incoming and Outgoing Correspondence – This includes all service or prospecting letters used with one client. Include documents that reflect the approval received from the Corporate Compliance Department or other designated reviewer, if applicable. Note: In-force illustrations for registered insurance products are considered correspondence and must be maintained in the Agent's correspondence file.

Note: California regulations require Agents with non-resident licenses and those with resident licenses who write business on California insureds to maintain the following information in the client file for **5 years after the expiration or cancellation date of the policy**. Agents can obtain the following information through the Company's systems: (a) name of insured; (b) name of insurer; (c) policy number; (d) effective date, termination date or cancellation date of coverage; (e) gross premium; (f) net premium; (g) commission amount, and (h) names of persons who receive commissions.

## 3. Administrative/Office Files

Agents must maintain copies of the following documents, at a minimum, for the current year plus the previous 5 years; some documents must be kept indefinitely, as indicated below. Where indicated for each category that paper copies must be available, a separate file must be maintained.

- 3010 logs – Original or copies as is appropriate and supporting correspondence;
- Universal Direct Trading records. Agents participating in the Direct Trading Program are required to maintain a Direct Trading File that contains a record of each transaction entered on behalf of a client. For Internet trades, this record will be a screen print of the Order Ticket Confirmation Page received following order;
- Sales Material Used with Clients. All approved insurance related and securities-related advertising and sales literature pieces **used** by the Agent. Include documents that reflect the approval received from SMRU, or other designated reviewer, if applicable. Advertising includes documents such as: any material that is published or used in a newspaper, magazine, radio, television, signs, billboards, yellow pages listing, websites, etc., as well as sales literature which includes circulars, newsletters, worksheets, seminars, article reprints, letter head and business cards, brochures, business reply material, telemarketing scripts, handouts, and mass mailing form letters, etc. Please note that for any Company-approved, registered product boilerplate material used, only one copy is required, along with an attached list of the names and addresses of the individuals that it was used with. For example:

  1. An Agent decides to use a Company-produced/Compliance-approved concept paper, ghostwritten article, brochure, fact sheet, branding advertisement, etc. The Agent must keep one copy of the piece and attach a list of all the clients/prospects to whom the Agent gave or mailed the piece. Always include the name, address, and the date of use (given or mailed to client);
  2. The same would apply if the material were published; i.e., the concept paper or ghostwritten article is placed by the Agent or on the Agent's behalf in a local publication,

newspaper or magazine. In this instance, the Agent would attach a list of all publications and dates of publication;

Agents are not required to maintain copies of prospectuses provided to customers.

- Agent supervision policies and procedures (includes Field Supervision Manual and the Agent/Registered Representative Handbook). These documents are available online through the Agency Portal - Standards and Compliance website;
- Copies of all paper inter-office memos regarding broker/dealer business. Note: Paper copies of inter-office memos relating to broker/dealer business do not have to be retained if the materials are available online and can be downloaded. This includes documents such as Field News, Agency Communications, etc;
- Registered Representative Agreement, (These records must be retained indefinitely); and
- Form U4 and any updates. These records must be retained indefinitely.

Upon request from a regulator, an Agent may provide the examiner the above listed records after the examiner's credentials have been verified and the examination has been reported to the Managing Partner. Further details on Handling Contacts by Regulatory Agencies can be found in Section IV-P.

## C. PROHIBITED RECORDS

The following documents must not be maintained in customer files:

1. The original insurance policy. Such original should be delivered to the customer.

2. Original documents signed by a customer (e.g., applications, service-related documents). Such original documents should be promptly submitted to the appropriate business service center and only copies retained in the client file.

3. Original "blank" signed customer forms (e.g., applications or service related documents signed by the customer to be processed at a later date). Agents are prohibited from obtaining signatures on blank forms of any type.

4. Copies of confidential customer information (e.g., CPHQ, Paramedical, APS, etc.).

## D. RECORDS REQUESTED THROUGH THE BOOKS AND RECORDS WEBSITE

A web application has been developed to assist Agents and all GO management with gathering the appropriate records to provide to a regulator. The application can be accessed from the Agency Portal Home Page by clicking on the Books and Records link in the Reference Center located on the right-hand side of the page. Then by clicking on the "Click Here" link on the Books and Records Web Site, Agents will be provided with access to detailed directions about how to obtain requested records. **Note: This Website should be used only in the event of a regulatory examination.** If Agents have any questions about how to proceed, they should contact their Managing Partner.

Once these records are requested through the Books and Records Web Site, the records will be printed at the GO and either faxed, delivered same day or mailed for next day delivery to the appropriate office. The records may be requested as follows:

- Purchase and Sales Blotters;
- Customer Complaints;
- Registered Representatives Cash Commissions Report;
- Registered Representatives Non-Cash Earnings Report;
- Principal Report;
- Client Profile Report;
- Email Communication Report;
- NASD Form U4 – Current NASD Version (CRD printout);
- GO Contact Report;
- Disciplinary Action Report;
- TPAL Report to Regulators;
- List of Associated Persons at Local Office;
- Supervisory Procedure Manuals;
- Registered Representative Cash Compensation Arrangement;
- Registered Representative Non-Cash Compensation Arrangement;
- Supervisory Compensation Information *(Note that Field Management has been given special instructions on how to request this information)*; and
- Discretionary Account Report

## E. PAPERLESS OFFICE

Agents are authorized to have a paperless office, and store records electronically through the PaperVision/ImageSilo software of MuniMetrix. **The use of any other document management software besides PaperVision/ImageSilo from MuniMetrix will require Agents to keep required paper documents for the record retention period.**

Agents, who use PaperVision/ImageSilo, will not need to maintain the actual paper copies of data upon confirmation of receipt of their read compliant media from Iron Mountain. **The only provision to allow you to destroy the original documents is to subscribe to the 17a-4 Compliance program with MuniMetrix and follow the detailed steps below:**

Agents must:

1   Follow the scanning procedures provided by MuniMetrix. These procedures explain the scanning process and creating backups for compliance purposes;

2   Use the New York Life-approved template  which is provided by MuniMetrix during the installation of the software  The template is for New York Life Business, Eagle and Approved Outside Business Activities. While Agents may scan and retain electronic copies of documents for non-New York Life business, they must retain the paper since the undertakings with the SEC cover only New York Life-related business;

3   Establish an Imaging Administration File that will contain control sheets, Agent Certifications and confirmation letters from Iron Mountain;

4   Store electronic data (documents and index) and additional required copies on the compliant media: CD-ROM (CD-R or CD+R media) or DVD-ROM (DVD-R or DVD+R media) which is, by

design, non-rewriteable and non-erasable. Agents may not use rewriteable media such as CD-RW or DVD-RW. Until the imaged documents have been copied to the compliant media, the paper file is the official record and must be maintained;

5.   Use a CD or DVD writing application which automatically verifies the accuracy of the recording process. CD recording applications such as Nero by Ahead Software or CD Creator by Roxio can be used to do this. CD writeable drives typically come with "lite" versions of CD writing software. Agents should check for included CD writing software that verifies the accuracy of the recording process before purchasing a new writeable CD drive, or acquire one of the recommended products;

6.   SEC Rule 17a-4 requires Agents to serialize the CDs or DVDs that are created. Most CD writing applications automatically encode the CD with a date and time code that is unique and satisfies the serialization requirement. Also note that the CDs themselves should be serialized, dated, and clearly marked (i) with the date of creation, (ii) what number this CD is in the series of CDs created, and (iii) whether the CD is the office copy, offsite copy, or copy to send to third party;

7.   Verify that the scanned images and index were accurately recorded in a verifiable and auditable process on the compliant media and keep a log of this verification process in the Imaging Administration File;

8.   Contract with MuniMetrix, which will act as a third party, and which has provided a letter of intent to the designated examining authorities with respect to keeping an up-to-date duplicate of the Agent's DMS database and indices at the Iron Mountain Storage Facility. This is a strict requirement for compliance with SEC regulations;

9.   Once per quarter, create three sets of CDs or DVDs of the images and index of the entire database. Verify that the image copy completed correctly by comparing the compliant media file size to the DMS database size. Spot check images on the media to assure that (i) the media contains a true copy of the DMS database and (ii) the images and index were accurately recorded in a verifiable and auditable process on the read only media before sending one set to the Iron Mountain Storage Facility. Agents must sign an Agent Certification, which can be accessed through Agency Portal > Field Technology > Document Management System > "Revised the Procedures", attesting to the completeness of the image storing process and send a copy of the certification to their Managing Partner for inclusion in the supervisory file and a copy to MuniMetrix. Agents must keep the original in their Imaging Administration File;

10.  The second set is the Agent's official record which, as required both by regulation and New York Life rules, must be retained onsite in the Agent's office. The third set is disaster recovery backup which must be maintained in a secure location offsite so as to comply with regulatory requirements. Sets two and three must be retained for 5 years from the creation date;

11.  Confirm receipt of the first copy by Iron Mountain before disposing of paper. A letter will be sent from Iron Mountain when they have received the Agent's CDs/DVDs and logged it into their system;

12.  Agents must keep the original notification from Iron Mountain with their Imaging Administration File of the backup process and send a copy to their Managing Partner. Then follow the procedures outlined in the 10/25/04 Field News titled "Secure Document Destruction" by Michael Gordon; and

13. Agents must be prepared to provide compliant media and/or use the export function of their DMS software to provide data, index and audit information to authorized Agency, Corporate Compliance, Corporate Audit and outside examining authorities, upon request. Imaged documents, which have not yet been copied to the compliant media, may be provided to a regulatory examiner for convenience if he/she so requests, but until the imaged documents have been placed on the compliant media, the paper file is the official record. Provide access to the DMS system to authorized Agency, Corporate Compliance and Corporate Audit personnel.

For additional details on the paperless office, please see the Site Directory Field on the welcome page of Agency Portal and click "Field Technology" then "Document Management System."

## F. DESTRUCTION OF RECORDS

Agents should follow prudent business practices in disposing of confidential business records once those records are no longer required to be maintained. This would include customer records, computer records, and any other information the Agent may have. The method used should assure that confidential information contained in the files is destroyed. If some third party uses the active or inactive Agent's files for criminal acts or makes public confidential information from the files, the Agent may be held responsible. The degree to which an Agent may be held liable is often commensurate with to the extent to which he or she took prudent steps to keep confidential information secure. Such confidential information would include customer records, computer records, correspondence, policy or account applications, and any other information in the Agent's possession.

## G. PROPERTY OF RECORDS

Information obtained on contracts, accounts, or policyholders of New York Life and its affiliates - whether in paper, computer or other format ("customer files") - is the property of the Company. If an Agent voluntarily or involuntarily leaves the Company or retires, the Agent shall immediately surrender to New York Life or its designee the original and any reproductions of such information in any form whatsoever. In any case, the Agent retains the responsibility to protect the customers' rights to privacy in accordance with the Company's Privacy Policy.

All information contained in customer files is proprietary to New York Life and must be kept confidential, even after the Agent has left the Company.

## H. NASD BOOKS AND RECORDS LETTER
### *This section only applies to registered representatives*

The SEC Books and Records regulations require that NYLIFE Securities periodically furnish account record information to its customers. The requirement allows the customer to review certain basic information regarding the account that the broker-dealer has on file and make updates and other revisions as necessary. This includes some of the basic information the Agent reviews in making investment recommendations and/or suitability determinations for the account. The requirement to furnish this record to the Agent's customers is designed to reduce the number of misunderstandings between customers and firms regarding the customer's situation, investment objectives, and other issues. In addition, it serves to facilitate access to up-to-date customer information when making recommendations to customers.

Upon receipt of the account record information, the customer has the opportunity to review and provide any

updates or corrections to the Company

Since May 2, 2003, the Company has provided confirmation of account record information to customers with new product sales within 30 days of the product purchase. The Company is required in many circumstances to again furnish this information to each customer every 3 years from the date of the original purchase. Since May 2006 and every three years thereafter, with limited exceptions, the Company also provides each customer with a copy of their account record. The Company also sends a copy of the customer's account record to accounts that might not require a mailing under the rules (e.g., accounts where a suitability determination has not been made in the prior 36 months)

When the customer notifies the Company of a change in their account record, the Agents will receive a TPAL communication. The TPAL will show the client's information before and after the information was updated on New York Life's systems. Agents should review this information prior to making any recommendations to their customers and ask the customer if this information has changed, in order to enable a proper suitability determination

## SECTION VI
## POLICY AGAINST HARASSMENT AND COMPLAINT PROCEDURE

Sexual harassment is defined by the Equal Employment Opportunity Commission ("EEOC") as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature According to the EEOC guidelines, such conduct is illegal if:

- it becomes a condition for employment;
- it affects employment decisions;
- it unreasonably interferes with an individual's work performance; and/or
- it creates an intimidating, hostile working environment

Reinforcing this policy protects our employees and Agents as well as the Company. Sexual harassment in any form undermines morale and productivity. That is why it is critical to instill a work culture that is free from any type of harassment. Harassment will not be tolerated under any circumstances

The principles of equal opportunity and freedom from sexual harassment are based firmly in law. Sexual harassment is a form of sex discrimination and is a violation of Title VII of the Civil Rights Act of 1964

The two broadly recognized forms of sexual harassment include:

1  Quid Pro Quo — "You give me this, I'll give you that," e.g., sexual favors in exchange for continued employment; and

2  Hostile Working Environment — Unwanted, repeated, and/or intrusive sexual behavior that makes it difficult for a worker to perform his or her job or that creates an offensive work environment

Some examples of this unlawful type of conduct include:

- repeated sexual flirtation;

- propositions;

- remarks about an individual's body;

- sexually degrading words;

- offensive or inappropriate touching;

- jokes or innuendoes of a sexual nature;

- other sexually-oriented statements; and/or

- the placement or display of sexually suggestive photographs or cartoons in the work area, including on computer or video screens

Harassment against someone based on any other characteristic (such as race, religion, national origin, age, disability, etc.) is likewise prohibited by law and Company policy

The Company will conduct a confidential investigation of all harassment complaints. If the complaint is substantiated, appropriate corrective action will be taken, up to and including termination. Confidentiality will be maintained, to the extent feasible.

The Company has a complaint procedure for any employee or Agent who believes that he or she has been subjected to sexual or other forms of harassment. All employees and Agents have a duty to act responsibly to prevent discrimination and harassment, to bring to the Company's attention any incidents of discrimination or harassment in violation of Company Policy, and to cooperate with the Company in any Company investigation. Employees or Agents who bring a complaint of possible sexual or other harassment to the Company's attention will not be disciplined or adversely affected in their jobs. As a first step, an employee or Agent should notify his or her Managing Partner, who must then notify the Zone Agency Standards Officer. These individuals are:

- North Eastern Zone: Drew Robertson (914) 701-2322
- Pacific Zone: Doug Campbell (925) 945-3703
- South Central Zone: Tom Barrett (770) 752-8033
- West Central Zone: Ron Bowers (972) 701-3311

In lieu of contacting the Zone, Agents may contact:

- Home Office Agency Standards Officer, William Morrison 914-846-3605, or
- The Corporate Ombudsperson, Patricia Folan 1-800-NYL-0909

## AMENDMENTS TO THIS HANDBOOK

This Handbook does not constitute an employment contract or any part of one. It does not create any contractual rights on the part of any Agent of New York Life Insurance Company or any Registered Representative of NYLIFE Securities.

The Company reserves the right to amend this Handbook at any time it deems appropriate by providing notice to the Agent. Such amendments will be communicated through Field News or by other means as appropriate. It is the Agent's responsibility to secure any such amendment and to file it permanently with this Handbook in accordance with any instructions accompanying the amendment. In addition, the contents of this Handbook are subject to any additional limitations, obligations, or prohibitions imposed by the laws of any applicable jurisdiction or by the rulings of any applicable state, federal or other regulatory authority. Citations to State and Federal and self-regulatory requirements are believed to be accurate as of the date of the printing, but are subject to change based upon regulatory or other legal developments.