1  THOMAS M. HERLIHY  (SBN 83615)
   LAWRENCE J. ROSE  (SBN 129511)
2  WILSON, ELSER, MOSKOWITZ,
        EDELMAN & DICKER LLP
3  525 Market Street, 17th Floor
   San Francisco, CA  94105
4  Telephone:    (415) 433-0990
   Facsimile:    (415) 434-1370
5
   Attorneys for Defendants
6  UNUM GROUP (formerly known as UNUMPROVIDENT CORPORATION),
   FIRST UNUM LIFE INSURANCE COMPANY (erroneously sued as
7  UNUM CORPORATION) and NEW YORK LIFE INSURANCE COMPANY

8  J. Russell Stedman  (SBN 117130)
   Jennifer N. Lee  (SBN 230727)
9  BARGER & WOLLEN LLP
   650 California Street, 9th Floor
10 San Francisco, CA  94108
   Telephone:    (415) 434-2800
11 Facsimile:    (415) 434-2533

12 Co-Counsel for NEW YORK LIFE INSURANCE COMPANY only

13

14                **UNITED STATES DISTRICT COURT**

15               **NORTHERN DISTRICT OF CALIFORNIA**

16

17 LYLE HUGHES,                    )  Case No.:    CV07-04088 PJH
                                   )
18         Plaintiff,              )  **DEFENDANTS' MEMORANDUM OF**
                                   )  **POINTS AND AUTHORITIES IN**
19    v.                           )  **SUPPORT OF MOTION FOR PARTIAL**
                                   )  **SUMMARY JUDGMENT, OR IN THE**
20 UNUMPROVIDENT CORPORATION; UNUM )  **ALTERNATIVE, MOTION FOR**
   CORPORATION, NEW YORK LIFE      )  **JUDGMENT UNDER RULE 52**
21 INSURANCE COMPANY, et al.,      )
                                   )
22         Defendants.             )  Date       :    August 27, 2008
                                   )  Time       :    9:00 a.m.
23                                 )  Courtroom  :    3
                                   )  Floor      :    17
24                                 )  Before     :    Hon. Phyllis J. Hamilton
                                   )
25 _____)

26

27 ─────────────────────────────────────────────────────────
   **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY**
28 **JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**
   USDC NDCA Case #CV07-044088 PJH
   363378.1

1

# **TABLE OF CONTENTS**

2
                                                                                          **PAGE**

I.      PROCEDURAL HISTORY AND ISSUE PRESENTED ............................ 1

II.     PROCEDURE FOR ADJUDICATION .................................................. 3

III.    STATEMENT OF FACTS ..................................................................... 4

IV.     LEGAL ARGUMENT ........................................................................... 14

        A.      The Administrative Record Submitted To Unum Constitutes The
                Evidence For This Case. ........................................................... 14

        B.      Unum's Claim Decision Must Be Upheld Under The Applicable
                ERISA Standard Of Review. .................................................... 15

        C.      The Decision To Reject The Opinion Of Plaintiff's Treating Physician
                Was Not An Abuse of Discretion. ............................................ 19

        D.      The Administrative Record Shows No "Corruption" That Could
                Reduce The Deference That Unum's Decision Is Due. ............... 20

V.      CONCLUSION ..................................................................................... 22

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

USDC NDCA Case #CV07-044088 PJH
363378.1

1

## TABLE OF AUTHORITIES

2

## FEDERAL CASES

3

PAGE

4

*Abatie v. Alta Health & Life Insurance*
5
458 F.3d 955 (9th Cir. 2006) .......................................................................... 14, 15, 17 22

6

*Atwood v. Newmont Gold Co., Inc.*
45 F.3d 1317 (9th Cir. 1995), *overruled on other grounds in Abatie* ................ 16, 17

7

*Bendixen v. Standard Insurance Co.*
8
185 F.3d 939 (9th Cir. 1999) ........................................................................... 4

9

*Black & Decker Disability Plan v. Nord*
538 U.S. 822, 155 L.Ed.3d 1034 (2003) .......................................................... 4

10

*Bogue v. Ampex Corporation*
11
976 F.2d 1319 (9th Cir. 1992) ......................................................................... 15

12

*Caplan v. CNA Finance Corp.*
544 F.Supp.2d 984 (N.D. Cal. 2008) ............................................................... 3

13

*Chadwick v. Metropolitan Life Insurance Co.*
498 F.Supp.2d 1309 (E.D. Cal. 2007) ............................................................. 4
14

15

*Concrete Pipe & Products, Inc. v. Construction Laborers Pension Trust*
508 U.S. 602, 124 L.Ed.2d 59 (1993) .............................................................. 16

16

*Eley v. Boeing Company*
17
945 F.2d 276 (9th Cir. 1991) ........................................................................... 15, 18

18

*Hoskins v. Bayer Corporation*
2008 U.S. Dist. LEXIS 48791 (N.D. Cal. 2008) ............................................. 3, 22, 23

19

*Jebian v. Hewlett-Packard Co. Emple. Benefits Organization Income Prot. Plan*
20
349 F.3d 1098 (9th Cir. 2003) ......................................................................... 14

21

*Kearney v. Standard Insurance Co.*
175 F.3d 1084 (9th Cir. 1999) ......................................................................... 3, 14, 15

22

*Martin v. Continental Casualty Co.*
23
96 F.Supp.2d 983 (N.D. Cal. 2000) ................................................................. 4, 21

24

*Metropolitan Life v. Glenn*
     No. 06-923 (June 19, 2008), *citing Firestone Tire & Rubber Co. v. Bruch*
25
     489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ................................. 15, 22

26

ii

27

28

*Metropolitan Life Insurance Co. v. Taylor*
481 U.S. 58, 95 L.Ed.2d 55 (1987) ................................................................. 1

*Mongeluzo v. Baxter Travenol Long Term Disability Plan*
46 F.3d 938 (9th Cir. 1995) ................................................................. 14

*Pilot Life Insurance Co. v. Dedeaux*
481 U.S. 41, 95 L.Ed.2d 39 (1987) ................................................................. 1

*Sandy v. Reliance Standard Life Insurance Co.*
222 F.3d 1202 (9th Cir. 2000) ................................................................. 15

*Snow v. Standard Insurance Company*
87 F.3d 327 (9th Cir. 1996) ................................................................. 15, 16, 18

*Taft v. Equitable Life Assur. Social*
9 F.3d 1469 (9th Cir. 1993) ................................................................. 18, 23

*Voight v. Metropolitan Life Insurance Co.*
28 F.Supp.2d 569 (C.D. Cal. 1998) ................................................................. 22

## STATE STATUTES

**PAGE**

28 U.S.C. § 1367(a) ................................................................. 2

29 U.S.C. § 1132(a)(1)(B) ................................................................. 3

Federal Rule of Civil Procedure 52 ................................................................. 3

Federal Rule of Civil Procedure 53 ................................................................. 3

iii

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

1

2

## I.    PROCEDURAL HISTORY AND ISSUE PRESENTED

3
       Plaintiff, Lyle T. Hughes, was a New York Life Insurance Company agent operating an

4
independent agency in Modesto, California.  In 2004, Hughes ceased working, and thereafter filed

5
claims for long term disability benefits under three different insurance policies, and claims under

6
separate, non-insurance contracts with New York Life, including the Agent's Contract known as

7
"Nylic Contract QN6-82."[1]  One of the insurance policies was a Group Long Term Disability Plan,

8
sponsored by New York Life, and open to certain employees and some of its independent agents; the

9
other two policies were individual plans that Hughes himself purchased.  Unum was the claims

10
administrator for these policies, and determined that Hughes did not satisfy the criteria for disability

11
benefits under any of the three policies.  Ultimately, this suit followed.

12
       Hughes began this action in the Superior Court for San Francisco, and the defendants

13
removed the matter to this Court; federal jurisdiction was predicated on both diversity and federal

14
question jurisdiction, as the group employer-sponsored plan is governed by ERISA.  *Pilot Life Ins.*

15
*Co. v. Dedeaux*, 481 U.S. 41, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S.

16
58, 95 L.Ed.2d 55 (1987).  (*See* Court Docket, Document No. 1, filed August 8, 2007.)  However,

17
Hughes filed a motion to remand, claiming *inter alia* that the parties were not diverse, and that Court

18
lacked federal question jurisdiction because none of the insurance plans were governed by ERISA.

19
(*See* Court Docket, Document No. 11, filed September 11, 2007.)

20
       In response to Hughes' motion to remand, the defendants provided the Court with substantial

21
evidentiary submissions to explain the various policies that plaintiff had mentioned, including the

22
Group Long Term Disability Plan. The applicable group insurance contract was authenticated and

23
introduced as Exhibit B to the Declaration of Sophia Rodriguez in Support of Defendants'

24
Opposition to Motion to Remand (*see* Court Docket, Documents No. 26 (declaration) and 27

25
---

[1]     The Nylic Contract QN6-82 is an agreement setting forth the manner in which New York
Life agents may continue to receive commission payments that may be due on policies sold in

26
previous years if they become disabled.  That contract and the other New York Life arrangements
with agents are not insurance, and are not pertinent to the present motion.

27

1
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28

(policy), filed November 7, 2007), and policy up-dates were introduced as Exhibits C and D.  (*See* Court Docket, Document No. 28, filed November 7, 2007).

By their request served and filed herewith, defendants hereby request this Court take judicial notice of those authenticated documents within its file for this matter.

On February 6, 2008, the Court issued its Order Granting Remand In Part and Denying Remand In Part.  (*See* Court Docket, Document No. 44, filed February 6, 2008).  In the ruling, the Court noted that the plaintiff had conceded that the New York Life Insurance Company Group Long Term Disability plan <u>was</u> subject to ERISA.  However, the Court also based its determination on the defendants' evidentiary submissions, including the Group Long Term Disability Plan policy identified above.  The Court stated:

> This concession, in addition to the showing made by defendants in their original and supplemental opposition briefs, compel the court's conclusion that (1) ERISA governs the Group LTD Plan in question; and (2) ERISA furthermore preempts plaintiff's first, second, third, and fourth causes of action, since each of these claims depends in part on, and relates to, the Group LTD Plan.

Order, page 1, line 27 to page 2, line 3.  For that reason, the Court denied the plaintiff's motion to remand with respect to those claims.[2]

On February 14, 2008, the parties appeared for the Initial Case Management Conference in this matter.  The Civil Minutes from that conference state

> Defendants and possibly Plaintiff shall file motion re: ERISA plan by 7/16/08 and shall set the motion on a 35 day briefing schedule.

(*See* Court Docket, Document No. 46, filed February 14, 2008).  This is that motion.

---

[2]    With respect to the claims under the individual, non-ERISA policies that were asserted in those same causes of action, the Court concluded that "plaintiff's complaint is so poorly pled with respect to the various different policies and contracts at issue, that it is impossible for the court to adequately determine what portion of plaintiff's claims relates to the Group LTD Plan exclusively, and which portion relates to any policies and contracts other than the Group LTD Plan."  *Id.* at 2-3.  Therefore, the Court retained jurisdiction over those claims within its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  The remaining causes of action, pled only against the California Insurance Commissioner, were remanded to state court.  *Id.*

2

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

Arguably, the Court could have required the plaintiff to re-plead and specify his claim for ERISA plan benefits under 29 U.S.C. § 1132(a)(1)(B), or the defendants could have moved under Rule 12 for a more appropriate statement of the plaintiff's claims.  However, *for the purposes of this motion only*, defendants are prepared to treat the plaintiff's contract claim as a claim for benefits under the Group LTD Policy, and seek an adjudication on the merits that no such benefits are owed under that policy.[3]  Thus, the defendants' motion here demonstrates that Unum, as administrator of the New York Life group long term disability plan, correctly determined that plaintiff was not eligible for disability benefits, and that the denial of his claim was not an abuse of discretion.

## II.    PROCEDURE FOR ADJUDICATION

Recent ERISA cases in this Court have frequently been determined on the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52.

> Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999).

*Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984 (N.D. Cal. 2008); *see Hoskins v. Bayer Corporation*, 2008 U.S. Dist. *LEXIS* 48791 *11 (N.D. Cal. 2008)(treating parties' cross-motions for summary judgment as motions under Rule 52).  In this instance, however, the adjudication that defendants seek will not resolve the entire case – the claims under the individual disability policies will not be addressed or resolved.  This motion, therefore, is more akin to a motion for partial summary judgment.

Other recent cases recognize that a proceeding under Rule 56 can also be correct:

> In an ERISA benefits case, the "traditional" summary judgment standards are not necessarily appropriate. Fed. R. Civ. P. 56. Where, as here, the administrator's decision is reviewed for abuse of discretion, "a motion for summary judgment is

---

[3]    As noted, the plaintiff's claims under the two individual disability policies are not addressed in this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

USDC NDCA Case #CV07-044088 PJH
363378.1

1
2
3

> merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) (finding that "[a]lthough there may be contradictory evidence in the record, we hold that, as a matter of law, the plan administrator did not abuse its discretion").

4
5
6
7
8
9

*Chadwick v. Metro. Life Ins. Co.*, 498 F. Supp. 2d 1309, 1316 n.6 (E.D. Cal. 2007); *see Martin v. Continental Cas. Co.,* 96 F. Supp. 2d 983, 990 (N.D. Cal. 2000)(summary judgment motion is vehicle for resolution of ERISA cases). Thus, the factual record before the Court, although containing conflicting opinions of the plaintiff's "disability," can support the legal determination that Unum's analysis was reasonable, and defendants are entitled to judgment on the ERISA claim.

10

## III.     STATEMENT OF FACTS

11
12
13
14
15
16
17
18
19
20

In September, 2004, Lyle Hughes, an independent insurance agent for New York Life, contacted Unum to file a claim for Long Term Disability insurance benefits, stating that the last day he worked was August 31, 2004, and that he was totally disabled due to fibromyalgia, sleep apnea, and bipolar disorder. *See* Summary of Administrative Record, filed herewith, at page 0005 (hereafter, "AR SUM (page)"). He identified his treating physician as Dr. John Duong in Modesto, and stated that he first began to treat with Dr. Duong for these conditions nine (9) years earlier, in June, 1995. (AR SUM 0008). On September 20, 2004, Unum wrote to Mr. Hughes to acknowledge receipt of his claim; Unum's letter stated that representatives had tried to reach Hughes repeatedly without success and requested that he contact the company to provide additional information. (AR SUM 0010).

21
22
23
24
25
26

Unum's administrative record contains notes of an in-take telephone call with Hughes on September 21, 2004. (AR SUM 0031). In this conversation, Hughes reported that he had suffered from fibromyalgia and sleep apnea since 1992, and perhaps earlier. Tests for rheumatoid arthritis and lupus had been negative, and Hughes was not seeing a rheumatologist. He had been using a continuous positive airway pressure (C-PAP) machine for his sleep apnea, and was obtaining some

27
28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**
USDC NDCA Case #CV07-044088 PJH
363378.1

relief.  He was receiving no specific treatment for his fibromyalgia.  He was taking lithium for his bipolar disorder, but hadn't seen a mental health therapist in four years.  Hughes identified his current and previous treating physicians, and the marriage and family therapist who had diagnosed his bipolar disorder.  (AR SUM 0032).

When asked about his mental status and his pastimes, Hughes stated that he had problems with memory and concentration, but was able to spend his time walking his dogs, visiting with friends and occasionally playing golf.  (AR SUM 0033).  He was able to drive, although not for long periods of time, and was able to sit for as long as an hour and a half.  However, Hughes did not foresee ever going back to work, and stated that he was looking into selling his agency.

Two days later, Unum wrote to Hughes, and informed him of the Plan's definition of "disability," which provides in relevant part that a beneficiary must be

> unable to perform the material and substantial duties of *any gainful occupation* for which the participant is reasonably fitted by education, training, or experience …

(AR SUM 0036, emphasis added).  Unum asked Hughes to provide an Attending Physician Statement, and informed that it would request medical records from his general physician, his sleep specialist and his mental health therapist.  Those requests appear in the Summary of Administrative Record at pages AR SUM 00038 to 43.

On October 18, nearly a month later, Hughes submitted the Attending Physician Statement from his primary care provider, Dr. Duong.  (AR SUM 0045).  In that statement, Dr. Duong confirmed Hughes' diagnoses as fibromyalgia, sleep apnea and bipolar disorder, and stated that he saw Hughes once every two months.  Under "Restrictions" – "What the patient should not do" – Dr. Duong wrote:

**"Avoid all stressful situations, no long periods of sitting."**

At that same time, Hughes submitted his response to Unum's questionnaire, describing his "disability" and the ways he spends his days.  (AR SUM 0046).  He stated that he goes to his office

---

5

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

one to three times a week, and stays one to two hours at each visit to supervise his employees, write

checks, et cetera.  He also described his daily routine:

> **I get out of bed around 7:00 a.m.  It takes me 2 to 3 hours of stretching and usually a very hot bath or shower to help me loosen up.  I take all of my medications and then I call my office to see how things are running.  I usually go for a 40 to 50 minute walk with my dogs.  I eat lunch, then take a 1-2 hour nap.  I read, or do small chores around the house.**

The third page of Hughes' submission contained another statement from his physician:

> **Due to patient's chronic illnesses, he is not able to perform a lot of tasks. Symptoms change from day to day.  Difficult for patient to perform any task**.

(AR SUM 0047).  However, Dr. Duong also completed the form indicating that Hughes could bend,

kneel, crawl, climb stairs, reach above his shoulder, and push and pull objects up to ten pounds for

up to one-third of his workday.  (AR SUM 0048).[4]

On November 2, 2004, a representative of Unum met with Hughes and conducted an in-depth

interview at his home and office.  (AR SUM 0056-61).  The representative spent approximately two

hours with Hughes, obtained an up-date on his physician visits and his symptoms, and his daily

activities. At the insurance agency, Unum's representative spoke with the office manager, who

confirmed that Hughes came in once or twice a week to supervise staffing, return phone calls, et

cetera.  (AR SUM 0060).

In this same period, Unum obtained a copy of the medical records of Hughes' sleep

specialist, Dr. Drew Logue.  (AR SUM 0062-81).  These records detail Dr. Logue's care and

opinions from the time that Hughes first presented in December, 2003 through his last visit in

---

[4]     Dr. Duong was asked to indicate the number of hours each workday that Hughes could spend at various activity levels.  Duong stated that Hughes could spend zero hours at light, medium and heavy activity, but the figure that Duong entered for "Sedentary Activity" is illegible, and could be an "8" or a "0."  Since sedentary activities are defined on the form as "walking/standing on occasion (and) sitting 6/8 hours," it is reasonable to presume that Dr. Duong intended to communicate that Hughes could perform those activities for an 8 hour workday.  After all, that is precisely the level of activity that Hughes reported for himself in his description of his usual daily activities.  And, it is virtually the same level of activity required in his office job as an insurance agency owner.

March, 2004, six months before Hughes declared himself "disabled." According to Dr. Logue's records, at the time he first presented, Hughes reported a recent divorce and "some business challenges which have been stressful." (AR SUM 0064). Dr. Logue described his symptoms as "compatible with moderate sleep apnea," and recommended a new C-PAP machine. In February, 2004, Hughes underwent a polysomnogram sleep study, apparently for the purpose of calibrating his C-PAP machine. (AR SUM 0068-76). Hughes returned a month later, in March, 2004, and saw Dr. Logue's associate, Dr. Margaret McKee, who noted that Hughes "actually is quite pleased with (the new C-PAP) and it is working for him for the first time since he was first diagnosed with obstructive sleep apnea some years ago." (AR SUM 0063). He was however having problems with drying of the nasal passages; Dr. McKee volunteered to look for alternative brands of C-PAP masks and scheduled a return visit in two months.

The Unum administrative record also contains records of several "one time only" visits to different physicians who sent reports to Hughes' general physician, Dr. Duong. (AR SUM 0082-0090). In 2002, Hughes had one visit with a psychiatrist, complaining of depression and mood swings while taking lithium and Paxil; at that time, Hughes had not seen the marriage and family therapist who had originally diagnosed him for several months. (AR SUM 0083-84). The psychiatrist noted no particular problems with cognitive functioning, but gave a "working diagnosis" of bipolar disorder. (AR SUM 0085-86). There is no sign that Hughes ever returned to that physician.

Similarly, the administrative record demonstrates one visit with a rheumatologist, in January, 1996. (AR SUM 0089-90). That physician, Dr. David Curtis, noted that Hughes reported finger joint pain and mild deformities of his knuckles. Previous blood tests showed two elevated rheumatological markers, but a normal sedimentation rate. Dr. Curtis noted a good range of motion, although Hughes "complained of stiffness." (AR SUM 0090). Dr. Curtis stated, "I would conclude

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

USDC NDCA Case #CV07-044088 PJH
363378.1

that he has psoriatic arthritis. This would be compatible with a long duration of a mild illness." He offered to see Hughes again in six months.

On December 17, 2004, the assembled medical records were presented for a "senior clinical consultant" review by a Unum staff nurse, Tina DiMatteo, RN, MSN, HIA, CCM. (RA SUM 0091-95). Ms. Matteo was asked:

> Can the reported level of impairment by the [employee] of unable to concentrate and remember things and [fibromyalgia] flare ups and/or [restrictions and limitations] ("avoid all stressful situations and no long periods of sitting") [be] supported by the provided medical data?

(AR SUM 0092). Ms. Matteo set out a careful review of the plaintiff's medical records, including those identified here and others dating back to 1994 (fully ten years prior to Hughes' claimed "disability"). (AR SUM 0092-94).

Ms. Matteo noted that "[t]he data on file does not support a diagnosis of FMS [fibromyalgia] as outlined by the American College of Rheumatology," and that the only real discussion of fibromyalgia was "in 5/98 when the P[rimary] C[are] P[hysician] wanted to [rule out] this among other conditions such as Rheumatoid arthritis and Lupus. The data does not show that there was any work up completed or a determination made in subsequent notes re: the PCP thoughts at the time." (AR SUM 0094). Further, she noted that despite the plaintiff's statements to Unum, "there is no report of decreased concentration and poor memory in the recent medical data." The plaintiff has been maintained on lithium, trazodone and Paxil since 2002 without any changes in doses or continuing care with any mental health professional; lithium blood levels, which were frequently below the therapeutic dose, were in the appropriate range in August of 2004, and reported by Dr. Duong to be working well. (AR SUM 0095). Finally, Ms. Matteo noted a significant history of obstructive sleep apnea, but the latest report from the sleep specialist stated that Hughes "was 'pleased' with his treatment and is tolerating CPAP well."

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

USDC NDCA Case #CV07-044088 PJH
363378.1

1    Based on that review, Ms. Matteo determined that the restrictions and limitations that were

2  stated by Dr. Duong ("avoid stressful situations and no long periods of sitting") were "overly

3  restrictive." (AR SUM 0095). She concluded:

4       Therefore, based on the above, and that there is no acute incident or injury or
        change in the insured's chronic medical condition around the time he goes out of
5       work, the [restrictions and limitations] provided are not supported.

6  Of note, however, Ms. Matteo did not make any recommendation regard Hughes' claim. Instead,

7  she proposed to double-check her conclusions with a Unum physician. (AR SUM 0095).

8       The administrative record demonstrates that the "second look" physician consultation was

9  performed that same day, December 17, 2004, by Donna J. Carr, D.O., a Vice President and Medical

10 Director for Unum. As shown in her note, Dr. Carr is Board certified, licensed to practice medicine

11 in four states, and served as a clinical associate professor of medicine at the University of New

12 England Osteopathic Medical School and an adjunct assistant clinical professor of medicine for

13 Dartmouth Medical School. (AR SUM 0097). Dr. Carr stated: "**I have read and discussed the file**

14 **review by T. DiMatteo, R.N. and the associated medical records and I agree**."

15      Dr. Carr noted that Hughes' medical records reflect a diagnosis of fibromyalgia, but the

16 findings reported by Hughes' own physicians do not meet the American College of Rheumatology

17 criteria for that condition; Hughes is receiving Neurontin, an anti-epileptic medication, and narcotic

18 pain killers, but neither of these medications are typically used in fibromyalgia care; Hughes is not

19 receiving any care for psoriatic arthritis, "suggesting a low level of concern for progressive

20 rheumatologic condition;" Hughes' mood and cognitive complaints are apparently not serious

21 enough to require on-going care with any mental health professional, which would be expected if

22 they were truly precluding employment. And, Dr. Carr concluded, "Avoidance of prolonged sitting

23 can be achieved by alternating sit/stand as needed, and I would expect the insured would be able to

24 accomplish this in his at (*sic*) work." (AR SUM 0097).

25

26
_____
                                        9
27 **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY**
   **JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28 USDC NDCA Case #CV07-044088 PJH
   363378.1

Once again, however, Unum's clinical medical staff did not offer a coverage decision, or even make a recommendation. Instead, the matter was referred to a "multi-disciplinary roundtable" for further analysis. (AR SUM 0100). That roundtable discussion was held a few days later, and again, the group concluded that "[t]he information does not support the [restrictions and limitations]." Nevertheless, Unum still determined to obtain more information: "Will refer to Dr. Carr to call Dr. Duong." (AR SUM 0101).

The administrative record shows that Dr. Carr made three attempts to telephone Dr. Duong, on January 20, 24 and 25, 2005, without success. (AR SUM 0103). Therefore, on January 25, 2005, Dr. Carr sent Dr. Duong a letter asking about Hughes' medical condition and setting out eight specific points on which more information might be helpful. (AR SUM 0104-05). On February 3, 2005, Dr. Carr prepared a brief memo for the claims file noting that she had received a response from Dr. Duong, and summarizing its contents. (AR SUM 0106). Dr. Duong stated that he had not formulated any thoughts of changing Hughes' medications and had not referred the patient to physical therapy – two logical options if Hughes actually suffered from disabling, uncontrolled fibromyalgia. Moreover, Dr. Duong confirmed that Hughes had not seen a psychiatrist in nearly three (3) years – a curious circumstance for a patient claiming to suffer from bipolar disease. Finally, Dr. Carr also noted that Unum had been asked by Hughes to speak with his pulmonologist, and Dr. Carr agreed to try to reach that physician as well. (AR SUM 0106).

Dr. Duong's original response is contained in the administrative record along with Dr. Carr's capsulization. Dr. Duong had sent a brief narrative note, setting out the points that Dr. Carr had noted, and mentioning that he had seen Hughes for an office visit two weeks before. (AR SUM 0108). Dr. Duong also made handwritten notations on the face of Dr. Carr's original letter, responding to some of the eight questions that Dr. Carr had submitted. ***Of note, however, Dr. Duong gave <u>no</u> response to the question, "What, if anything, about his medical condition impairs him from his previous level of activity?"*** (AR SUM 0110).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

1     The administrative record reflects that thereafter, Unum had received a report from a follow-

2 up visit with Hughes' sleep specialist, Dr. Logue, on November 10, 1994, in which Hughes

3 minimized the benefit he received from the C-PAP therapy.  Dr. Logue noted, "Given his ongoing

4 difficulties, I am a bit surprised we have not seen him since March of this year, at which time he was

5 advised to return for follow-up in two months."  (AR SUM 0111).

6     Dr. Carr was able to speak with Dr. Logue about Hughes' sleep apnea; afterwards, she

7 memorialized their conversation in a letter and sent it to Dr. Logue, inviting his corrections.  (AR

8 SUM 0112).  Dr. Carr confirmed Hughes' specific diagnosis, the issue of his compliance with Dr.

9 Logue's recommendation of the C-PAP machine, and Dr. Logue's opinion that sleep apnea, under

10 appropriate medical care, is rarely a cause of total disability.  Later that week, Dr. Logue returned

11 Dr. Carr's letter with one (1) handwritten correction:  he substituted the word "treated" for the word

12 "corrected" in Dr. Carr's statement, "It is your medical opinion that sleep apnea, when corrected, is

13 generally not considered a medically impairing condition."   (AR SUM 0115).  On the second page

14 of Dr. Carr's letter, Dr. Logue added a handwritten note, "**Concur [with] above, 2/10/05**," and

15 signed the letter.  (AR SUM 0116).

16     Even then, Unum continued to seek out additional information on Hughes' medical

17 condition.  Mindful that Hughes was scheduled to return to Dr. Logue's office on February 14,

18 Unum sent a another records request, specifically asking for the chart note from that most recent

19 visit.  (AR SUM 0117).  As it turned out, Hughes saw Dr. Logue's colleague, Dr. McKee, who noted

20 that Hughes had seen an otolaryngologist, and "is very excited about having surgery for obstructive

21 sleep apnea."  Dr. McKee disagreed with that plan, "but he was not really interested in listening to

22 my recommendations."  (AR SUM 1119).  Nevertheless, she asked Hughes to return in two to three

23 weeks to continue monitoring his response to the latest C-PAP version.

24     Later in February, Hughes completed an additional Claimant's Statement, and provided

25 another Attending Physician Statement from Dr. Duong.  Hughes reported on-going problems with

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**
USDC NDCA Case #CV07-044088 PJH
363378.1

1   fatigue and the discovery of a low testosterone level, for which he had been prescribed Androgel.

2   He stated:  "Seems to be working," and included a smiley face.  (AR 0122).  Dr. Duong reported

3   "sleep apnea still severe," and stated, "Patient should not be working full time or part time anymore.

4   Multiple overlapping symptoms are and will be an ongoing concern for patient both in the short term

5   as well as the long term outlook."  Dr. Duong also noted the discovery of a low testosterone level,

6   but did not describe any diagnostic work-up plans.  (AR SUM 0123).

7           This latest information was provided to Dr. Carr, and again – *for a third time* – Unum

8   decided to obtain additional input before making a final claims determination.   Thus, Dr. Carr

9   suggested, "I recommend D[esgnated] M[edical] O[fficer] review."  (AR SUM 0129).

10          On March 15, 2005, Hughes' complete medical information was provided to Robert Anfield,

11  M.D., J.D., a Board certified family practice physician licensed in four states, with a subspeciality in

12  occupational medicine.  (AR SUM 0130).  Dr. Anfield identified the physician records and other

13  information that he had reviewed, and identified some of the controversy surrounding fibromyalgia

14  in the medical literature.  (AR SUM 0130-31).   He noted that one expert had written that

15  fibromyalgia patients should be encouraged to remain active and employed, and that "physicians

16  must avoid enabling illness behavior."  (AR SUM 1031).  However, Dr. Anfield's conclusion was

17  concrete, not theoretical:   "**In Mr. Hughes' particular case, his physicians' records do not**

18  **demonstrate functional limitations; in the context of FM, in my opinion, with a reasonable**

19  **degree of medical certainty, work as an insurance agent is not medically contraindicated.**"

20  (AR SUM 0131).

21          Dr. Anfield also addressed Hughes' bipolar disorder, noting that "the only reasonably

22  complete evaluation of Mr. Hughes' mental health" came from the psychiatric evaluation in 2002,

23  which showed no serious limitations, while the treatment that Hughes had been receiving "does not

24  comport with a worsening trend."  From that psychiatric information, Dr. Anfield concluded "Mr.

25  Hughes' mental health does not preclude his working as an insurance agent."  With regard to sleep

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

USDC NDCA Case #CV07-044088 PJH
363378.1

apnea, Dr. Anfield noted that Hughes had been able to work with the condition for many years, and that as a self-employed business owner, Hughes could be expected to have the ability to set his own hours, rely on employees, and make accommodations for whatever daytime drowsiness he might actually have.  Therefore, Hughes' obstructive sleep apnea "does not preclude his working as an insurance agent."  (AR SUM 0131).

Finally, at that point, following three different levels of clinical review by medical professionals, Unum determined that Hughes did not meet the plan definition for disability, and was not entitled to benefits.  A coverage determination letter was prepared that set out the correct, applicable definition for "disability," described in detail the medical information that Unum had obtained and the conclusions that Unum drew from that information, and, ultimately, described the plan appeal procedure as required by the U.S. Department of Labor and the California Department of Insurance.   (AR SUM 0136-40).  Moreover, Unum's claim representative personally telephoned Hughes, to tell him of Unum's conclusion and the denial of benefits letter that was en route.  (AR SUM 0141).

Remarkably, Unum then took one additional step to safeguard Hughes' interests.  When Dr. Logue's office voluntarily sent in the report of a follow-up office visit a month later (AR SUM 0142-43), Unum circulated that document back to Dr. Carr for her review (AR SUM 0144), and then explained to Hughes why that extra piece of information could not alter Unum's determination in a letter sent a few days later.  (AR SUM 0145-46).

Plainly, taken as a whole, the administrative record in this case shows a committed, on-going effort to obtain all possible relevant medical information, and the submission of that information for fair review by three levels of medical professionals.  Unum's claims-handling here was entirely appropriate, even-handed and thorough.  Its conclusion is well supported by the record, and certainly does not constitute an "arbitrary and capricious" result.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

USDC NDCA Case #CV07-044088 PJH
363378.1

1

# IV.    LEGAL ARGUMENT

2

**A.    The Administrative Record Submitted To Unum Constitutes The Evidence For This Case.**

3

4

As shown below, the ERISA long term disability benefits plan here appointed Unum as the

5

claims fiduciary, with discretionary authority to adjudicate benefits claims in accord with its own

6

interpretation of the plan's terms.  Unum's decision, therefore, is assessed under a deferential

7

standard review, and under established Ninth Circuit precedent, this court's analysis must be based

8

solely on the information contained in the administrative record of the claim.  *Abatie v. Alta Health*

9

*& Life Ins.,* 458 F.3d 955, 970 (9th Cir. 2006), *citing Jebian v. Hewlett-Packard Co. Emple. Benefits*

10

*Org. Income Prot. Plan,* 349 F.3d 1098, 1110 (9th Cir. 2003).  Indeed, even if a *de novo* standard of

11

review were applied, "the record that was before the administrator furnishes the primary basis for

12

review."  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999).  The Ninth Circuit

13

court has emphasized that "a district court should not take additional evidence merely because

14

someone at a later time comes up with new evidence that was not presented to the plan

15

administrator."  *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 944

16

(9th Cir. 1995).

17

In this instance, the administrative record developed by Unum is considerable.  The record

18

consists of exemplars of the relevant policy language, voluminous medical records dating back well

19

beyond the Hughes' "disability;" the correspondence among Unum, Hughes, and his treating

20

physicians; and the opinions of Unum's medical staff on which its determination was based.  This

21

evidence is fully adequate to demonstrate both Hughes' medical condition, and the open, even-

22

handed analysis that Unum performed.  There is no sign that Unum rushed its adjudication of

23

Hughes' claim; in fact, the administrative record shows that Unum independently requested

24

additional information from Hughes' physicians and invited Hughes to supplement his submissions

25

in any way he saw fit – an opportunity of which he took full advantage.  This court's review,

26

27

28

---

14

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

therefore, should properly be limited to the evidence contained in the administrative record, and not "supplemented" by extraneous material.  *Cf. Kearney, supra,* 175 F.3d at 1091.

**B.    Unum's Claim Decision Must Be Upheld Under The Applicable ERISA Standard Of Review.**

Earlier this summer, the Supreme Court confirmed that when an ERISA plan provides an administrator the right to use its own discretion in making benefit determinations, the district court's review is deferential, and the administrator's decision must be upheld unless it is "arbitrary and capricious."  *Metropolitan Life v. Glenn*, No. 06-923, slip op. at 4 (June 19, 2008), *citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  The fact that the administrator, like Unum here, pays those benefits from its own assets *may* be a factor in assessing the administrator's decision; it does not, however, "impl[y] a change in the *standard* of review, say, from deferential to *de novo* review."  *Id.*, slip op. at 9 (emphasis original).

Ninth Circuit precedent does require a clear and unambiguous statement if the plan documents are to confer discretion on an ERISA claims administrator.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999).  However, the court has "not been stingy in [its] determination that discretion is conferred upon plan administrators." *Snow v. Standard Insurance Company*, 87 F3d 327, 330 (9th Cir. 1996), and "[t]here are no 'magic' words that conjure up discretion on the part of the plan administrator."  *Abatie v. Alta Health & Life Ins., supra,* 458 F.3d at 963, *citing Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000).  Thus, the *Abatie* court concluded that when a plan that "bestows on the administrator the responsibility to interpret the terms of the plan *and* to determine eligibility [with] 'full and final' authority," that language is "sufficient to vest discretion in the plan administrator."  *Id.* at 965; *see Bogue v. Ampex Corporation*, 976 F.2d 1319 (9th Cir. 1992) (phrase "the determination . . . will be made by Allied Signal . . . ." sufficient to confer discretionary authority); *Eley v. Boeing Company*, 945 F.2d 276 (9th Cir. 1991)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52

USDC NDCA Case #CV07-044088 PJH
363378.1

1  (phrase "[t]he Company shall determine the eligibility of a person for benefits . . ." sufficient to

2  confer discretionary authority).

3      In this instance, the Group LTD Plan specifically provided:

4  **DISCRETIONARY ACTS**

5  In exercising its discretionary powers under the Plan, the Plan Administrator, with

6  regard to eligibility to participate in the plan, and any designee (which shall
include Unum as a claims fiduciary) will have the broadest discretion permissible

7  under ERISA and any other applicable laws, and its decision will constitute final
review of your claim by the Plan.  **Benefits under this Plan will be paid only if**

8  **Unum, as claims fiduciary, decides in its discretion that the applicant is**
**entitled to them.**

9

10  (*See* Request for Judicial Notice, Declaration of Sophia Rodriguez, Exhibit C, emphasis added).

11  Thus, the plain language of the plan here makes specific reference ERISA, identifies Unum and its

12  function, and uses the "magic word" of "discretion."  In this circumstance, there can be no serious

13  dispute that this language is sufficient to grant discretionary authority to Unum.  Therefore, Unum's

14  claims decision must be assessed under the "abuse of discretion" standard.

15      A court's review under the abuse of discretion standard "is significantly deferential, requiring

16  a 'definite and firm conviction that a mistake has been committed.'"  *Snow*, *supra*, 87 F.3d at 1329,

17  *quoting Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust*, 508 US 602, 623, 124

18  L Ed 2d 539 (1993).  When an ERISA plan administrator is entitled to exercise discretion, its

19  benefits determination should only be overturned if it made "a decision without any explanation, or

20  in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous

21  findings of fact."  *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1323-24 (9th Cir. 1995),

22  *overruled on other grounds in Abatie, supra,* 458 F.3d at 966-68.  Therefore, the court should uphold

23  the administrator's decision:

24  where there is substantial evidence to support the decision, that is, where there
25  is 'relevant evidence [that] reasonable minds might accept as adequate to

26

27  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28  USDC NDCA Case #CV07-044088 PJH
363378.1

1   support a conclusion even if it is possible to draw two inconsistent
    conclusions from the evidence.'

2

3   *Snow*, 87 F.3d at 332, *quoting Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).  For

4   that reason, the Ninth Circuit has repeatedly held that the plan administrator does not abuse its

5   discretion even when its decision is "directly contrary to evidence in the record." *Taft v. Equitable*

6   *Life Assur. Soc.,* 9 F.3d 1469, 1472 (9th Cir. 1993); *see Eley v. Boeing Co.*, 945 F.2d 276, 279 (9th

7   Cir. 1991) (no abuse of discretion to deny benefits despite expert evidence showing that a certain

8   procedure was diagnostic and therefore was covered by the plan).  Instead, the decision should be

9   upheld unless it is "so patently arbitrary and unreasonable as to lack foundation in factual basis."

10  *Taft, supra,* 9 F.3d at 1473.

11       Here, the administrative record demonstrates that Unum conducted a full and fair review of

12  plaintiff's claims for benefits, and reached a conclusion that was amply supported by the facts.  For

13  example, the plaintiff's ERISA plan defined "Totally Disabled" as

14       • The participant is unable to perform the material and substantial duties of any
           gainful occupation for which the participant is reasonably fitted by education,
15           training, or experience, and

16       • The participant has a 20% or more loss in this or her indexed monthly
           earnings due to the same sickness or injury, and
17
         • During the elimination period, the participant is unable to perform any of the
18           material and substantial duties of any gainful occupation for which he or she
             is reasonably fitted by education, training or experience.
19

20  Unum specifically searched the submissions by Hughes and his physicians to find real evidence that

21  Hughes was suffering from physical limitations that prevented him from working as an insurance

22  agent or in another sedentary occupation.  In fact, all of the information that Hughes himself

23  submitted showed that he <u>*was*</u> satisfying the actual requirements of sedentary employment – he was

24  driving to his office or to visit friends; he was taking a walk of nearly an hour a day; he was sitting to

25  read or pay bills; he was managing his personal affairs; and he was supervising his office and

26

27  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY**
    **JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28  USDC NDCA Case #CV07-044088 PJH
    363378.1

1  employees.  Indeed, all of these activities fit precisely within the physical restrictions that Dr. Duong

2  had stated – limiting "long periods of sitting," (AR SUM 0045), but allowing bending, kneeling,

3  climbing stairs, and pushing or pulling up to 10 pounds for as much as One-Third of the workday..

4  (AR SUM 0048).

5       Hughes had the education, training and experience to make a meaningful contribution to the

6  management of his own insurance agency, or to someone else's; he had the opportunity to schedule

7  his duties as he saw fit to accommodate his "naps;" and he had the opportunity to work from home

8  or by telephone to conduct much of his business.   By his own physician's evaluation, Hughes had

9  the strength to manage the routine types of lifting and carrying required in an office position – paper

10  files, books, et cetera.  – and the mobility to move safely through an office environment.  And, most

11  tellingly, when Hughes' own physician was asked the direct question, "What, if anything, about his

12  medical condition impairs him from his previous levels of activity?" – *the physician simply did not*

13  *respond.*  (AR SUM 0105).

14       Similarly, Hughes' claims of mental or cognitive impairment cannot support a conclusion

15  that he is totally disabled from employment.  At the outset, it is important to note that these claims

16  are the most subjective complaints possible – he personally doesn't think that he thinks like he used

17  to think.  However, the medical records show that none of Hughes' physicians considered these

18  complaints sufficiently serious to seek neuropsychiatric testing, or a brain scan, or an MRI, or any

19  other diagnostic work-up.  Hughes has not seen a mental health professional since 2002, and has

20  taken a stable – indeed, often below therapeutic – dose of lithium for that whole time.  There is

21  nothing in the administrative record that actually shows that Hughes suffers from cognitive

22  disabilities of sufficient gravity as to preclude employment.

23       Finally, it is true that Dr. Duong recommended that Hughes "avoid all stressful situations."

24  This recommendation, however, is actually just general advice; it cannot be considered a medical

25  order to be credited by a disability insurer.  No other physician noted a particular problem with

26

27  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
    JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28  USDC NDCA Case #CV07-044088 PJH
    363378.1

1   stress, and Hughes is not taking any of the usual medications for stress or anxiety, such as Valium,

2   Librium, Xanax, or Ativan.  Insofar as his physicians report and his medical records reveal, Hughes

3   is adequately constructed to withstand the ordinary stress of employment.

4          The administrative record in this case demonstrates Unum's repeated and continuing efforts

5   to discover *any factual basis* that might actually support Hughes' complaints and justify his claim of

6   being totally disabled.  The conclusion that Unum reached was fully explained to Hughes, with an

7   analysis of his medical circumstances and the Plan provisions.  The conclusion was consonant with

8   the terms of the Plan, and certainly was not based on erroneous facts.  Under the applicable case law,

9   therefore, Unum fulfilled its obligations as the claims fiduciary, and its conclusion must be upheld.

10

11  **C.     The Decision To Reject The Opinion Of Plaintiff's Treating Physician Was Not An
            Abuse Of Discretion.**

12

13         The fact that Unum's determination of Hughes' claim disagreed with the vague

14  recommendations of his treating physician is not evidence that UNUM's decision was arbitrary or an

15  abuse of discretion.  To the contrary:  the independent review of a claimant's medical circumstances

16  is precisely *the job for which Unum was retained;* that review is no less full or fair simply because it

17  reaches a conclusion that the claimant does not like.  Thus, the law on this point is clear:  "plan

18  administrators are not obliged to accord special deference to the opinions of treating physicians."

19  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 155 L.Ed.3d 1034 (2003).

20         In *Black & Decker*, the plaintiff suffered from a degenerative disc disease, and submitted

21  documentation from his general physician and an orthopedist in support of his claim for disability

22  benefits.  *Id.*, 538 U.S. at 826.  The administrator of the plan, however, rejected those physicians'

23  conclusions, and relied instead on the findings of an independent neurologist to whom it had referred

24  the plaintiff.  *Id.* at 827.  The Supreme Court concluded that the administrator's conduct was

25  perfectly appropriate:

26

27  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
    JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28  USDC NDCA Case #CV07-044088 PJH
    363378.1

> Nothing in the [ERISA] Act itself … suggests that plan administrators must accord special deference to the opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.

*Id.* at 831.  Thus, an arbitrary rejection of the treating physician's opinion may be found improper, but imposition of a rule that favored the treating physician constituted error.  *Id.* at 834.

There is no legitimate claim here that Unum failed to give fair consideration to the any of treating physicians in this case.  The administrative record demonstrates that Unum's physicians made repeated efforts to contact the treating physicians, and conducted open and thoughtful conversations with them.  Indeed, the record shows that plaintiff's sleep specialist reviewed Unum's medical director's summary of their conversation, and made just one change – substituting the word "treated" for "corrected."  (AR SUM 0115).

Even when the administrative record contains information that favors the claimant's disability status, a plan administrator does not abuse its discretion by favoring other, contradictory opinions.  *Martin v. Continental Casualty Company,* 96 F.Supp.2d 983, 994 (N.D. Cal. 2000).  Moreover, the "mere fact" that a plan administrator accepted the opinions of its medical reviewers rather than those of the claimant's treating physicians "is not proof of arbitrary or capricious conduct."  *Voight v. Metropolitan Life Insurance Co.,* 28 F.Supp.2d 569, 580 (C.D. Cal. 1998).  Thus, the fact that Unum may have accepted the opinions of its medical reviewers does not constitute arbitrary or capricious conduct as a matter of law.

**D.     The Administrative Record Shows No "Corruption" That Could Reduce The Deference That Unum's Decision Is Due.**

In *Abatie v. Alta Health & Life Ins., supra,* decided before the Supreme Court opinion in *Metropolitan Life v. Glenn,* the Ninth Circuit Court of Appeal ruled that when an ERISA plan administrator is also responsible for funding the benefits available under the plan, that circumstance necessarily creates a "structural conflict of interest."   458 F.3d at 966.   In that circumstance, a

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**
USDC NDCA Case #CV07-044088 PJH
363378.1

court's review of the administrator's decision remains deferential, but it is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest *that may appear in the record*." *Id.,* at 967 (emphasis added). Thus, the "level of skepticism" to be applied to an insurance company's decision should be low, unless the record before the court reveals some evidence of corrupt conduct. *Id.* at 968.

In *Metropolitan Life v. Glenn, supra,* the Supreme Court adopted an approach to the "structural" conflict of interest that was largely similar to *Abatie*. The Court rejected the idea of "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." Slip op. at 10. Instead, the Court ruled that the existence of an apparent conflict is simply one factor that district court may consider – along with all the other factors relevant to a particular dispute. *Id.* The Supreme Court noted, however, that in absence of any evidence of impropriety, consideration of the conflict should recede – "perhaps to the vanishing point." Slip op. at 11.

In *Hoskins v Bayer Corporation, supra*, 2008 U.S. Dist. *LEXIS* 48791 [*11-12], this Court determined that these two approaches were consistent, and obligated the plaintiff to adduce evidence of improper conduct in order to raise "the level of skepticism." The plaintiff fails to sustain its burden, however, unless he shows that "defendant was acting in malice or in its own self-interest," or that it was "self-dealing or otherwise acting in bad faith." *Id.* at [*16-17]. In the absence of that evidence, the *Hoskins* court applied "the abuse of discretion standard, with a low amount of skepticism." *Id.* at [*19].

Unum submits that the same "level of skepticism" – low, "to the vanishing point" – should apply here. The administrative record in this matter is completely devoid of any sign of misconduct – or even any misplaced self-interest. To the contrary, the administrative record shows that Unum repeatedly sought additional information from Hughes and his physicians, and that Unum reserved judgment and obtained successive reviews of the medical information by different clinicians. There

---

21

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

1  is no "smoking gun" in the claims file; not even an unduly gratuitous or jocular remark.  Unum's

2  decision shows no sign whatsoever of improper taint, and is entitled to receive the full deference that

3  it is due.

4  **V.    <u>CONCLUSION</u>**

5      The ERISA plan under which Hughes seeks benefits specifically appoints Unum to make

6  claims determinations in the exercise of its discretion.  Established case law provides that a decision

7  of that type is to be sustained unless it is "so patently arbitrary and unreasonable as to lack

8  foundation in factual basis."  *Taft, supra,* 9 F.3d at 1473.

9      The administrative record demonstrates that Unum obtained the relevant medical information

10  and analyzed it without prejudice.  The result of that analysis is not "patently arbitrary;" indeed, it is

11  rational, appropriate and reasonable.  Unum's decision must be upheld, and judgment in favor of the

12  defendants should enter on plaintiff's ERISA claims.

13  Dated: July 16, 2008          WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

14

15                  By:_____*/s/ Thomas M. Herlihy*_____

16                      THOMAS M. HERLIHY
                       LAWRENCE J. ROSE

17                      Attorneys for Defendants
                       UNUM GROUP (formerly known as UNUMPROVIDENT

18                      CORPORATION), FIRST UNUM LIFE INSURANCE
                       COMPANY (erroneously sued as UNUM CORPORATION)

19                      and NEW YORK LIFE INSURANCE COMPANY

20

21

22

23

24

25

26                                                22

27  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
    JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR JUDGMENT UNDER RULE 52**

28  USDC NDCA Case #CV07-044088 PJH
    363378.1