**BUREAU OF INSURANCE**
- Home
- About us
- Licensee search
- Licensing & registration
- Consumer information
- Company services
- Producer and Business Entity services
- Employer information
- Laws, rules & decisions
- Bulletins
- FAQs

Department of Professional & Financial Regulation

**OTHER PFR AGENCIES**
- Professional Licensing
- Consumer Credit Protection
- Financial & Banking Regulation
- Securities & Investment Regulation

# INFORMATION ABOUT THE UNUMPROVIDENT SETTLEMENT CONCERNING DISABILITY INCOME CLAIM HANDLING PRACTICES

**Sub Title**

**Q. What was the purpose of the Multistate Market Conduct Examination?**

A. The multistate examination was initiated by the home-state chief insurance regulators (Maine, Massachusetts and Tennessee) of the three principal insurers within the UnumProvident Group. The multistate examination addressed claims handling practices for both long term individual disability income ("IDI") and group disability insurance ("LTD") policies. The purpose of the examination was to determine if the disability income claims handling practices of the Companies reflected systemic "unfair claim settlement practices". All the states, the District of Columbia and American Samoa decided to participate.

**Q. What were the results of the Multistate Examination?**

A. The examiners noted several areas of concern which applied to IDI and LTD claims and identified no material differences in claim handling among the individual companies or among their claim offices. The general areas of concern included the following: excessive reliance on in-house medical professionals, unfair construction of attending physician or independent medical examiner reports, failure to evaluate the totality of the claimant's medical condition, inappropriate burden placed on claimants to justify eligibility for benefits.

**Q. Did the Multistate Examination conclude that the Companies' claim handling practices reflected systemic "unfair claim settlement practices"?**

A. The Lead Regulators concluded that the level of claim handling errors identified by the Examination were sufficient to merit further regulatory action but no specific "findings" were reached. A lengthy

**CONSUMER TOOLS**

Consumer information
Brochures
Consumer Inventory Checklist PSA (video)
File a complaint
Licensee search and status
Glossary of terms
Hearing notices

**INDUSTRY TOOLS**

Online Maine Fraud and Abuse Annual Reporting Form
PPO Annual Registration
Licensee search and status
Company forms and information
Producer and Business Entity forms and information
Address change forms
Fees
Laws, rules & decisions
Bulletins
Hearing notices
Helpful links

**EMPLOYER TOOLS**

Workers compensation insurance
Health insurance information
Electronic health claims
Rural Medical Access Program

**FEATURED**

Information for Insurance Producers Regarding The Order of United Commercial Travelers of America
Dirigo Health Savings Offset Payment Filing
Mega Life and Health Notice of Hearing
Reform Options for Maine's Individual Health Insurance Market
Flood Information
Maine Emergency Management Agency (MEMA)

adjudicatory process with the Companies could be anticipated before any formal findings would be confirmed and enforced. For the reasons described in the Examination Report, the Lead Regulators concluded that the $15,000,000 penalty and the robust Plan of Corrective Action detailed in the Settlement Agreement was in the best interest of claimants and other policyholders.

**Q: Why did the Lead State Regulators enter into the settlement with UnumProvident?**

A: The Lead Regulators concluded that the greatest potential benefit to past, present and future disability income claimants of the Companies could be obtained by negotiating a Plan of Corrective Action. The Plan was specifically designed to address the concerns noted by the Lead Regulators in the Multistate Examination. In an effort to achieve a coordinated national approach, the Lead Regulators reached-out to other stakeholders (the United States Department of Labor ("DOL") and the New York Attorney General ("NY AG")) that had also been conducting investigations of similar UnumProvident issues. The DOL is a party and the NY AG supports the Agreements.

**Q: How specifically will the Plan of Corrective Action benefit past claimants?**

A: The Plan of Corrective Action includes a Claim Reassessment Process by which disability income claimants (both individual and group) whose claims were denied or whose benefits were terminated based upon judgmental factors ("Specified Claimants") will be able to elect to have the Companies perform a "de novo" review of such denials or closures. Approximately 215,000 claimants will receive written notice of this option.

**Q: Will the Claim Reassessment Process apply to all past denials or closures?**

A: Written notice of the Claim Reassessment Process will be provided to Specified Claimants whose claims were denied or whose benefits were terminated on or after January 1, 2000. Claimants will need to elect to participate within 60 days, and may do so by mail, phone, or through the Companies' website.

**Q: What about denials or closures prior to January 1, 2000?**

A: Claimants whose judgmental claim denials

Bureau Survey - Tell us what you think of our sevices

Legislative Proposals

Frequently Asked Questions About Data Breach (Notice of Risk to Personal Data Act)

FAQ's: Electronic Health Claims Submission

UnumProvident Settlement

Dirigo Health

Maine Rx Plus

Request for proposal

or closures took place between January 1, 1997 and December 31, 1999 will not receive written notice of the Claim Reassessment Process, but will be entitled to participate if they so request. UnumProvident will post the Settlement Agreement on its website and will send a copy to all of its group policyholders. Such claimants will have 180 days from the Implementation Date to request to participate.

**Q. What is a "judgmental" claim denial or termination?**

A. Judgmental claim decisions are all decisions except those based on objective factors, such as death, reaching the maximum benefit period, settlement or compromise of a claim, etc.

**Q: Does the Plan of Corrective Action apply to the Companies' New York affiliates?**

A: Yes; as described above, with the support of the NY AG, the New York Superintendent of Insurance has entered into a similar settlement with UnumProvident's New York subsidiary.

**Q: How will the Companies conduct the Claim Reassessment Process?**

A: A new Claim Reassessment Unit ("CRU") will be formed, and will be staffed with experienced disability income claim persons. The operation of the CRU will be monitored by the Lead Regulators, and periodic examinations will be conducted as deemed appropriate. At the end of the Claim Reassessment Process, the Lead Regulators will conduct a formal examination to determine if claims were processed in accord with the terms of the Settlement Agreement. In addition to the remediation of individual claim errors, a fine of $145,000,000 will be imposed in the event that the error rate exceeds the tolerance level permitted (now 7%) by the NAIC Market Conduct Examiners Handbook ("Handbook").

**Q: How long will the Claim Reassessment Process take?**

A: The CRU will be staffed to complete the process within 24 months.

**Q: Must all eligible claimants participate in this process?**

A: No; eligible claimants are under no obligation to participate, and may utilize any

other legally available means to contest the Companies' prior adverse claim actions. However, by electing to participate, claimants must agree that if (and only if) the reassessment results in a reversal or other change to the prior claim decision, that they will not to pursue any legal action against the Companies to the extent (and only to the extent) such action would be based upon any aspect of the prior claim decision that is reversed or changed. Any statute of limitations is tolled during the Claim Reassessment Process.

**Q: How will the Companies prioritize the work of the CRU?**

A: The CRU will review claims of those claimants electing to participate based on the original date of the denial or closure, with the oldest denial or closure dates being reviewed first.

**Q: How will the Plan of Corrective Action benefit current and future claimants?**

A: The Plan of Corrective Action provides for changes in the Companies' claim organization and procedures in order to address concerns noted by the Lead Regulators and the DOL. The chief objectives of these changes will be to place increased emphasis upon accountability for compliance with the terms of insurance policies and applicable law; create increased involvement of more experienced claim personnel at the earliest stages of claims; and create increased accountability of claim management for denial and closure decisions. The Plan of Corrective Action also provides for additional training of the Companies' claim staff, with emphasis upon the Plan and the concerns raised by the Multistate Examination.

**Q: How will the changes in claim organization and procedures be implemented?**

A: The Settlement Agreement contains detailed exhibits which set forth specific ways in which the Companies will implement these changes. The Lead Regulators and the DOL will monitor compliance with these changes in an ongoing manner, and the Lead Regulators will report periodically to the Participating Regulators. Failure to make the agreed changes by the dates specified will result in $100,000/day fines.

**Q: In what other ways will the Plan of**

Corrective Action address the concerns raised by the Lead Regulators in the Multistate Examination?

A: The Plan of Corrective Action also includes provisions which will result in changes to the Companies' corporate governance. The Board of Directors of the parent company will be expanded by three directors with Insurance Industry or regulatory experience (two must have regulatory experience), approved by the Lead Regulators. One of the new directors will be appointed to the Audit Committee. The Board will also establish a new Regulatory Compliance Committee to monitor compliance with the Plan of Corrective Action and applicable laws concerning market conduct. Management and the Regulatory Compliance Committee will meet quarterly with the Lead Regulators. A new Regulatory Compliance Unit will also be formed, which will report to the Regulatory Compliance Committee on matters of compliance and the Plan of Corrective Action.

**Q: How will the Plan of Corrective Action be enforced?**

A: The Lead Regulators will monitor the Companies' compliance with the Plan of Corrective Action on an ongoing basis, conducting such periodic audits as deemed necessary. The Settlement Agreements provides for a $145,000,000 fine to be imposed upon the Companies in the event of non-compliance with the terms of the Plan.

**Q: Is an immediate fine imposed?**

A: Yes, an immediate $15,000,000 fine will be paid within fifteen days of the effective date of the Settlement Agreement and will be shared among the Participating Regulators based on relative UnumProvident long term disability income insurance premium reported as of December 31, 2003.

**Q: When will the Lead Regulators conduct a full re-examination of the Companies?**

A: A full re-examination will take place within 24 months. The Settlement Agreement provides for a substantial fine ($145,000,000) in the event that the follow-up examination reflects error rates in excess of the tolerance level permitted by the Handbook. Also, the Settlement Agreement does not bar any Participating Regulator from imposing fines

or resorting to other remedies in the event of the Company's willful non-compliance.

**Q: Where can claimants be directed for information about the Claim Reassessment Process?**

A: UnumProvident has established a toll-free number for such claimant inquiries: 866-278-4641.

Last Updated: **July 16, 2008**

Copyright © 2006 All rights reserved.