

1  Ray Bourhis, Esq. SBN 53196
Lawrence Mann, Esq. SBN 83698
2  Bennett M. Cohen, Esq. SBN 98065
**BOURHIS & MANN**
3  1050 Battery Street
San Francisco, CA 94111
4  Tel: (415) 392-4660; Fax: (415) 421-0259
5
6  Attorneys for Plaintiff LYLE HUGHES
7
8            **IN THE UNITED STATES DISTRICT COURT**
9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  LYLE HUGHES, | ) Case No.: C 07-4088 PJH **(E-FILING)** |
| 12            Plaintiff, | )<br>) DECLARATION OF JOHN SARGENT IN |
| 13      v. | ) OPPOSITION TO MOTION FOR<br>) PARTIAL SUMMARY JUDGMENT, OR |
| 14 | ) IN THE ALTERNATIVE, MOTION FOR |
| 15  UNUMPROVIDENT CORPORAITON; UNUM<br>CORPORATION, NEW YORK LIFE | ) JUDGMENT UNDER RULE 52<br>) |
| 16  INSURANCE COMPANY, THE<br>COMMISSIONER OF THE CALIFORNIA | ) [Filed concurrently with Memorandum Of<br>) Points & Authorities) |
| 17  DEPARTMENT OF INSURANCE and DOES 1<br>through 20, inclusive | )<br>) DATE:   August 27, 2008 |
| 18 | ) TIME:   9:00 A.M. |
| 19            Defendants. | ) DEPT:   Courtroom 3, 17th Floor<br>) BEFORE: Hon. Phyllis J. Hamilton |
| 20  _____ | ) TRIAL DATE:  Not Yet Set |

21
22  I, John Sargent, declare:
23      1.   I have personal knowledge of the facts stated herein and, if called as a witness, I could and
24  would so testify.
25      2. I reside at 129 Whipple Road, Kittery, Maine, 02942.
26      3. I have been an employee for two disability insurance companies in management positions for
27        a total of 15 years.  My last salaried position in the insurance industry was with
0
28  ────────────────────────────────────

1    UnumProvident Insurance Company where I held several positions of increasing
2    responsibility including Head of Operations for Disability Claims. In this capacity, I was
3    responsible for the adjudication of group and individual disability claims. I had signature
4    authority of one million dollars and was one of four Senior Managers who had claim-
5    settling authority. I had supervisory responsibility for two Claim Directors who reported
6    directly to me. The Directors had Claim Managers who reported to them. I functioned as
7    a company representative in depositions and was involved in the development and
8    implementation of claim handling policies and procedures. As my resume indicates, I
9    frequently speak on matters pertaining to disability claims. I have a Masters of Science
10   degree from Syracuse University and a Bachelors of Arts degree from St. Lawrence
11   University. I have been involved in the field of disability management my entire career of
12   31 years. My experience in disability insurance claims and practices qualifies me as an
13   expert to express the following opinions regarding the handling of Lyle Hughes' disability
14   claim by Unum. Attached to this declaration is my C.V. which accurately describes my
15   training and professional experience.

16   4. I am familiar with the standard of care governing the evaluation and determination of
17   disability claims. My familiarity with industry standards for claims handling is based on,
18   among other things, my own claims experience, my conversations with claims persons
19   employed by other insurance companies, my participation seminars and talks relative to
20   claims and the content of the Multi-State Market Conduct Examination described below.

21   5. Bennett M. Cohen, acting on behalf of Mr. Hughes, requested from me an expert opinion
22   regarding the processing of Mr. Hughes' disability claim by Unum. Specifically, Mr.
23   Cohen has requested my opinion as to whether Unum adhered to industry standards, had
24   made a fair and objective evaluation of Mr. Hughes' claim, whether I saw evidence in the
25   claims file or other sources that bias in favor of Unum had entered into the claims
26   determination and whether, in my opinion, Unum had made a reasonable claims decision

27
28

1

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1        in light of the industry standards. (I am using the term "Unum" to refer to any and all

2        Unum entity involved in the evaluation and determination of Mr. Hughes' claim.)

3   6.    I set forth the factual and documentary basis of my analysis below followed by a

4        summary of my opinions. I may have additional opinions which are not stated herein and

5        reserve the right to offer additional opinions in response to specific questions or based on

6        new information provided to me.

7   7.    The Claim documents reveal that Lyle Hughes was covered under disability policy No.

8        573600 issued to New York Life Insurance Company with an effective date of 1/1/2003.

9        The policy contains the following definition of disability:

10       Definition of Total Disability:

11  HOW DOES UNUM DEFINE DISABILITY?

12  You are disabled when Unum determines that:

13  •  You are unable to perform the material and substantial duties of any gainful occupation
14      for which you are reasonably fitted by education, training, or experience; and

15  •  You have a 20% or more loss in your indexed monthly earnings due to the same sickness
16      or injury; and

17  •  During the elimination period, you are unable to perform any of the material and
18      substantial duties or any gainful occupation for which you are reasonably fitted by
    education, training or experience.

19
20      We may require you to be examined by a physician, other medical practitioner and/or
    vocational expert of our choice. Unum will pay for this examination. We can require an
21      examination as often as it is reasonable to do so. We may also require you to be
    interviewed by an authorized Unum Representative.

22

23  8.    Documents reviewed were provided to me by Mr. Bennett M. Cohen and included:

24  •  Unum's Disability Claim file

25  •  Declaration of William T. Bradley

26  •  Declaration of Sophia Rodriguez

27

28

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    • The motion for partial summary judgment filed by Wilson, Elser, Moskowitz, Edelman &
2        Dicker LLP

3    9. In arriving at my opinion, I consulted the following resources:

4    • Mayo Clinic Website

5    • Russell v. Unum, CA No. 6:99-0224-20 , a copy of which I had in my possession. (I am
6        informed by Mr. Cohen that the full legal citation for this case is *Russell v. UNUM Life Ins.*
7        *Co. of Am.*, 40 F. Supp. 2d 747 (E.D. South Carolina 1999)

8    • Review: Fibromyalgia and the Disability Dilemma: A New Era in Understanding a
9        Complex, Multidimensional Pain Syndrome. Robert M. Bennet. *Arthritis and Rheumatism,*
10       Vol. 39, October 1996

11   • Fibromyalgia Syndrome a Decade Later:  What Have We Learned?  Don Goldenberg.
12       *Archives of Internal Medicine,* Vol. 159 (8), April 1999

13   • Report of the Targeted Multistate Market Conduct Examination, 11/18/2004

14

15   9. It is my opinion that, prior to and during the time it made its the decision on Mr. Hughes'

16   claim, Unum formed a negative institution wide opinion, expressed at the highest level of the

17   organization, that fibromyalgia is not a disabling condition and functional limitations associated

18   with this diagnosis are therefore not valid. Unum's institution wide opinion is made clear by

19   statements made by Robert N. Anfield, -- whom I know, based upon my working for

20   UnumProvident, to be the most senior medical executive in the company.  In Mr. Anfield's review

21   dated 3/15/05, he states:

22

23       [Fibromyalgia] is a label developed within the discipline of rheumatology to identify

24       individuals with widespread chronic aches and pain.  The label does not provide nor imply a

25       pathophysiologic explanation for the pain not the other associated symptoms of which these

26       individuals may complain.

27

28

3

Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1

2      There is no evidence that fibromyalgia is a crippling or incapacitating disorder or is the

3      prodrome for more serious illness (Blackburn WD. Fibromyalgia. SMA Southern Medicine

4      1998; 85:3-5).    Ultimately, the label "fibromyalgia" provides no pathophysiologic

5      foundation upon which to base a set of restrictions and limitations.    (See page

6      UACL00677.)

7
Unum's position is inconsistent with other opinions expressed in the medical literature. An article
8
published in 1999 entitled, "Fibromyalgia Syndrome a Decade Later: What Have We Learned,"
9
published in the *Archives of Internal Medicine* states:
10

11      No valid instruments are able to assess disability in patients with myalgia". And, "An

12      individual physician may choose to be an advocate for a patient with FM seeking

13      compensation (disability), provided the patient meets the diagnostic criteria and that

14      symptom severity, activity level, work capacity, psychosocial factors and current work

15      status support the claim. Disability should not be based on the diagnosis of FM rather on an

16      evaluation of the effect of chronic pain and distress on the person".

17
Unum's negative opinion creates a bias against Mr. Hughes's claim despite widespread medical
18
opinion accepting fibromyalgia as a potentially disabling illness and a diagnosable condition.
19
Unum was aware of this as a result of the ruling in *Russell v. Unum* (CA no. 6:99-0224-20 ) decided
20
March 30, 1999 in which the court stated:

21

22      The essence of Unum's argument is that fibromyalgia is not an objectively diagnosable

23      disease. The courts disagree. "Fibromyalgia is a type of muscular or soft-tissue rheumatism

24      that affects principally muscles and their attachment to bones, but which is also commonly

25      accompanied by fatigue, sleep disturbance, lack of concentration, changes in mood or

26      thinking, anxiety and depression."

27

28
Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1

2          **10. Medical History**

3    The following medical history is not totally inclusive but is sufficient to understand that Mr. Hughes

4    has a debilitating medical condition that significantly impairs his work function.  This information

5    is in the claims file and was available to Unum in their assessment of Mr. Hughes' disability claim.

6

7    A.    **February 9, 1995**:  Edward L. Auen, MD, OVN (Office Visit Note).

8    "Aching 'all over his body.'"

9

10   **January 24, 1996**:  David L. Curtis, MD, Rheumatology Consultation.

11   "He says he has always hurt and had 'aches and stiffness' in multiple joints throughout his life

12   without any significant period of remission."  Psoriatic arthritis was diagnosed.  "This would be

13   compatible with a long duration of a mild illness."

14

15   **September 13, 1996**:  Drew Logue, MD, Correspondence.

16   Persistent daytime fatigue noted with occasional falling asleep during the day as well as "increasing

17   difficulty in concentrating during his daytime activities."  Morning headache was noted.

18

19   **November 18, 1996**:  Drew H. Logue, MD, Correspondence.

20   Sleep studies revealed moderately severe obstructive sleep apnea.

21

22   **April 4, 1997**:  Stephen J. Lee, MD, OVN.

23   Insomnia and sleep apnea noted thought to be related to stress.  Dr. Lee commented, "he is under a

24   larger degree of stress than usual."

25

26   **April 7, 1997**:  Alfred M Venturini, MD, Correspondence.

27

28

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    Excessive daytime sleepiness noted due to sleep apnea

2

3    **November 7, 1997**: The Valley Physical Therapy Network denies Dr. Cohen's request for medical

4    services for Mr. Hughes.

5

6    **May 2, 1998**: Edward L. Auen, MD, OVN.

7    Dr. Auen commented, "He is concerned that he is continuing to have a decrease in his activity level,

8    his functioning level. He had been able to work out 4-5 times a week, now at best once, maybe

9    twice a week. In general he has aches to the point where he has non-restorative sleep. It does fit

10   with the diagnosis of fibromyalgia. He has a deviated nasal septum which is giving him some

11   relatively poor sleep. He stopped the C-pap machine. In general, this whole thing is not looking

12   good in terms of a good diagnosis….He probably has trigger points." (UACL000464)

13

14   **July 30, 1998:**

15   Dr. Auen comments in his office chart that the diagnosis is most likely psoriatic arthritis.

16   (UACL000463)

17

18   B.    **June 16, 1998**:  Alfred M. Venturini, MD, correspondence.

19   Chronic nasal airway obstruction noted without ability to benefit from CPAP or BiPAP treatment.

20   Ambien needed at night for sleep. "He is very tired during the day."

21

22   **July 16,1999**: Edward L Auen, MD, OVN.

23   Dr. Auen notes some anxiety and depression. He comments, "Recently he has [had] a professional

24   situation where he was going to be relaxing for a weekend that seemed to fall apart, he lost weight

25   and had a high degree of anxiety throughout the whole weekend. It did settle out perfectly fine, but

26   this is probably not appropriate and this will obviously affect his long term [health]."

27

28

6

1

2   **January 10, 2000**: Gervacio Dias, MD, OVN

3   Tension headaches identified as the probable cause for eyelid twitching. Celebrex prescribed.

4

5   C.   **September 16, 2002**: Psychiatric Evaluation, M. J. Hetnal, MD.

6   Dr. Hetnal noted longstanding depression and anxiety with periods of high energy and periods or

7   depression, irritability and anger. He noted that Mr. Hughes was admitted for hospitalization in

8   May 2002, and discharged after four days with Paxil. Lithium carbonate was prescribed for mood

9   swings although they continued. Trazodone was prescribed at bedtime for insomnia. Norco and

10  Celebrex were noted for pain relief due to fibromyalgia. A diagnosis of bipolar disorder NOS was

11  suggested. Use of Depakote instead of lithium was suggested with resumption of psychotherapy.

12

13  **D.   December 29, 2003: Drew H. Logue, MD, correspondence.**

14  Dr. Logue noted recent divorce and stressful business challenges. He commented on Mr. Hughes'

15  inability to benefit from CPAP. Fibromyalgia and bipolar disorder were noted. Treatment options

16  were discussed.

17

18  **E.   March 23, 2004**: Margaret C. McKee, MD, for Drew H. Logue, MD, OVN.

19  Sleep study done on 2/11/04 indicated severe obstructive sleep apnea and use of CPAP with a large

20  NasalAire mask. Dr. McKee commented, "He actually is quite pleased with this treatment for the

21  first time since he was first diagnosed with obstructive sleep apnea some years ago." Nasal

22  bleeding and crusting upon awakening were noted. The use of a different CPAP mask was

23  discussed to reduce nasal complications.

24

25  **August 2, 2004**: John T. Duong, MD, OVN.

26  Flare-up of fibromyalgia noted. Dr. Duong commented, "Can't do normal things now, not

27

7

28

1    exercising as much due to pain."

2

3    F.    **October 10, 2004**:  John Duong, MD, Attending Physician Statement,

4    Primary Diagnosis: Fibromyalgia 729.1/Sleep Apnea 780.59/Bipolar disorder 296.7.

5

6    Restrictions:  Avoid all stressful situations, no long periods of sitting

7

8    Comments:  Due to patient's chronic illness, he is not able to perform a lot of duties.  Symptoms

9    change from day to day.  Difficult for patient to perform any tasks.

10

11    **October 13, 2004**:  Lyle Hughes, Claimant's Supplemental Statement

12

13    I cannot concentrate or remember things on a day–to-day basis due to the pain and the

14    medication that I take.  It is extremely difficult for me to make onsite decisions, and the

15    stress that my duties put on me are at times overwhelming: this causes my fibromyalgia to

16    flare up even more.

17

18    G.    **November 2, 2004**:  Unum Field Representative Chris Moffat, Report.

19

20    The meeting was conducted in the family room and lasted approximately two hours.  As the

21    meeting proceeded, I noticed the insured spoke slower, quieter, and yawned a lot.  Upon

22    leaving, I shook the insured's hand and he had no grip pressure.

23

24    I asked Ms. Scherli if she noticed a change in the insured's physical or mental behavior and

25    she stated, 'Oh Yeah.'  She stated in February/March 2003, she noticed he was not mentally

26    retaining information, had poor stamina, and 'he did not seem to retain what he had

27

28

8

Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    previously.'"

2

3    **November 10, 2004**:  Drew H Logue, MD, OVN.

4    "He was titrated to 7 cm. Water pressure on his original study and in spite of what he reports

5    as ongoing compliance with CPAP therapy he notes continued daytime sleepiness,

6    considerable ongoing fatigue, short-term memory problems, and he does not feel he is

7    benefiting from therapy.  He feels tired in the morning, unrefreshed, and it takes him several

8    hours to get going.  He finds it difficult to function at work and he feels he is not obtaining

9    maximum benefit from therapy."

10

11   H.    **February 14, 2005**:  Margaret C. McKee, MD for Dr. Logue, OVN.

12   Dr. McKee noted Mr. Hughes is excited about surgery by Dr. Yates for obstructive sleep apnea.  Dr.

13   McKee commented, "He has severe obstructive sleep apnea and I do not feel that surgery will be an

14   adequate treatment for this patient.  We have not even proved that his daytime sleepiness is solely

15   due to obstructive sleep apnea."

16

17   The medical records available to Unum reveal a consistent history of symptoms over a ten-year

18   period including bodily aches and pains, depression, anxiety, fatigue, insomnia, non-restorative

19   sleep, daytime sleepiness, concentration difficulties, and memory problems.

20

21   Although this is just a portion of the medical information available to Unum for review, by itself it

22   consistently supports the existence of medical symptoms that can be disabling.  Unum had medical

23   information that should have compelled them to pay Mr. Hughes.  Had Unum had concerns about

24   the diagnosis or with the restrictions imposed by Dr. Duong, in my opinion, the standard of care in

25   the industry required that they obtain a rheumatologic IME.  The medical records reveal that a

26   treating physician, Dr. Duong, made the diagnosis of fibromyalgia and Dr. Auen suspected it.

27

28
Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    Other physicians noted symptoms consistent this diagnosis. Unum's own field investigator reported

2    information that supported Mr. Hughes' claim.  There is no evidence to suggest that Mr. Hughes'

3    was ever fabricating or exaggerating his symptoms.

4

5    The following information obtained from the Mayo Clinic's website regarding fibromyalgia is

6    consistent with Mr. Hughes' medical history.

7

8    **I.  Fibromyalgia**

9

10        **I.  Definition**

11

12            You hurt all over, and you frequently feel exhausted. Even after

13            numerous tests, your doctor can't find anything specifically wrong

14            with you. If this sounds familiar, you may have fibromyalgia.

15

16            Fibromyalgia is a chronic condition characterized by widespread

17            pain in your muscles, ligaments and tendons, as well as fatigue and

18            multiple tender points — places on your body where slight pressure

19            causes pain. Fibromyalgia is more common in women than in men.

20            Previously, fibromyalgia was known by other names such as

21            fibrositis, chronic muscle pain syndrome, psychogenic rheumatism

22            and tension myalgias.

23

24            Although the intensity of your symptoms may vary, they'll probably

25            never disappear completely. It may be reassuring to know, however,

26            that fibromyalgia isn't progressive or life-threatening. Treatments

27

28

10

Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

and self-care steps can improve fibromyalgia symptoms and your general health.

## J. Symptoms

Signs and symptoms of fibromyalgia can vary, depending on the weather, stress, physical activity or even the time of day. Common signs and symptoms include:

- **Widespread pain.** Fibromyalgia is characterized by pain in specific areas of your body when pressure is applied, including the back of your head, upper back and neck, upper chest, elbows, hips and knees. The pain generally persists for months at a time and is often accompanied by stiffness.

- **Fatigue and sleep disturbances.** People with fibromyalgia often wake up tired and unrefreshed even though they seem to get plenty of sleep. Some studies suggest that this sleep problem is the result of a sleep disorder called alpha wave interrupted sleep pattern, a condition in which deep sleep is frequently interrupted by bursts of brain activity similar to wakefulness. So people with fibromyalgia miss the deep restorative stage of sleep. Nighttime muscle spasms in your legs and restless legs syndrome also may be associated with fibromyalgia.

- **Irritable bowel syndrome (IBS).** The constipation, diarrhea, abdominal pain and bloating associated with IBS are common

11

in people with fibromyalgia.

- **Headaches and facial pain.** Many people who have fibromyalgia also have headaches and facial pain that may be related to tenderness or stiffness in their neck and shoulders. Temporomandibular joint (TMJ) dysfunction, which affects the jaw joints and surrounding muscles, also is common in people with fibromyalgia.

- **Heightened sensitivity.** It's common for people with fibromyalgia to report being sensitive to odors, noises, bright lights and touch.

Other common signs and symptoms include:

- Depression

- Numbness or tingling sensations in the hands and feet (paresthesia)

- Difficulty concentrating

- Mood changes

- Chest pain

- Dry eyes, skin and mouth

- Painful menstrual periods

- Dizziness

- Anxiety

12

1    **K. Causes**

2    - Doctors don't know what causes fibromyalgia. Current thinking

3    centers around a theory called "central sensitization." This

4    theory states that people with fibromyalgia have a lower

5    threshold for pain because of increased sensitivity in the brain

6    to pain signals. Researchers believe repeated nerve stimulation

7    causes the brains of people with fibromyalgia to change. This

8    change involves an abnormal increase in levels of certain

9    chemicals in the brain that signal pain (neurotransmitters). In

10   addition, the brain's pain receptors (neurons) — which receive

11   signals from the neurotransmitters — seem to develop a sort of

12   memory of the pain and become more sensitive, meaning they

13   can overreact to pain signals. In this way, pressure on a spot on

14   the body that wouldn't hurt someone without fibromyalgia can

15   be very painful to someone who has the condition. But what

16   initiates this process of central sensitization isn't known.

17

18   It's likely that a number of factors contribute to the development of

19   fibromyalgia. Other theories as to the cause of fibromyalgia include:

20

21   **Sleep disturbances.** Some researchers theorize that disturbed sleep

22   patterns may be a cause rather than just a symptom of fibromyalgia.

23

24   - **Injury.** An injury or trauma, particularly in the upper spinal

25   region, may trigger the development of fibromyalgia in some

26   people. An injury may affect your central nervous system,

27   which may trigger fibromyalgia.

13

28

- **Infection.** Some researchers believe that a viral or bacterial infection may trigger fibromyalgia.

- **Abnormalities of the autonomic (sympathetic) nervous system.** Part of your autonomic nervous system — the sympathetic, or involuntary, system — controls bodily functions that you don't consciously control, such as heart rate, blood vessel contraction, sweating, salivary flow and intestinal movements. It's thought that sympathetic nervous system dysfunction occurs in people with fibromyalgia, particularly at night, which leads to fatigue, stiffness, dizziness and other signs and symptoms associated with the condition.

- **Changes in muscle metabolism.** For example, deconditioning and decreased blood flow to muscles may contribute to decreased strength and fatigue. Differences in metabolism and abnormalities in the hormonal substance that influences the activity of nerves may play a role.

- Psychological stress and hormonal changes also may be possible causes of fibromyalgia.

**L. Risk factors**

Risk factors for fibromyalgia include:

- **Your sex.** Fibromyalgia occurs more often in women than in men.

- **Age.** Fibromyalgia tends to develop during early and middle

14

Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    adulthood. But it can also occur in children and older adults.

2

3    • **Disturbed sleep patterns.** It's unclear whether sleeping

4    difficulties are a cause or a result of fibromyalgia — but people

5    with sleep disorders, such as nighttime muscle spasms in the

6    legs, restless legs syndrome or sleep apnea, can also develop

7    fibromyalgia.

8

9    • **Family history.** You may be more likely to develop

10    fibromyalgia if a relative also has the condition.

11

12    • **Rheumatic disease.** If you have a rheumatic disease, such as

13    rheumatoid arthritis, lupus or ankylosing spondylitis, you may

14    be more likely to have fibromyalgia.

15    **M. When to seek medical advice**

16    See your doctor if you experience general aching or widespread pain

17    that lasts several months and is accompanied by fatigue. Many of the

18    symptoms of fibromyalgia mimic those of other diseases, such as low

19    thyroid hormone production (hypothyroidism), polymyalgia

20    rheumatica, neuropathies, lupus, multiple sclerosis and rheumatoid

21    arthritis. Your doctor can help determine if one of these other

22    conditions may be causing your symptoms.

23

24    **N. Tests and diagnosis**

25    Diagnosing fibromyalgia is difficult because there isn't a single,

26    specific diagnostic laboratory test. In fact, before receiving a diagnosis

27    of fibromyalgia, you may go through several medical tests, such as

28

15

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    blood tests and X-rays, only to have the results come back normal.

2    Although these tests may rule out other conditions, such as rheumatoid

3    arthritis, lupus and multiple sclerosis, they can't confirm fibromyalgia.

4    The American College of Rheumatology has established general

5    classification guidelines for fibromyalgia, to help in the assessment and

6    study of the condition. According to these guidelines, to be diagnosed

7    with fibromyalgia you must have experienced widespread aching pain

8    for at least three months and have a minimum of 11 locations on your

9    body that are abnormally tender under relatively mild, firm pressure. In

10    addition to taking your medical history, a doctor checking for

11    fibromyalgia will likely press firmly on specific points on your head,

12    upper body and certain joints so that you can confirm which cause pain.

13    Not all doctors agree with these guidelines. Some believe that the

14    criteria are too rigid and that you can have fibromyalgia even if you

15    don't meet the required number of tender points. Others question how

16    reliable and valid tender points are as a diagnostic tool.

17    Complications

18    Fibromyalgia isn't progressive and generally doesn't lead to other

19    conditions or diseases. It can, however, cause pain, depression and lack

20    of sleep. These problems can then interfere with your ability to function

21    at home or on the job, or maintain close family or personal

22    relationships. The frustration of dealing with an often-misunderstood

23    condition also can be a complication of the condition.

24

25    **O. Treatments and drugs**

26    In general, treatment for fibromyalgia includes both medication and

27

28

Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

self-care. The emphasis is on minimizing symptoms and improving general health.

**Medications**

Medications can help reduce the pain of fibromyalgia and improve sleep. Common choices include:

**Analgesics.** Acetaminophen (Tylenol, others) may ease the pain and stiffness caused by fibromyalgia. However, its effectiveness varies. Tramadol (Ultram) is a prescription pain reliever that may be taken with or without acetaminophen. Your doctor may recommend nonsteroidal anti-inflammatory drugs (NSAIDs) — such as aspirin, ibuprofen (Advil, Motrin, others) or naproxen sodium (Anaprox, Aleve) — in conjunction with other medications. NSAIDs haven't proved to be effective in managing the pain in fibromyalgia when taken by themselves.

- **Antidepressants.** Your doctor may prescribe antidepressant medications such as amitriptyline, nortriptyline (Pamelor) or doxepin (Sinequan) to help promote sleep. Fluoxetine (Prozac) in combination with amitriptyline has also been found effective. Sertraline (Zoloft) and paroxetine (Paxil) may help if you're experiencing depression.

  Some evidence exists for a newer class of antidepressants known as serotonin and norepinephrine reuptake inhibitors or

17

dual uptake inhibitors, which regulate two brain chemicals that may transmit pain signals. Studies have found that duloxetine (Cymbalta) may help control pain better than placebo in people with fibromyalgia. Small trials of venlafaxine (Effexor) suggest the same, though more study is needed to confirm these findings.

- **Muscle relaxants.** Taking the medication cyclobenzaprine (Flexeril) at bedtime may help treat muscle pain and spasms. Muscle relaxants are generally limited to short-term use.

- **Pregabalin (Lyrica).** Pregabalin may reduce pain and improve function in people with fibromyalgia. Pregabalin, an anti-seizure medication that's also used to treat some types of pain, is the first drug approved by the Food and Drug Administration to treat fibromyalgia. Studies show pregabalin reduced signs and symptoms of fibromyalgia in some people. In one study, about half of the participants taking the highest doses of the drug reported at least a 30 percent improvement. Side effects of pregabalin include dizziness, sleepiness, difficulty concentrating, blurred vision, weight gain, dry mouth, and swelling in the hands and feet.

Prescription sleeping pills, such as zolpidem (Ambien), may provide short-term benefits for some people with fibromyalgia, but doctors usually advise against long-term use of these drugs. These

18

1  medications tend to work for only a short time, after which your

2  body becomes resistant to their effects. Ultimately, using sleeping

3  pills tends to create even more sleeping problems in many people.

4

5  Benzodiazepines may help relax muscles and promote sleep, but

6  doctors often avoid these drugs in treating fibromyalgia.

7  Benzodiazepines can become habit-forming, and they haven't been

8  shown to provide long-term benefits.

9

10  Doctors don't usually recommend narcotics for treating fibromyalgia

11  because of the potential for dependence and addiction.

12  Corticosteroids, such as prednisone, haven't been shown to be

13  effective in treating fibromyalgia.

14

15  **Cognitive behavior therapy**

16  Cognitive behavior therapy seeks to strengthen your belief in your

17  abilities and teaches you methods for dealing with stressful

18  situations. Therapy is provided through individual counseling,

19  classes, and with tapes, CDs or DVDs, and may help you manage

20  your fibromyalgia.

21

22  **Treatment programs**

23  Programs that combine a variety of treatments may be effective in

24  improving your symptoms, including relieving pain. These

25  interdisciplinary programs can combine relaxation techniques,

26

27

28

19

biofeedback and receiving information about chronic pain. There isn't one combination that works best for everybody. Your doctor can create a program based on what works best for you.

**P. Lifestyle and home remedies**

Self-care is critical in the management of fibromyalgia.

- **Reduce stress.** Develop a plan to avoid or limit overexertion and emotional stress. Allow yourself time each day to relax. That may mean learning how to say no without guilt. But try not to change your routine completely. People who quit work or drop all activity tend to do worse than those who remain active. Try stress management techniques, such as deep-breathing exercises or meditation.

- **Get enough sleep.** Because fatigue is one of the main characteristics of fibromyalgia, getting sufficient sleep is essential. In addition to allotting enough time for sleep, practice good sleep habits, such as going to bed and getting up at the same time each day and limiting daytime napping.

- **Exercise regularly.** At first, exercise may increase your pain. But doing it regularly often decreases symptoms. Appropriate exercises may include walking, swimming, biking and water aerobics. A physical therapist can help you develop a home exercise program. Stretching, good posture and relaxation exercises also are helpful.

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- **Pace yourself.** Keep your activity on an even level. If you do too much on your good days, you may have more bad days.

- **Maintain a healthy lifestyle.** Eat healthy foods. Limit your caffeine intake. Do something that you find enjoyable and fulfilling every day.

**Q. Coping and support**

Besides dealing with the pain and fatigue of fibromyalgia, you may also have to deal with the frustration of having a condition that's often misunderstood. In addition to educating yourself about fibromyalgia, you may find it helpful to provide your family, friends and co-workers with information.

It's also helpful to know that you're not alone. Organizations such as the Arthritis Foundation and the American Chronic Pain Association provide educational classes and support groups. These groups can often provide a level of help and advice that you might not find anywhere else. They can also help put you in touch with others who have had similar experiences and can understand what you're going through.

11. Unum's handling of Mr. Hughes' disability claim is inconsistent with the industry standard for claims handling and, more particularly, the mandates of the *Report of the Targeted Multistate Market Conduct Examination* issued on 11/18/2004. The mandates stated in the *Report of the Targeted Multistate Market Conduct Examination,* in my opinion, correctly reflect the industry standard of care for claims handling.

12. The purpose of the Multistate Market Conduct Examination by the Insurance

21

1    Commissioner's of all 50 states was to determine if the disability income claim handling

2    practices of the UnumProvident Companies (Unum, Paul Revere, Provident Life and

3    Accident) reflected systemic "unfair claim settlement practices" as defined in the NAIC

4    *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the*

5    *Business of Insurance Model Act* (1972) or NAIC *Claims Settlement Practices Model*

6    *Act* (1990). Claims reviewed were selected from claims closed in 2002. The issues

7    identified by the Multistate Examination were judged to represent claim practices

8    common to all three UnumProvident Companies.

9    Areas of concern identified in the initial claim review included:

10        1. Excessive reliance upon in-house medical professionals

11        2. Unfair construction of attending physician or IME records

12        3. Failure to evaluate the totality of the claimant's medical condition

13        4. Inappropriate burden placed on claimants to justify eligibility for benefits.

14

15    Following completion of the initial claim review, the examination team met with representative of

16    the Companies in February 2004 to review the foregoing areas of concern as they related to specific

17    claims which had been identified for discussion. After additional explanation was provided by the

18    Companies, the examiners concluded that the level of claim handling errors identified was sufficient

19    to merit additional review and regulatory action.

20

21    An additional 75 claims were reviewed and subsequent meetings with the Companies'

22    representatives and the examination team resulted in a Plan of Corrective Action. In addition to a

23    $15,000,000 fine, the most significant provisions of the agreement included:

24

25        1. A reassessment of approximately 215,000 claims denied benefits

26        2. Changes in Claim Organization and Procedures

27

28    Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1     3.  Changes in corporate governance

2     4.  Quarterly Meetings between the Lead regulators and the Companies

3

4   Exhibit D of the Targeted Multistate Market Conduct Examination detailed specific changes

5   required in claim handling by UnumProvident companies:

6

7     1.  Give significant weight to evidence of an award of Social Security disability benefits as

8         supporting a finding of disability

9

10    2.  Obtain complete medical records needed for a claim decision

11

12    3.  Appropriately use in-house medical resources

13

14    4.  Contact an attending physician where circumstances warrant and fairly interpret and apply

15        information from the claimant's AP

16

17    5.  Obtain a field visit where circumstances warrant

18

19    6.  Conduct an occupational review, as appropriate

20

21    7.  Obtain an Independent Medical Evaluation (IME) or Functional Capacity Evaluation (FCE)

22        in appropriate circumstances and fairly interpret or apply the IME or FCE, without any

23        attempt to influence the impairment determination of professionals conducting the IME

24        and/or FCE

25

26    8.  Work with claimants to obtain specific information necessary to determine disability

27

28

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    9. Provide a fair and reasonable evaluation considering all available medical, clinical, and/or

2    vocational evidence both objective and subjective, bearing on impairment.

3

4    10. Classify disability under the mental and nervous limitation policy provisions appropriately

5

6    Additional concerns identified in Exhibit D included:

7

8    1. Reliance on lack of "objective" data or "objective" medical information as basis for claim

9    denial or termination of benefits

10

11   2. Faulty or overly restrictive interpretation or application of policy provisions, including

12   the definition of "occupation" in "own occupation" policies

13

14   3. Actions suggesting a pre-disposition of bias against the claimant

15

16   4. Threats to seek repayment of past benefits

17

18   5. Forcing claimants to seek legal counsel to obtain benefits

19

20   6. Evidence of any incentives provided to deny or terminate benefits

21

22   13. My opinions concerning Unum's handling of Mr. Hughes' disability claim are as

23   follows:

24                     i. Unum violated numerous industry standards which it was required to

25                        follow in order to arrive at a fair and balanced claim decision.  As a

26                        result Unum's violations of the standard of care, critical factual findings

27

28

24

1    were never made which, in my opinion, must be made in order to arrive

2    at a fair and objective claims decision.

ii.    More particularly, Unum never determined Mr. Hughes' actual job

3

4    duties and particular demands of his job as an insurance agent.   As

5    reflected on page UACL000671 of the claims file, on January 10, 2005,

6    Unum's own employee states, "Medical info support needed and

7    confirm occ duties."   Although Dr. Donna J. Carr, Unum's Medical

8    Director, determined that Mr. Hughes was able to work as a agent during

9    those times when he was not fatigued or sleepy, she is not a vocational

10    expert and never develops a factual basis on which to base her opinion

11    that working in this manner, in fact, was feasible. More specifically, Dr.

12    Carr and the other Unum employees working on Mr. Hughes' claim

13    failed to determine the particular demands of his occupation -- for

14    example, how often Mr. Hughes would have to be on the phone or

15    interact in person with clients and over what time period during the day,

16    whether it is practical or even possible for Mr. Hughes to schedule his

17    important job duties when he was not fatigued or sleepy or in too much

18    pain, whether he realistically could even predict in advance when he

19    would not be too fatigued, sleepy or suffering from pain to work.   Dr.

20    Carr, as stated, is not a vocational expert and is not competent to

21    determine that Mr. Hughes' profession as an insurance agent is such that

22    he can work successfully if he limits his work only to those time periods

23    when he is not too fatigued, sleepy or in pain -- which is what she

24    determined.   It appears that Dr. Carr's vocational determination was

25    adopted as a key part of Unum's rationale for the denial of the claim

26

27

28

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1    despite the fact that Unum never conducted an adequate vocational

2    analysis.

3    iii.  In my opinion, had Unum performed the type of occupational analysis

4         which is required by the standard of care, Unum would have clearly

5         understood that Mr. Hughes' job is stressful due to intensive competition

6         in insurance sales and would then have arrived at a realistic and fair

7         evaluation of the demands of his job. Without such an evaluation, as

8         stated, Unum failed to make critical factual findings on which to base a

9         fair and objective claims decision.

10    iv.  In my opinion, Unum demonstrated clear bias against finding a person

11        disabled based on a diagnosis of fibromyalgia.  As stated above, the

12        collection of citations to medical articles by Robert N. Anfield, the most

13        senior medical executive in the company, appears to contain citations

14        only to articles which cast doubt on the existence of fibromyalgia or its

15        disabling effects.  As stated above, the position that fibromyalgia is not a

16        genuine condition or is not disabling is contrary to medical literature,

17        court opinions and the statement of the American College of

18        Rheumatology which has recognized it as a legitimate disorder.  At least

19        one federal case to which Unum was a party, *Russell v. Unum*, cited

20        above, states that based on medical literature, fibromyalgia is a genuine

21        and medical condition which can be disabling.  As the court stated:

22    "The essence of Unum's argument is that fibromyalgia is not an objectively

23    diagnosable disease.  The courts disagree.  'Fibromyalgia is a type of

24    muscular or soft-tissue rheumatism that affects principally muscles and their

25    attachment to bones, but which is also commonly accompanied by fatigue,

26

27

28

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1     sleep disturbance, lack of concentration, changes in mood or thinking, anxiety

2     and depression.'"

3     As stated in the *Russell v. Unum* case, other courts have also recognized

4     fibromyalgia to be a genuine medical condition which can be disabling.

5     v.   It appears clear from the claims file that Unum's bias against finding

6          that fibromyalgia is a legitimate disorder effected its claim decision. On

7          May 2, 1998, Dr. Edward L. Auen, one of Mr. Hughes' treating

8          physicians, suspected fibromyalgia and stated that Mr. Hughes fits the

9          diagnosis of fibromyalgia and "probably has trigger points." Dr. Duong,

10         another of Mr. Hughes' treating physicians, advised Unum that he

11         believed Mr. Hughes suffered from fibromyalgia. Unum chose to reject

12         the diagnosis from Dr. Duong -- and did so without an IME consultation

13         to confirm its own in-house medical staff review.

14    vi.  Other evidence that Unum permitted bias and self-interest to impact this

15         claims decision is how Unum selectively cites to a purported lack of

16         findings in the medical records or makes assumptions to support its

17         denial but ignores substantial medical information which supports the

18         payment of the claim. As set forth in its letter to Mr. Hughes dated

19         March 22, 2005 (UACL000730-734), for example, Unum disregards the

20         statement of Dr. Auen that Mr. Hughes "probably has trigger points" and

21         that he suspected (even though he later believed that Mr. Hughes that

22         psoriatic arthritis  was the most likely diagnosis); Unum disregards the

23         observations of the field agent who witnessed Mr. Hughes' fatigue and

24         evidence of increasing difficulty functioning as well as Mr. Hughes'

25         description of the very extensive pain throughout his body; Unum

26         disregards the limitations and restrictions imposed by Dr. Duong as set

27

28

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1   forth in his Attending Physician Statement; Unum disregards Mr.

2   Hughes' own statement of his extensive symptoms and problems; Unum

3   disregards or dismisses the totality of co-morbid conditions effecting Mr.

4   Hughes; Unum falsely states that there is "no data indicating that [Mr.

5   Hughes] is having difficulty with daytime somnolence, decreased

6   concentration, or memory" (UACL00732) when Mr. Hughes has given

7   Unum multiple reports of these difficulties and they are recorded in the

8   medical records.   Unum then, for example, makes the unsupported

9   assumption that if Mr. Hughes really had cognitive deficits, he would

10  seek the services of a mental health care provider.   Another example of

11  Unum's selective citation of the medical evidence to justify its denial is

12  its citation of the comment by Dr. McKee in March of 2004 that Mr.

13  Hughes was "pleased" with the results from the CPAP machine to treat

14  his sleep apnea coupled with Unum's disregard of the significance of

15  reports of Mr. Hughes' consideration of surgery in February, 2005 to

16  treat the very same problem. (UACL00732)

17  vii.   The findings of the *Report of the Targeted Multistate Market Conduct*

18  *Examination*, described above, further support my opinion that, in this

19  case, Unum allowed its own self-interest to effect its claims decision.  In

20  my opinion, Unum's handling of Mr. Hughes' claim evidences the same

21  pattern of improper claims handling condemned by that *Examination*.

22  More particularly, for example, Unum exhibited an excessive reliance

23  upon in-house medical professionals who were at odds with the treating

24  physician as to the diagnosis of fibromyalgia and other medical issues;

25  Unum engaged in an unfair and self-serving construction of the

26  attending physician's records and statements, as stated in more detail

27

28

28

1      below, when Unum chose to interpret a treating doctor's silence as a

2      negative; Unum further failed to evaluate the totality of Mr. Hughes'

3      condition -- that is, how the combination of several different conditions

4      might impair his ability to work.

5      viii.   In my opinion, Dr. Anfield's citations to articles which only cast doubt

6      on both the legitimacy of a diagnosis of fibromyalgia and its

7      incapacitating nature is a particularly egregious example of Unum's

8      attempting to find a way to deny the claim. Dr. Anfield's collection of

9      only articles that would support a denial is particularly egregious

10     because it ignores subjective symptoms in violation of the mandate of

11     the *Report of the Targeted Multistate Market Conduct Examination*; it

12     also marginalizes the importance of a treating clinician's evaluation in

13     violation of the mandate of the *Report of the Targeted Multistate Market*

14     *Conduct Examination*.

15     ix.    In light of the fact that one treating physician had diagnosed Mr. Hughes

16     with fibromyalgia and another treating physician had suspected

17     fibromyalgia, if Unum had legitimate questions about this diagnosis, the

18     standard of care required that Unum obtain a rheumatological IME. In

19     my opinion, Unum violated the standard of care (as expressed in the

20     *Report of the Targeted Multistate Market Conduct Examination*), by

21     rejecting the opinions of treating physicians in favor of its own in-house

22     medical staff and not seeking a rheumatological IME to attempt to

23     resolve the disagreement.

24     x.     Although the standard of care requires that Unum contact an attending

25     physician where circumstances warrant and further require that Unum

26     fairly interpret and apply information obtained from the treating

27

28

29

1    physician, it is clear that Unum did not do so.  More particularly, when

2    Dr. Carr wrote Dr. Duong and asked "What, if anything, about his

3    medical condition impairs him from his previous level of activity?" (AR

4    SUM 0119) and Dr. Duong did not respond to the question, Unum chose

5    to interpret Dr. Duong's silence as indicating that his answer was

6    "Nothing."  In my opinion, it was clearly inconsistent with industry

7    standard to choose to interpret Dr. Duong's silence to mean that there is

8    nothing which impairs Mr. Hughes from performing his prior level of

9    activity.  Silence on the part of Dr. Duong is ambiguous and it is unclear

10   what it means.  Dr. Duong may have believed he had already answered

11   the question in the Attending Physician Statement or may possibly not

12   have understood the question as phrased or may have had some other

13   reason for not answering.  At that point, it was essential for Unum to

14   contact Dr. Duong to ascertain what his silence meant (if anything)

15   rather than choosing to interpret it in a manner which would support the

16   denial of the claim.  Unum's interpretation of Dr. Duong's silence to

17   support its denial is another example of Unum acting in its own financial

18   self-interest rather than fairly and objectively evaluating the claim.

19   xi.  In my opinion, Unum also violated industry standard by failing to

20        evaluate the totality of Mr. Hughes' medical condition.  Unum did not

21        consider the significant impact of Mr. Hughes' sleeping disorder within

22        the context of his pain, nor did they factor in the variability of his mental

23        disorder that is inconsistently controlled.  Unum clearly does not

24        consider the cumulative impact of the medical conditions on impairment;

25        rather, it uses a reductive approach to minimize each condition

26        individually.

27

28

30

Case No.:  C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

xii.  In my opinion and for the reasons stated above, from a claims standpoint and in light of the industry standard of care governing claims handling, it was unreasonable to deny Mr. Hughes' claim for disability benefits. Before Unum could reasonably deny benefits to Mr. Hughes, it had to perform a complete, fair and objective evaluation -- which it clearly never performed.

xiii.  In my opinion, based on the medical information in the claims file and my understanding of the occupation of an insurance agent -- an occupation with which I am quite familiar due to my work in the industry -- industry standard mandated the payment of Mr. Hughes' claim. (Unum, as stated, did not adequately evaluate Mr. Hughes' job duties and demands as an insurance agent.) There is abundant evidence of conditions, including sleep apnea, fibromyalgia, bi-polar disorder, which produce symptoms which would likely impair Mr. Hughes' ability to function effectively as an insurance agent. Unum has not identified any other appropriate job for which he would be suited in light of his medical condition, symptoms and limitations. Based on the information in the claims file, had Unum conducted an evaluation in conformity with industry standard, it would likely have concluded that Mr. Hughes was unable to perform the material and substantial duties of his occupation on a regular basis and of any other occupation for which he is suited.

31

Case No.: C 07-4088 PJH (E-FILING)
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

1

2

3

4   I declare under penalty of perjury under the laws of the State of California and the United States

5   of America that the above is true and correct.

6

7

8   Executed this 2nd day of August at Kittery, Maine.

9

10

11              John Sargent

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
DECLARATION OF JOHN SARGENT IN OPPOSITION TO MOTION FOR PARTIAL
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR
JUDGMENT UNDER RULE 52

**JOHN E. SARGENT**
603-502-4246                          jesargent1@comcast.net          129 Whipple Road
                                                                      Kittery, Maine  03904

| | |
|---|---|
| **CERTIFICATION/ LICENSURE** | NH Licensed Clinical Mental Health Counselor No. 501 <br> Certified Clinical Mental Health Counselor, #572, 1983, '88, '93, '98, '03 <br> Certified Rehabilitation Counselor, #15882, 1982, '87, '92, '97, '02, '07 <br> National Certified Counselor, #17925, 1988, '93, '98, '03 <br> Certified English Teacher (NY State), 1977 |
| **EDUCATION** | M.S. Rehabilitation Counseling, Syracuse University, May 1977 <br>        Thesis: "Vocational Counseling as an Adjunct Therapy in <br>              Methadone Maintenance Treatment Programs" <br> B.A. English, St. Lawrence University, May 1975 |
| **EXPERIENCE** | **Private Practice, Center for Personal Management**.  Provide clinical counseling, work & career counseling, strategic life planning, expert disability claim analysis and testimony.  January 2002 – present <br><br> **Director of Vocational and Clinical Resources.** UnumProvident, Portland, Maine. Directly supervised a team of 20 clinicians and vocational rehabilitation professionals who provided medical and vocational  expertise to the management of  LTD disability claims. Participated in department management meetings as part of the management team. 12/99 – 1/02 <br><br> **Head of New Business.** UnumProvident, Portland, ME. Accountable for the management of new UnumProvident LTD/ID/STD claims and the development and implementation of policies and procedures for the transition to impairment-based claims handling.  Supervised rehabilitation coordinators, nurses and the supervisor of administration. 6/99 – 12/99 <br><br> **Head of Claim Operations.**  Unum, Portland, ME. Responsible for the adjudication of Individual Disability Claims sold through Association, Brokerage, and Private Label distribution channels. Operational unit included five Vocational Case Managers, two Directors, six Operations Managers, and thirty-three Disability Benefit Specialists. Responsible for three operating budgets totaling seven million annually. 12/97 – 6/99 <br><br> **Director, Psychiatric Unit and Vocational Case Management.**  Unum. Directly managed five Rehabilitation Professionals, one operations manager, one psychiatric nurse, and three external, doctoral-level clinical consultants.  Had responsibility for the adjudication of individual disability psychiatric claims.  5/95 – 12/97 <br><br> **Director of Physical Medicine and Rehabilitation,** Exeter Hospital, Exeter, NH.  Had overall responsibility for the management of inpatient and outpatient rehabilitation services including physical therapy, occupational therapy, speech language pathology, injured worker rehabilitation programs, sports and orthopedic rehabilitation, cardiac |

1

rehabilitation, massage therapy, and functional restoration.  Controlled an operating budget in excess of $2,500,000 annually with a professional staff of 35 therapists and 8 support staff.  Negotiated and monitored 31 contracts for rehabilitation services at area treatment facilities and schools.  12/92 – 5/95

**Occupational Health Consultant.**  Provided disability management, medical claims coordination, comprehensive vocational rehabilitation, psychiatric case management, expert testimony, outplacement counseling, career counseling, and employee intervention services, as owner and principal of Occupational Health Systems   1984 – 1993

**Director of Rehabilitation Services.**  Mutual of New York, Syracuse, NY.  Was responsible for all aspects of rehabilitation programming for individual and group long-term disability claimants nationally. Managerial duties included the ongoing development and administration of a system to select, program, and place disabled policyholders drawn from a pool of 7,000 open claims.  Supervised professional rehabilitation staff and administered an annual budget of $300,000.  10/83 – 12/90

**Psychiatric Rehabilitation Counselor.**  Willard Psychiatric Center, Willard, NY.  Provided individual and group counseling to psychiatric patients.  Wrote comprehensive treatment plans and functioned as treatment team leader on a rotating basis with other treatment team professionals.  Worked 4 days each week on the admission team of a large inpatient facility and one day per week in a community mental health center.  5/79 – 10/83

**Vocational Rehabilitation Counselor.**  Office of Vocational Rehabilitation, Syracuse, NY.  Provided assessments of clients' disabling conditions, resulting limitations, residual skills and abilities, and employment and rehabilitation potential.  Developed long-range vocational rehabilitation plans and purchased and coordinated medical, psychological, vocational, and educational services.  10/77 – 5/79

**INTERNSHIPS**

Drug Abuse Counselor.  Crouse-Irving Memorial Hospital Detoxification Unit and Methadone Treatment Program.  Clients served were primarily heroin addicts and alcoholics.

Mental Health Counselor.  Syracuse Veterans Administration Hospital, Psychology Service.  Provided individual therapy and diagnostic services on a psychiatric unit.

Mental Health Counselor.  Willard Psychiatric Center Alcohol Treatment Unit.  Ran a Rational Emotive Therapy Group for alcoholics and provided individual counseling to alcoholics and psychiatric clients.

**PUBLICATIONS**

"Perspective of Individual Disability Insurance Case Management From the Insurance Industry," in, *The Neuropsychology of Malingering Casebook,* edited by Joel Morgan and Jerry J. Sweet.  In Press.

"Response to the Care Continuum in Traumatic Brain Injury,"    Special Issue of Rehabilitation Psychology, Vol. 34, No. 2.

"Disability Prevention and Rehabilitation in the Workplace," Proceeds of the First National Conference on the Prevention of Disabilities

"Rehabilitation & Insurance: Good Practice & Good Business," Health Insurance Association of America Monograph, August 1985, 1987

**PRESENTATIONS**    **"Effective Utilization of a Vocational Expert,"** ACI National Advanced Forum on Litigating Disability Insurance Claims, 3/2005, 2/2006

"Managing the Psychiatric Claim," John Hewitt & Associates Dynamics of Disability Seminar, Palm Springs, FL, February 23 – 25, 1998

"The Effective use of Functional Capacity Evaluations," Unum, August 29, 1996

"The Insurance Industry Perspective," The Insurance Conference to Establish Standards and Guidelines for the Assessment of Psychological Disability Duration, Treatment Protocols and Recovery Management, Georgetown University, Washington, DC, June 3, 1996

"Meeting the Challenge of Individual Disability Claims," Mid-West Claims Conference, Arlington Heights, IL, May 19 – 21, 1996

"Professional Angst: The new Disability," Insurance Industry Seminar, Boston, MA, April 29, 1996

"Creative Claim Practices that Work," LIMRA Annual National Conference, Miami Beach, FL, December 3 – 4 1991

"Disability Prevention and Rehabilitation in the Workplace," First National Conference on the Prevention of Disabilities, Syracuse University, May 19, 1988

"Rehabilitation of the Traumatically Brain Injured" (with Anthony Blumetti, Ph.D.) Central New York Health and Accident Claims Association, Syracuse, NY, April 1988

**MEDIA EXPOSURE**    In addition to involvement in creating numerous marketing videos, audio tapes, and articles, created the concept, edited the script, and was the focus of a two-minute television commercial broadcast nationally by ABC and ESPN for MONY Financial Services throughout 1988 and 1989. This commercial won an "Award for Excellence" from the Life Communicators Association in 1988.

**AWARDS**    **Employee of the Year,** MONY Financial Services, 1988

**Outstanding Service Award,** American Counseling Association, 1995